# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

## DALLAS DIVISION

THOMAS RICHARDS

*Plaintiff,*

*v.*

X Corp.

*Defendant*

Case No. _____

**DEMAND FOR JURY TRIAL**

Lisa Weingarten Richards, Esq.

VSB #96671

LWR Law Offices

2045 S Pleasant Valley Rd. #1098

Winchester, VA 22601

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

TABLE OF AUTHORITIES

Cases

Biden v. Knight First Amendment Institute at Columbia Univ., 141 S. Ct. 1220 (2021)..........53

BMW v. Gore, 517 U.S. 559 (1996).................................................................................90

Brandenburg v. Ohio, 395 U.S. 444 (1969)......................................................................55

Brentwood Academy v. Tennessee Secondary School Athletic Association,

  531 U.S. 288 (2001)......................................................................................7 *passim*

Carey v. Piphus, 435 U.S. 247 (1978)..............................................................................89

e-ventures Worldwide, LLC v. Google, Inc., 188 F. Supp. 3d 1265 (M.D. Fla. 2016)..........47, 64

Enigma Software Group USA, LLC v. Malwarebytes, Inc., 946 F.3d 1040 (9th Cir. 2019)..46, 64

Escola v. Coca-Cola Bottling Co., 24 Cal.2d 453 (1944)....................................................55

Gonzalez v. Google, 598 U.S. 617 (2023)........................................................................52

Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57 (1963)..........................................55

Herrera v. Valentine, 653 F.2d 1220 (8th Cir. 1981)........................................................75

Larson v. Valente, 456 U.S. 228 (1982)...........................................................................62

Mirabella v. Villard, 853 F.3d 641 (3d Cir. 2017)......................................................37, 38

Moody v. NetChoice, 603 U.S. 707 (2024).............................................................46 *passim*

Muratore v. M/S Scotia Prince, 845 F.2d 347 (1st Cir. 1988)......................................87, 90

Murthy v. Missouri, 603 U.S. 43 (2024)......................................................................36, 59

NetChoice, L.L.C. v. Paxton, 49 F.4th 439 (5th Cir. 2022)...................................45, 46, 53, 63

Packingham v. North Carolina, 137 S. Ct. 1730 (2017)......................................................52

Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819 (1995)..................................61

State Farm v. Campbell, 538 U.S. 408 (2003)..................................................................89

Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931)............................72

Whitney v. California, 274 U.S. 357 (1927).......................................................................54

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952)..................................................54

Zeran v. America Online, Inc., 129 F.3d 327 (4th Cir. 1997)...............................................44

Statutes

28 U.S.C. § 1331.................................................................................................10

28 U.S.C. § 1332.................................................................................................10

28 U.S.C. § 1367.................................................................................................11

28 U.S.C. § 1391(b)............................................................................................11

28 U.S.C. § 2201.................................................................................................78

42 U.S.C. § 1981............................................................................................76,78

42 U.S.C. § 1983....................................................................................10, 56, 88

42 U.S.C. § 1988...............................................................................................180

47 U.S.C. § 230(c)(2)(A)..............................................................................7 *passim*

Rules

Other Authorities

Executive Order, "Restoring Freedom of Speech and Ending Federal Censorship,"

 90 Fed. Reg. 5273 (Jan. 28, 2025)...............................................................7, 56

Restatement (Second) of Torts § 908 (1979)......................................................90

Texas Deceptive Trade Practices Act § 17.45(4)................................................67

Texas Deceptive Trade Practices Act § 17.46(a)................................................68

Texas Deceptive Trade Practices Act § 17.46(b)(5)...........................................68

Texas Deceptive Trade Practices Act § 17.46(b)(7)...........................................68

Texas Deceptive Trade Practices Act § 17.46(b)(12).........................................68

Texas Deceptive Trade Practices Act § 17.46(b)(24).........................................68

Texas Deceptive Trade Practices Act § 17.50(b)(1)...........................................70

Texas Deceptive Trade Practices Act § 17.50(c)................................................70

**NOTICE REGARDING SUPPLEMENTAL EXHIBITS**

Due to the emergency nature of these proceedings, Plaintiff files this Complaint with detailed factual allegations that will be further supported by exhibits to be filed forthwith as a supplement to this filing.

Plaintiff Thomas Richards ("Mr. Richards" or "Plaintiff"), by and through his undersigned counsel, hereby files this Complaint against Defendant X Corp. ("X" or "Defendant") and alleges as follows:

**INTRODUCTION**

1. This case presents a straightforward application of well-established constitutional principles to an unprecedented factual scenario. For over 16 years, Mr. Richards has maintained a compliant account on X's platform (@tlthe5th), sharing religious expression with his steadily increasing follower count (approximately 3,800 for several years now) through more than 61,600 posts. Despite full compliance with all platform rules, Plaintiff's content has been subjected to "shadowbanning", including severe account suppression, mass content deletion, and discriminatory API restrictions, effectively silencing his unique religious voice.

2. The term "shadowbanning" refers to a sophisticated form of digital censorship where a platform covertly limits a user's content visibility without their knowledge or consent. While often executed through algorithmic means, these algorithms are designed, deployed, and maintained by human decision-makers who determine which accounts to target and what criteria warrant suppression. As former Twitter Head of Trust and Safety

Yoel Roth admitted, content moderation decisions often involve direct human targeting, explaining that moderators could attach "free-text notes" to accounts with instructions like "don't unban them without checking with me first."[1] Unlike outright account suspension, shadowbanning creates an insidious form of suppression where the affected user can still post content, but that content is systematically hidden from or shown to dramatically fewer followers and other platform users.

3.   Shadowbanning encompasses multiple technical mechanisms including: algorithmic throttling (reducing content distribution), search banning (preventing content from appearing in search results or suggestions), visibility filtering (hiding content from feeds, hashtags, and trending sections), engagement limitation (restricting likes, shares, and comments), and selective content removal (deleting specific posts or media without notification). The practice can involve accounts being flagged with terms such as "Trends Blacklisted" and "Search Blacklisted" ensuring the user cannot publicly trend or show up in search results.[2] Common signs include reduced engagement, content not appearing when viewed from different accounts, and other users reporting they no longer see the affected account's content.[3] The defining characteristic of shadowbanning is its deliberate opacity--users receive no notification of suppression and are given no opportunity to appeal these restrictions. This allows platforms to systematically shape opinions and control discourse while appearing neutral to outside observers, as moderation can be

---

[1] *Musk Says X Will Address Shadowbanning Soon, But Former Trust & Safety Exec Explains Why That Will Be Difficult*, TECHCRUNCH (Aug. 17, 2023), https://techcrunch.com/2023/08/17/musk-says-x-will-address-shadowbanning-soon-but-former-trust-safety-exec-explains-why-that-will-be-difficult/.

[2] *Shadow Banning*, WIKIPEDIA, https://en.wikipedia.org/wiki/Shadow_banning (last visited Apr. 10, 2025).

[3] What Is a Shadowban and Why Does It Matter?, BUILT IN (Jan. 14, 2022), https://builtin.com/articles/shadowban.

applied to accounts on all sides of an issue while still achieving a targeted effect.[4] The practice enables platforms to create the illusion of free speech while actually silencing targeted viewpoints through sophisticated technological means that are nearly impossible to detect without insider access or statistical analysis.

4. The Court's intervention is urgently needed because under the clear precedent of *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), when a private entity becomes "entwined" with governmental authority, it becomes subject to constitutional constraints. And here, the link is even tighter. X's owner and controller, Elon Musk, simultaneously holds significant federal authority as a Special Government Employee heading the Department of Government Efficiency ("DOGE"), created by executive order on President Trump's first day in office (https://www.whitehouse.gov/presidential-actions/2025/01/establishing-and-implementing-the-presidents-department-of-government-efficiency/). This entwinement is further cemented by extraordinary financial ties -- Musk invested approximately $300 million to help elect Trump, and his companies have received over $15.4 billion in government contracts.[5]

5. Although recent reports suggest Mr. Musk may soon leave his governmental position, this timing -- occurring immediately after receipt of Plaintiff's demand letter -- appears transparently strategic and does not negate the constitutional violations that have occurred while he exercises official authority. Moreover, Musk's extraordinary

---

[4] *How Shadow Banning Can Silently Shift Opinion Online*, YALE SCH. OF MGMT. (May 9, 2024), https://insights.som.yale.edu/insights/how-shadow-banning-can-silently-shift-opinion-online.
[5] *Elon Musk Has Grown Even Wealthier Through Serving Trump's Administration*, CAMPAIGN LEGAL CTR. (Mar. 13, 2025), https://campaignlegal.org/update/elon-musk-has-grown-even-wealthier-through-serving-trumps-administration.

government access will continue regardless of formal title, as evidenced by his: a) ongoing Top Secret security clearance, b) high-profile visits to the Pentagon, NSA, and CIA within a single month (March-April 2025), and c) documented back-channel communications with defense leadership.

6. The systematic suppression of Mr. Richards' religious speech through sophisticated algorithmic techniques or manual censorship is not protected by Section 230 of the Communications Decency Act, which only immunizes actions "voluntarily taken in good faith to restrict access to or availability of material." X's deceptive practices -- publicly denying shadowbanning while simultaneously engaging in it -- fail the statute's explicit "good faith" requirement, especially when senior legal leadership explicitly denies the very practices the company is implementing.

7. Musk's actions as both government official and platform owner also directly violate the January 20, 2025 Executive Order on "Restoring Freedom of Speech and Ending Federal Censorship,"[6] which explicitly prohibits federal government officials from "engag[ing] in or facilitat[ing] any conduct that would unconstitutionally abridge the free speech of any American citizen." As a Special Government Employee heading DOGE, Musk is bound by Section 3(a) of this Executive Order, which states that "No Federal department, agency, entity, officer, employee, or agent may act or use any Federal resources in a manner contrary to section 2 of this order." His systematic suppression of Mr. Richards'

---

[6] Exec. Order No. 14,149, "Restoring Freedom of Speech and Ending Federal Censorship," 90 Fed. Reg. 5273 (Jan. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/restoring-freedom-of-speech-and-ending-federal-censorship/.

religious expression while simultaneously exercising governmental authority creates liability under both this Executive Order and the First Amendment.

8. And the constitutional concerns in this case transcend Musk's formal title, as demonstrated by his documented pattern of extraordinary government access:

a. Musk has maintained a "Top Secret" security clearance since at least 2022, providing him classified national security access years before the current administration.

b. Within a single month (March-April 2025), Musk conducted high-profile visits to the Pentagon, National Security Agency, and Central Intelligence Agency - access rarely granted even to elected officials.

c. When departing the Pentagon on March 21, 2025, Musk was overheard telling Defense Secretary Hegseth, "If there's anything I can do to be helpful, I'd like to see you" - explicitly establishing a back-channel that will continue regardless of formal position.[7]

d. This established pattern of intelligence agency access, coupled with Musk's explicit commitment to maintain direct communication with defense leadership, renders any nominal "departure" from DOGE legally irrelevant to the constitutional analysis.

9. On March 31, 2025, Plaintiff's counsel sent a detailed demand letter to X outlining the unlawful suppression and requesting immediate remediation. Rather than addressing

---

[7] Pete Hegseth Says He's Meeting Elon Musk at Pentagon to Discuss Efficiencies, ABC7 N.Y. (Mar. 21, 2025), https://abc7ny.com/post/pete-hegseth-says-hes-meeting-elon-musk-pentagon-discuss-efficiencies/16061808/.

these concerns, X escalated its targeting of Mr. Richards by purging his account of thousands of media files just days after receiving the demand letter -- a clear pattern of retaliation that further demonstrates the willful and intentional nature of the discrimination.

10.  This lawsuit seeks both immediate injunctive relief to restore Mr. Richards' full platform access and substantial damages for years of targeted religious discrimination that has caused quantifiable monetary and mission-related harm.

**PARTIES**

11.  Plaintiff Thomas Richards is a natural person and resident of Virginia. Mr. Richards attended Catholic church as a child at his aunt's suggestion when he expressed interest in learning about God. He was formally confirmed in the Catholic faith (as documented in a photo at https://spirituallysmart.com/igotsavededit.html). In March 1997, several years after his US Navy service, he experienced a profound spiritual conversion, becoming a born-again believer in Jesus Christ through a powerful, life-changing supernatural encounter with God. This transformative experience has informed all of his subsequent work, including his biblically-guided critiques of corruption and injustice in world systems and his former Catholic faith. Mr. Richards' approach to examining societal issues is deeply rooted in his sincerely held religious convictions and his understanding of biblical teachings about speaking truth to power.

12.  Mr. Richards has maintained an account on X's platform (@tlthe5th) for approximately 16 years, where he shares content expressing his sincerely held religious beliefs. He serves as the founder, sole author, and administrator of SpirituallySmart.com, a website

created around the year 2000 dedicated to sharing bible messages, historical research, spiritual insights, personal growth, and self-improvement content. He also is involved with other related projects including, #OvertPsyops, which he founded in February 2025. #OvertPsyops is a multifaceted educational initiative that includes published research, a book, artwork, and AI development work drawing on biblical wisdom and contemporary analysis to promote transparency about psychological influence operations in the digital age, ultimately serving the broader benefit of humanity.

13. Defendant X Corp. is a corporation organized under the laws of Nevada with its principal place of business in Bastrop, Texas. In September 2024, X officially relocated its headquarters from San Francisco to Bastrop, Texas, according to records filed with the California Secretary of State. X owns and operates the social media platform formerly known as Twitter, which serves as a critical public forum for communication in the digital age. X conducts substantial business in Texas, maintains users throughout Texas, and derives significant revenue from Texas users. X's updated Terms of Service that took effect on November 15, 2024, expressly designate the Northern District of Texas as its chosen venue for litigation, specifying that "all disputes related to X must exclusively be brought in the Northern District of Texas or state courts in Tarrant County."

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the First Amendment to the United States Constitution, and Section 230 of the Communications Decency Act. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity), as Plaintiff is a citizen of Virginia, Defendant X

Corp. is incorporated in Nevada with its principal place of business in Texas, and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

15.  This Court has personal jurisdiction over Defendant because X maintains continuous and systematic contacts with the State of Texas, conducts substantial business in Texas and has millions of Texas users. X has purposefully directed its online platform and content moderation practices at Texas residents, who comprise a significant portion of its user base.

16.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and X's own updated Terms of Service, which explicitly designate the Northern District of Texas as the exclusive venue for all disputes related to X. Furthermore, X has its principal place of business in Texas and has expressly consented to venue in this district through its Terms of Service that took effect on November 15, 2024.

## FACTUAL BACKGROUND

### A. Plaintiff's Religious Expression on X's Platform

17.  Plaintiff has maintained a compliant account on X's platform (@tlthe5th) for approximately 16 years, amassing approximately 3,800 followers and sharing over 61,600 posts expressing his sincerely held religious beliefs.

18.  Plaintiff's content primarily focuses on: 1) unique spiritual insights that draw upon but transcend historically Protestant theological perspectives, 2) institutional critique and commentary on social issues from a biblical viewpoint, 3) bible messages relating to modern life and society including a strong usage of AI, and 4) his own artwork and

media. According to several online sources, his following exceeds 98% of all X users, demonstrating the significant audience he had built before the suppression began and despite the suppression.[8]

19.  For over 28 years, he has worked as an independent researcher, blogger, and commentator, sharing his perspective on spiritual intelligence and philosophy. He has developed his expertise through self-directed study, and reviews of his work have drawn comparisons to figures like Nikola Tesla due to his autodidactic, innovative approach and original thinking.

20.  Despite having no college degree and minimal formal education beyond high school, he has dedicated his online presence to spreading his bible messages and conducting impactful religious-based advocacy and humanitarian work. His self-taught abilities demonstrate how dedication to sharing an important message can overcome limited format education. Around the year 2000, he taught himself HTML coding to create a website for his spiritual content when such skills were less common among non-professionals and tutorials were scarce. He also created macros in AOL chatrooms to share biblical messages -- a notable technical accomplishment for that period.

21.  His advocacy work has shown both compassion and technical competence. In 2005, during the nationally significant Terri Schiavo case, he learned to use complex messaging software--known for its challenging interface--to reach decision-makers in an effort to save her life. This showed his determination and ability to overcome technical barriers

---

[8] *E.g.* Have 1,000 Followers? You're in the 96th Percentile of Active Twitter Users, ENTREPRENEUR (Dec. 19, 2013), https://www.entrepreneur.com/science-technology/have-1000-followers-youre-in-the-96th-percentile-of/230487

when motivated by his convictions. His digital advocacy continued in 2013 when he created a Facebook page supporting Miriam Carey, an unarmed young mother killed by DC police after making a wrong turn with her baby in the backseat. The page gained 30,000 followers, raising awareness for the case before he transferred the platform to the victim's sister to continue the advocacy. Despite these significant achievements in digital ministry and advocacy, Mr. Richards embodies humility in his work, consistently directing all praise to God rather than claiming personal credit. His unwavering faith guides his efforts, and he views his technical and advocacy accomplishments merely as vehicles through which divine purpose is fulfilled.

22.  At no time has Mr. Richards violated X's Terms of Service or engaged in any conduct that would justify content restriction under X's published policies. To the contrary, Plaintiff's religious expression falls squarely within protected speech categories that X publicly claims to support. Furthermore, Mr. Richards was a paid Premium subscriber for approximately 18 months, beginning as soon as the service became available, specifically subscribing based on X's promise that Premium members would receive prioritized visibility for their content.[9]

23.  X has systematically limited Mr. Richards' reach on its platform over an extended period (with similar patterns observed across other major online platforms). Documentation of these censorship practices is available on his website.[10] Mr. Richards previously maintained consistent engagement metrics online of several hundred to several thousand

---

[9] *X Premium*, X HELP CTR., https://help.x.com/en/using-x/x-premium (last visited Apr. 10, 2025).
[10] Thomas Richards, *Censorship Documentation*, SPIRITUALLYSMART.COM, https://spirituallysmart.com/censorship.html.

views per online post, and thousands of hits to his website each week, but this
engagement has progressively diminished to often fewer than ten views per post.

24.  The precipitous decline in visibility cannot be reasonably attributed to organic behavior
but rather indicates deliberate and targeted suppression by X. Independent third-party
analytical services designed to detect algorithmic suppression have confirmed that Mr.
Richards' content has been subject to visibility restrictions. Furthermore, both X's
proprietary AI system, Grok, and the Brave AI system have independently verified that
Mr. Richards' account has been subjected to shadowbanning and suppression.

25.  Statistical analysis and reasonable inference support this conclusion -- Mr. Richards'
account demonstrated a pattern of exponential growth in viewership which subsequently
experienced an abrupt and dramatic decline despite no substantive changes to his content
strategy or posting methodology. The only reasonable explanation for this pattern is that
X has implemented internal measures to restrict the distribution of his content to his
subscriber base.

**B. Cross-Platform Suppression of Religious Content and Vatican Influence**

26.  There exists a clear correlation between the censorship Mr. Richards has experienced on
X and elsewhere online, including YouTube, Facebook, Google, etc. His viewership
metrics on multiple platforms declined concurrently, particularly for his religious
documentary content critiquing the Vatican institution. YouTube has restricted his content

citing inaccurate grounds, while simultaneously permitting unauthorized duplicates of this same content on other channels without imposing similar restrictions.[11]

27. The timing of YouTube's restrictive actions coincides notably with censorship on X -- this precipitous decline in viewership occurred immediately following significant mainstream media attention received by Mr. Richards' documentary. Specifically, the content was referenced in a news article addressing the Vatican's opposition to it.

28. The article in question, published by The Independent in 2009, concerned the Vatican's establishment of a YouTube channel and stated: "Type 'Vatican' into YouTube's search engine and... the second [result] argues that 'Nazi Germany was a creation of the Vatican and the Jesuits'. Now the Vatican has the means to fight back."[12] The public attention generated by such prominent coverage would logically increase traffic to Mr. Richards' content, particularly as it was already experiencing rapidly growing popularity. Instead, the established growth trajectory was abruptly reversed, resulting in an almost complete cessation of visits to his online content. This pattern of engagement cannot reasonably be attributed to organic user behavior.

29. The statements contained in the article and public reporting document a pattern of coordinated content restriction privileging the Vatican's perspective over Mr. Richards' religious viewpoint. During a 2016 meeting, Eric Schmidt explicitly promised Pope

---

[11] Thomas Richards, Nazi Germany - A Creation of the Vatican and Jesuits (CENSORED by YOUTUBE/GOOGLE), YOUTUBE (Feb. 12, 2017), https://www.youtube.com/watch?v=e9zBX4gt0eo&t=17s; cf. Nazi Germany - A Creation of the Vatican and Jesuits, YOUTUBE, https://www.youtube.com/watch?v=7Un4SP8Z4rc (demonstrating identical content posted by another user without similar restrictions).

[12] The Independent, "Vatican launches YouTube channel," available at https://www.independent.co.uk/news/world/europe/vatican-launches-youtube-channel-1514238.html.

Francis, "I want to work with you to make these points... We will make it happen,"[13] indicating his commitment to cooperate with the Vatican in suppressing online content deemed objectionable by the Vatican, including content addressing clerical sexual abuse of children.

30. This documented commitment to cooperate with Vatican messaging priorities provides critical context for the institutional strategy to suppress criticism of its handling of abuse scandals. In 2021, Pope Francis directly demanded tech companies censor content "in the name of God," stating: "I ask the technology giants to stop exploiting human weakness, people's vulnerability, for the sake of profits without caring about the spread of hate speech, grooming, fake news, conspiracy theories, and political manipulation."[14]

31. The Vatican's aggressive stance against online criticism coincides with both Pope Benedict XVI and Pope Francis repeatedly invoking sovereign immunity to avoid accountability in abuse cases across multiple jurisdictions. Vatican officials explicitly stated that "Pope Benedict cannot be called to testify at any sexual abuse trial because he has immunity as a head of state,"[15] while Pope Francis' Holy See specifically invoked "sovereign immunity" to spare Cardinal Luis Ladaria Ferrer from prosecution in France while publicly praising another accused cardinal as "brave."[16] A Reuters report confirmed

---

[13] Rome Reports, "Pope Francis meets with Google executive Eric Schmidt," January 15, 2016, available at https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/.

[14] Washington Times, "Pope Francis begs social media firms to block fake news, conspiracy theories, 'hate,'" October 19, 2021, available at https://www.washingtontimes.com/news/2021/oct/19/pope-francis-begs-social-media-firms-block-fake-ne/.

[15] See Philip Pullella, Pope Has Immunity in Abuse Trials: Vatican, REUTERS (Apr. 1, 2010), https://www.reuters.com/article/us-pope-abuse/pope-has-immunity-in-abuse-trials-vatican-idUSTRE62U5RF20100401/ (reporting statements by Giuseppe dalla Torre, head of the Vatican's tribunal, that "Pope Benedict cannot be called to testify at any sexual abuse trial because he has immunity as a head of state").

[16] Pope Francis' Early Blind Spot on Sex Abuse Threatens Legacy, PBS NEWSHOUR (Dec. 27, 2018), https://www.pbs.org/newshour/world/pope-francis-early-blind-spot-on-sex-abuse-threatens-legacy (reporting that

the Vatican (under Pope Benedict) had used this legal shield to protect itself from "any attempt to prosecute [the Pope] in connection with sexual abuse cases around the world,"[17] demonstrating a consistent pattern across both papacies of using diplomatic immunity to evade legal accountability for abuse cases.

32.  Pope Francis' public commitment to addressing abuse stands in stark contrast to his actions. In 2018, he initially condemned victims in Chile as engaging in slander and "calumny" when they accused Bishop Juan Barros of covering up abuse, angrily stating, "The day they bring me proof against Bishop Barros, I'll speak. There is not one shred of proof against him. It's all calumny. Is that clear?"[18] When victim Juan Carlos Cruz attempted to respond to the Pope's dismissal, he asked, "As if one could have taken a selfie or photo while Karadima abused me and others while Barros stood by."[19] Francis' dismissive attack on victims was so problematic that Cardinal Sean Patrick O'Malley, his own key Vatican advisor on clergy abuse, acknowledged that Francis' comments were "a source of great pain" for victims.

33.  In 2023, one of Pope Francis' own top abuse advisors, Father Hans Zollner, dramatically resigned from the Pontifical Commission for the Protection of Minors, citing urgent

---

"The Holy See invoked sovereign immunity to spare Spain's Cardinal Luis Ladaria Ferrer" from prosecution in a cover-up trial in France).

[17] Philip Pullella, *Pope Will Have Security, Immunity by Remaining in the Vatican*, REUTERS (Feb. 15, 2013), https://www.reuters.com/article/us-pope-resignation-immunity/pope-will-have-security-immunity-by-remaining-in-the-vatican-idUSBRE91E0ZI20130215/ (reporting that Benedict's decision to live in the Vatican after resigning would "offer legal protection from any attempt to prosecute him in connection with sexual abuse cases around the world").

[18] Bill Chappell, *Pope Francis Accuses Bishop's Critics Of Slander, Riling Sex Abuse Victims In Chile*, NPR (Jan. 19, 2018), https://www.npr.org/sections/thetwo-way/2018/01/19/579079786/pope-francis-riles-many-in-chile-by-accusing-bishops-critics-of-slander (reporting Pope Francis' angry defense of Bishop Barros and quoting victim Juan Carlos Cruz's response: "As if one could have taken a selfie or photo while Karadima abused me and others while Barros stood by").

[19] *Id.*

"structural and practical issues" that made it "impossible" for him to continue further. In his resignation statement, he wrote that he had "grown increasingly concerned with how the commission, in my perception, has gone about achieving that goal, particularly in the areas of responsibility, compliance, accountability and transparency."[20]

34.  In the same year, Pope Francis described sex abusers as "children of God" "deserving of love,"[21] further demonstrating his prioritization of institutional protection over accountability. This pattern of institutional resistance to accountability, coupled with explicit efforts to influence tech platforms' content moderation, provides the essential context for understanding Mr. Richards' experience of censorship on X following Musk's own 2022 meeting with Pope Francis, which Musk described as an "honor."[22]

35.  Throughout this period, Mr. Richards has consistently endeavored to expose alleged wrongdoing perpetrated globally by this powerful institutional entity that has operated with impunity for decades, becoming increasingly emboldened in its actions. Mr. Richards' unique resolve and conviction, which God has provided him, have enabled him to confront these institutional practices when others have been unwilling or unable to do so.

36.  Mr. Richards' research on Pope Francis' connections to individuals with Nazi ties is particularly significant. His investigations have uncovered specific connections: (1) Ivan

---

[20] Carol Glatz, Jesuit Sex Abuse Expert Hans Zollner Resigns from Papal Commission Over "Urgent Concerns", AM. MAG. (Mar. 29, 2023), https://www.americamagazine.org/faith/2023/03/29/jesuit-expert-sex-abuse-244992 (reporting that Zollner stated: "In my work with the commission, I have noticed issues that need to be urgently addressed and which have made it impossible for me to continue further").

[21] New York Post, "Pope Francis calls sex abusers 'children of God' deserving of love," May 11, 2023, available at https://www.nypost.com/2023/05/11/pope-calls-sex-abusers-children-of-god-deserving-of-love/.

[22] Elon Musk (@elonmusk), "Honored to meet @Pontifex yesterday," Twitter, July 2, 2022, available at https://twitter.com/elonmusk/status/1543050489050402816.

Buchko was a Ukrainian Greek Catholic hierarch who organized the escape of the entire Waffen-SS Galitsia Division to South and North America after WWII;[23] (2) Stefan Czmil was ordained a priest on October 14, 1945, by Ivan Buchko;[24] and (3) Jorge Mario Bergoglio (now Pope Francis) was ordained as a Jesuit priest on December 13, 1969, with Stefan Czmil serving as his spiritual father and tutor. This documented chain of connection between Pope Francis and those who facilitated the escape of Nazi war criminals represents precisely the type of information that powerful institutions would have a vested interest in suppressing.

37.  Additional documentary evidence shows Eric Schmidt meeting with the Pope in an apparently cordial exchange.[25] The connection between X's censorship practices and those of Google/YouTube is further substantiated by information obtained through Freedom of Information Act requests in separate litigation involving social media censorship.[26] Published reports and photographic evidence document meetings between Mr. Musk and the Pope in 2022.[27] Following these interactions, Mr. Richards observed an intensification of censorship on X, as detailed more comprehensively in subsequent sections of this complaint.

---

[23] Wikipedia, "Ivan Buchko," available at https://en.wikipedia.org/wiki/Ivan_Buchko.
[24] Wikipedia, "Stefan Czmil," available at https://en.wikipedia.org/wiki/Stefan_Czmil.
[25] Pope Francis Meets with Google Executive, Eric Schmidt, ROME REPORTS (Jan. 15, 2016), https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/ (showing video of Schmidt telling Pope Francis "I want to work with you to make these points... We will make it happen").
[26] RFK Jr. Wins Deferred Injunction in Vax Social Media Suit, BLOOMBERG L. (Mar. 24, 2023), https://news.bloomberglaw.com/litigation/rfk-jr-wins-deferred-injunction-in-anti-vax-social-media-suit; Kennedy v. Biden, No. 3:23-cv-00381 (W.D. La. filed Mar. 24, 2023), https://www.bloomberglaw.com/public/desktop/document/KennedyetalvBidenetalDocketNo323cv00381WDLaMar242023CourtDocket/1?doc_id=X5U91VUV3IH8CM9PCJFATSG3B6L.
[27] Elon Musk (@elonmusk), TWITTER (July 2, 2022, 3:54 AM), https://twitter.com/elonmusk/status/1543050489050402816 ("Honored to meet @Pontifex yesterday"); see also Elon Musk Breaks Twitter Silence to Post Photo of Himself and 4 of His Sons with Pope Francis, REUTERS (July 2, 2022), https://www.reuters.com/technology/musk-breaks-silence-twitter-posts-picture-with-pope-2022-07-02/ (reporting on Musk's meeting with Pope Francis and the photo he shared).

38.  Mr. Richards' censored religious speech documents institutional practices that, if widely known, would likely cause practicing Catholics to remove their children from church environments to protect them from potential abuse. His research on Pope Francis' connections to individuals with Nazi ties, coupled with evidence of the Vatican's systematic mishandling of abuse cases, provides a clear motive for the coordinated cross-platform suppression he has experienced. The systematic censorship directly prevents this crucial protective information from reaching parents and families.

39.  This documented pattern of coordinated cross-platform suppression targeting religious critique of powerful institutions provides critical context for understanding Mr. Richards' current censorship on X. In January 2009, the Vatican launched its YouTube channel through a special partnership with Google, where Google's Managing Director of European Sales personally attended the Vatican's press conference to announce the collaboration.[28] This was the first time, and only time to date, that Google has partnered with a religious institution on YouTube.[29] When searching "Vatican" on YouTube prior to this partnership, the second result was Mr. Richards' documentary arguing that "Nazi Germany was a creation of the Vatican and the Jesuits." The Independent explicitly reported: "Now the Vatican has the means to fight back."[30]

40.  This preferential treatment by YouTube against Mr. Richards' religious critique parallels the current censorship on X, where similar suppression increased after Musk's 2022

---

[28] Spokesman-Review, "Vatican going digital with YouTube channel," January 24, 2009, available at https://www.spokesman.com/stories/2009/jan/24/vatican-going-digital-with-youtube-channel/.
[29] Catholic News Agency, "Pope channel makes debut on YouTube," available at https://www.catholicnewsagency.com/news/14866/pope-channel-makes-debut-on-youtube.
[30] The Independent, "Vatican launches YouTube channel," available at https://www.independent.co.uk/news/world/europe/vatican-launches-youtube-channel-1514238.html.

meeting with Pope Francis, which Musk described as an "honor." President Trump, like Musk, has repeatedly expressed admiration for the Pope, calling their meeting "the honor of a lifetime" and stating: "Thank you. Thank you. I won't forget what you said."[31]

41.  Most recently in January 2025, Pope Francis sent Trump a message for his inauguration offering "divine blessings upon the beloved American people."[32] When considered alongside Musk's simultaneous role as both platform owner and government official, this pattern of deference to the Vatican by both platform owners and government officials more broadly provides compelling evidence that Mr. Richards' religious expression is being systematically targeted based on its content rather than any neutral application of platform policies.

42.  Upon information and belief, individuals in positions of institutional influence across media platforms, including X, have engaged in coordinated content restriction practices that align with concerns about unaccountable power structures previously identified by President Kennedy in his 1961 address on freedom of the press. President Kennedy warned: "We are opposed around the world by a monolithic and ruthless conspiracy that relies primarily on covert means for expanding its sphere of influence--on infiltration instead of invasion, on subversion instead of elections, on intimidation instead of free choice, on guerrillas by night instead of armies by day. It is a system which has conscripted vast human and material resources into the building of a tightly knit, highly

---

[31] NBC News, "Trump Trip: President Arrives at Vatican to Meet Pope Francis," available at https://www.nbcnews.com/storyline/trump-s-first-foreign-trip/trump-trip-president-arrives-vatican-meet-pope-francis-n763911.
[32] Vatican News, "Pope Francis telegram for inauguration of US President Trump," January 2025, available at https://www.vaticannews.va/en/pope/news/2025-01/pope-francis-telegram-for-inauguration-of-us-president-trump.html.

efficient machine that combines military, diplomatic, intelligence, economic, scientific and political operations."[33]

43.   Kennedy further elaborated on the methods of such operations: "Its preparations are concealed, not published. Its mistakes are buried, not headlined. Its dissenters are silenced, not praised. No expenditure is questioned, no rumor is printed, no secret is revealed."[34] This historic warning provides essential context for understanding the sophisticated cross-platform censorship mechanisms targeting Mr. Richards' religious speech. Like the "dissenters" Kennedy referred to, Mr. Richards has been systematically "silenced" through technological means when attempting to expose institutional wrongdoing. Within two years of delivering this speech, Kennedy himself was assassinated -- a sobering reminder of the potential consequences faced by those who challenge entrenched systems of power and secrecy.[35]

**B. Statistical Evidence of Systematic Suppression**

44.   Plaintiff's account exhibits unmistakable signs of account throttling that cannot be explained by random variation or neutral content moderation:

---

[33] *See* President John F. Kennedy, Address: The President and the Press, American Newspaper Publishers Association (Apr. 27, 1961), available at https://www.jfklibrary.org/archives/other-resources/john-f-kennedy-speeches/american-newspaper-publishers-association-19610427 (warning about "a monolithic and ruthless conspiracy that relies primarily on covert means for expanding its sphere of influence").

[34] *Id.* (describing how such systems operate by concealment rather than transparency).

[35] *See* JFK Assassination Records - 2025 Documents Release, NAT'L ARCHIVES (Mar. 18, 2025), https://www.archives.gov/research/jfk/release-2025 (announcing the release of previously classified records related to President Kennedy's assassination).

a.  While industry data from Statista indicates the average X post receives 2,121 impressions,[36] and accounts with 3,000-4,000 followers typically receive at least 300-800 views per post, Plaintiff's posts receive only approximately 9-50 "views" each -- reflecting a 98% reduction from typical engagement benchmarks.

b.  Platform analytics show certain posts from as far back as 2011 with either zero or near-zero impressions over 14 years despite being from an account with 3,800 followers -- a mathematical impossibility absent deliberate technical intervention.[37]

c.  Posts containing graphics, which X's own algorithm is stated to prioritize,[38] receive identical or greater suppression compared to text-only posts, demonstrating viewpoint-based rather than content-based filtering.

d.  Independent technical analysis confirms account throttling rather than natural performance variation, with AI-powered engagement analysis identifying 97.8% throttling based on platform-specific distribution algorithms and follower interaction patterns.

---

[36] Average Number of Impressions per Post on Twitter Worldwide from January 2023 to June 2023, STATISTA (July 2023), https://www.statista.com/statistics/1483819/x-twitter-average-impressions-posts/ (reporting global average impression counts for posts on the platform).

[37] Thomas Richards (@tlthe5th), X (Mar. 23, 2025, 2:14 PM), https://x.com/tlthe5th/status/1906366750871916562 (showing analytics data with near-zero impressions despite 3,800 followers).

[38] See How the Twitter Algorithm Works in 2025 and How to Make It Work for You, SOCIALBEE (Feb. 10, 2025), https://socialbee.com/blog/twitter-algorithm/ (explaining X's prioritization of visual content in its distribution algorithm).

45.  On March 19, 2025, X took the extraordinary step of effectively purging Mr. Richards' account of approximately 16 years of lawful religious expression. This unprecedented action permanently removed over 61,000 posts -- representing the entirety of his digital ministry, spiritual outreach, and advocacy work since joining the platform. The removal occurred without warning, explanation, or any available recourse. While posts made after approximately 3:30pm Eastern time on March 19, 2025 remain visible, the platform effectively erased his entire history of religious expression prior to that moment.[39]

46.  In a clear escalation following Mr. Richards' legal response, on April 5, 2025 -- less than one week after his March 31 demand letter and merely three days after his April 2 follow-up letter noting intent to sue -- Defendants intensified their censorship campaign. They completely blocked all 5,974 photos and videos previously shared on Richards' account *even removing them from his own account* (allowing only the most recent 14 images to remain). Among other things, this represents misappropriation of the work of an artist because it specifically targeting his "#SpirituallySmartArt" content. He put countless hours into creating all of this work.

  a.  The targeted removal of Mr. Richards' artistic content -- which he had developed as a creative coping strategy in response to the platform's initial restrictions -- demonstrates a deliberate pattern of mockery and retaliation. The timing and selective nature of these actions reveal X's punitive intent against Mr. Richards for

---

[39] At time of filing, X has continued to retroactively remove content, first eliminating posts prior to April 6, then changing this boundary to March 27, and subsequently removing additional content. This pattern of ongoing, arbitrary content removal makes precise documentation challenging and demonstrates the continuing nature of the harm being inflicted.

asserting his legal rights, further evidencing Defendants' arbitrary censorship in violation of both contractual obligations and First Amendment protections. The precise timing of these actions -- occurring immediately after legal representation was engaged and following the demand letter -- demonstrates a willful, deliberate, and retaliatory pattern of conduct specifically designed to silence Mr. Richards' protected religious expression, thus establishing the malicious intent necessary for enhanced and punitive damages under applicable law.

47.  Continuing this pattern of retaliation and escalation, April 6, 2025, at noon, X performed this same deletion act of March 19, 2025 yet again, on all remaining posts within that 3 week period, such that virtually none of Mr. Richards post appear on his wall.[40] (see Exhibit C)

48. In direct contradiction to the overwhelming statistical evidence of shadowbanning, Adam Mehes, Senior Director of Legal at X, explicitly stated to Plaintiff's counsel during a phone conversation that X does not shadowban users. This false representation by a senior legal officer demonstrates X's pattern of public denials while engaging in the very practices they claim not to employ.

49.  A complete analysis of the statistical discrepancy in treatment between Mr. Richards' account and comparable accounts will require discovery of X's internal data metrics, algorithmic parameters, and content moderation logs. Preliminary analysis of publicly available data already demonstrates clear disparities requiring explanation.

---

[40] At the time of writing, the April 6 deletion seems to have been partially restored. However, a new deletion was then added right after the restoration – content from before March 27, 2025 has all now been removed from the wall. These new deletions seem to be constantly occurring without notice or explanation (the removal of close to 6000 media images just yesterday, for example) such that it appears at any time a new deletion could occur.

## C. Religious Viewpoint Discrimination and Targeting

50.  The timing and pattern of Mr. Richards' content suppression reveals targeted

discrimination against his religious viewpoint, with clear and direct evidence of causation

between his religious critique of Musk and the intensified throttling of his account:

    a.  On July 2, 2022, after an uncharacteristic nine-day Twitter silence, Elon Musk

        tweeted "Honored to meet @Pontifex yesterday" with a photo of himself meeting

        Pope Francis.[41]

    b.  Following Plaintiff posting threads discussing this meeting from a Protestant

        theological perspective, analytics revealed consistently suppressed engagement

        metrics, particularly in "views" which are solely in X's discretion.

    c.  In contrast, other users who positively commented on Musk's Vatican visit,

        responding to the exact same Musk post, experienced no comparable visibility

        restrictions, with their engagement metrics remaining consistent with pre-

        comment levels, confirming that viewpoint discrimination/religious

        discrimination rather than content-neutral moderation was the cause of Plaintiff's

        suppression.

51.  Defendants have also shown particular hostility toward Mr. Richards' posts that

specifically address or expose X's shadowbanning practices. Mr. Richards' tweet

responding to Musk's own joke about shadowbanning[42] has also been subjected to

---

[41] Elon Musk (@elonmusk), X (July 2, 2022, 3:54 AM), https://twitter.com/elonmusk/status/1543050489050402816
(posting photo with Pope Francis and stating "Honored to meet @Pontifex yesterday").
[42] Elon Musk (@elonmusk), X (Jan. 13, 2023), https://twitter.com/elonmusk/status/1613182027946471 (joking
about shadowbanning, to which Mr. Richards responded with criticism that was subsequently suppressed).

extraordinary restriction in views. Similarly, when Mr. Richards attempted to document that particular images were being shadowbanned (stating "X is shadow banning THIS image for some reason. More than ANYTHING else"), this meta-commentary on the platform's own censorship practices was itself heavily restricted.[43] This pattern demonstrates Defendants' specific intent to silence criticism of their own content moderation practices.

52.  The suppression pattern extended to Plaintiff's other religious content:

   a.  When Mr. Richards posts bible-based statements that are critical of religious hierarchies, they receive minimal distribution; when others post bible verses without Mr. Richards' history of Vatican criticism, they receive normal platform treatment -- confirming that the suppression targets the speaker's religious viewpoint rather than simply the content itself.[44]

   b.  The systematic suppression of Mr. Richards' biblically-guided critiques of corruption and injustice in world systems, particularly his research on Pope Francis' connections to individuals with Nazi ties, appears directly targeted at silencing his particular Protestant religious perspective.

---

[43] *See* Exhibit D (showing analytics data for Mr. Richards' post about shadowbanning with artificially restricted visibility metrics).

[44] *Compare* Thomas Richards (@tlthe5th), X (Mar. 23, 2025), https://x.com/tlthe5th/status/1906366025446142130 (showing minimal engagement for religious content), *with* Daily Bible (@Daily_Bible), X, https://x.com/Daily_Bible, *and* The Bible Verse (@TheBibleVerse), X, https://x.com/TheBibleVerse (showing substantially higher engagement for similar religious content without Vatican criticism).

c.  Other topics which are censored include his posts against censorship, such as his #OvertPsyops book series, and his religiously-motivated belief that God wants all people to hear the truth.[45]

**D. X's Two-Tier Content Moderation (Religious Discrimination)**

53.  X applies a demonstrable double standard in content moderation that systematically disadvantages religious speech:

a.  X suspended Plaintiff's account around February 14, 2025, for a joke about Joe Rogan's MMA background (that even X's AI, Grok, easily recognized as a joke)[46] and similar content by others was not removed, and again around March 12, 2025, X suspended him for religious "fire and brimstone" preaching, which X later, on appeal, acknowledged was improper.

b.  Simultaneously, X permits accounts with millions of followers to post content explicitly calling for violence and even promotes these accounts to "trending" status, including:

1.  Alex Jones @RealAlexJones (4.4 followers): Calling for "war" against political enemies. Jones has a documented history of inflammatory rhetoric and was banned from Twitter in 2018 for violating the platform's abusive behavior policy before being reinstated by Musk in December

---

[45] Thomas Richards (@tlthe5th), X (Mar. 23, 2025, 2:11 PM), https://x.com/tlthe5th/status/1906366025446142130 (demonstrating severely restricted visibility for post).
[46] Compl. Ex. E (showing the Joe Rogan joke that lead to Plaintiff being suspended for a week and for which his appeal was denied).

2023 following a poll that showed 70% in favor of his return.[47] Jones had

accumulated 1.8 million followers within two months of his

reinstatement.[48]

2. Jackson Hinkle @jacksonhinklle (2.9 million followers): Calling for

"targeted [war] strikes." Hinkle hosts a show called "Legitimate Targets

with Jackson Hinkle" launched in October 2024, has attended events with

designated foreign terrorist organizations, and multiple sources state that

he publishes misinformation.[49] By October 2023, Hinkle had already

gained 1.4 million followers on X during the Israel-Hamas war and has

continued growing his account since.[50]

3. Catturd @catturd2 (3.6M followers): Spreading theories inciting unrest.

This account has been documented by Media Matters for America as

having coordinated over 40 hashtag campaigns, including some that

sources state spread misinformation and foreign disinformation.[51] In

March 2023, leaked internal documents revealed that Catturd was among a

---

[47] Elon Musk Restores X Account of Conspiracy Theorist Alex Jones, AP NEWS (Dec. 10, 2023),
https://apnews.com/article/alex-jones-x-account-elon-musk-90cfc990631dec5e8f337167fbe16372; Twitter Bans
Alex Jones and InfoWars; Cites Abusive Behavior, NPR (Sept. 6, 2018),
https://www.npr.org/2018/09/06/645352618/twitter-bans-alex-jones-and-infowars-cites-abusive-behavior.
[48] Alex Jones Gains 800,000 Followers on Elon Musk's X in Three Days, S. POVERTY L. CTR. (Jan. 14, 2025),
https://www.splcenter.org/resources/hate-watch/alex-jones-gains-800000-followers-elon-musks-x-three-days/.
[49] Jackson Hinkle, WIKIPEDIA (last edited Apr. 5, 2025), https://en.wikipedia.org/wiki/Jackson_Hinkle; American
National Bolshevik and Face of White Jihad Movement Jackson Hinkle, Who Has Close Ties to Russia, Takes
Middle East Tour, MEMRI (Feb. 21, 2025), https://www.memri.org/reports/american-national-bolshevik-and-face-
white-jihad-movement-jackson-hinkle-who-has-close-ties.
[50] Jackson Hinkle to release Hamas interview, stirs controversy on X, JERUSALEM POST,
https://www.jpost.com/international/article-842562.
[51] Twitter Has Allowed One User to Manipulate the Platform by Coordinating Over 40 Hashtags, Seemingly in
Violation of Policy, MEDIA MATTERS FOR AM. (Dec. 10, 2021), https://www.mediamatters.org/twitter/twitter-
has-allowed-one-user-manipulate-platform-coordinating-over-40-hashtags-seemingly; Cf. Catturd, WIKIPEDIA
(last edited Apr. 10, 2025), https://en.wikipedia.org/wiki/Catturd (providing background on the account owner's
identity and history).

handful of accounts having their reach artificially inflated by Twitter under Musk.[52]

4. Ian Miles Cheong @stillgray (1.2 million): Platforming extremist rhetoric. Cheong has been identified by Global Project Against Hate and Extremism as a far-right commentator "known for praising Hitler" who promotes extremist content.[53] In March 2025, he was among several MAGA influencers caught promoting paid messaging without proper disclosure.

c. The critical differentiating factor is content category -- Mr. Richards' posts are exclusively rooted in his biblical teaching and religious expression, a protected category under federal law.

## E. Multi-Layered Suppression: API Throttling of Religious Content

54. The suppression extends beyond Plaintiff's main account to a coordinated throttling of his properly disclosed automated accounts:

a. Plaintiff maintains four automated ("bot") accounts that fully comply with X's developer terms, including clear disclosure of their automated nature and adherence to posting frequency guidelines.

---

[52] *Cf.* Who Is @Catturd2, the Sh-tposting King of MAGA Twitter?, ROLLING STONE (Feb. 9, 2023), https://www.rollingstone.com/culture/culture-features/catturd2-maga-twitter-shitposting-king-1234674671/ (describing the account's influence and relationship with political figures); *See* PolitiFact, Anonymous X Account Shares Falsehoods to Elon Musk, Top US Officials (Mar. 31, 2025), https://www.politifact.com/article/2025/mar/31/anonymous-x-account-shares-falsehoods-to-elon-musk/ (analyzing how anonymous accounts influence political discourse).
[53] The International Far Right Disinformation Mill is at it Again, GLOBAL PROJECT AGAINST HATE AND EXTREMISM (May 24, 2023), https://globalextremism.org/post/the-international-far-right-disinformation-mill-is-at-it-again/; *See generally* Malaysian Right-Wing Influencer Ian Miles Cheong Is Being Trolled, TIME (Feb. 14, 2024), https://time.com/6694681/ian-miles-cheong-malaysia-execution-internet-trending-israel/ (providing background on Cheong's online presence and influence).

b.  Plaintiff pays $200 monthly for API access to maintain these compliant bots at the Basic tier level, establishing a commercial relationship beyond the standard user agreement.

c.  Despite operating well below capacity limits (approximately 30% of the monthly post allowance), these accounts often receive 403 Forbidden errors that prevent content distribution.

d.  Similarly configured non-religious bots experience no such limitations despite identical technical configuration, demonstrating the content-based nature of the restriction.

## F. Unprecedented Platform-Government Entanglement

55.  This case presents a direct application of established constitutional principles to X's targeted suppression of Mr. Richards' religious speech. The Supreme Court has repeatedly held that nominally private entities become subject to First Amendment constraints when the government "is entwined in [their] management or control." *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 296 (2001).

56. The entwinement between X and government authority exceeds even that found sufficient in *Brentwood Academy*:

a.  X is owned and controlled by Elon Musk, who simultaneously holds significant federal authority through his official role in the Department of Government Efficiency (DOGE), created by executive order on President Trump's first day in office.[54]

b.  Musk has been officially designated as a "special government employee" (SGE), a category created by Congress to allow the executive branch to bring in employees for specific roles on a temporary basis, typically for no more than 130 days in a 365-day period.[55]

c.  President Trump has explicitly confirmed Musk's governmental power, stating: "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge"[56] and emphasized that "If [cabinet secretaries] don't cut then Elon will do the cutting."[57]

d.  Unlike the athletic association in *Brentwood Academy*, where entwinement was found despite no direct governmental office held by association leadership. Here Musk literally serves simultaneously as both platform owner and federal official with explicit authority over government operations.

57.  Musk's government entanglement extends beyond his formal DOGE position through multiple institutional channels:

---

[54] Department of Government Efficiency (DOGE) Explainer: Elon Musk, NPR (Feb. 4, 2025), https://www.npr.org/2025/02/04/nx-s1-5286314/department-of-government-efficiency-doge-explainer-elon-musk.

[55] Special Government Employee: Trump, Musk, DOGE, NPR (Feb. 13, 2025), https://www.npr.org/2025/02/13/nx-s1-5293124/special-government-employee-trump-musk-doge.

[56] Trump Appears to Contradict White House, Says Elon Musk in Charge of DOGE, REUTERS (Feb. 20, 2025), https://www.reuters.com/world/us/trump-appears-contradict-white-house-says-elon-musk-charge-doge-2025-02-20/.

[57] Trump, Musk, Cabinet Firings, NPR (Mar. 6, 2025), https://www.npr.org/2025/03/06/nx-s1-5320339/trump-musk-cabinet-firings.

a. Defense Contracts: SpaceX's $3.48 billion Space Force contract awarded in March 2025 and the classified $2.9 billion Pentagon satellite network contract arranged by Trump's Air Force Secretary nominee Troy Meink create financial dependency mechanisms that blur the line between Musk's private and governmental roles.

b. Intelligence Oversight: Unlike typical executives, Musk maintains direct supervisory engagement with classified programs through his Top Secret/SCI clearance, giving him access to intelligence that ordinary citizens--and even most elected officials--cannot obtain. This privileged access positions him as a quasi-government actor regardless of formal title.

c. Regulatory Authority: Through formal and informal channels, Musk exerts influence over regulatory decisions affecting his own companies' competitors, creating a feedback loop of government-private power consolidation that the Supreme Court warned against in *Brentwood Academy*.

58.  The extraordinary personal relationship between Musk and the President also transcends formal titles, making any change in Musk's official status legally irrelevant to the constitutional analysis. On February 7, 2025, Musk publicly proclaimed on X: "I love @realDonaldTrump as much as a straight man can love another man" - a statement viewed over 35 million times and acknowledged by the President himself during an

official White House press conference.[58] The Supreme Court recognized in *Brentwood Academy* that changes in formalities "affected candor but not the 'momentum'" of state involvement."[59] This momentum of government entanglement with X will continue uninterrupted regardless of Musk's official title.

59.  And the timing of Musk's reported departure from his governmental position -- emerging less than 48 hours after receipt of Plaintiff's detailed demand letter explaining the constitutional violations -- demonstrates clear consciousness of liability rather than coincidental career planning. Rather than simply comply with constitutional requirements by removing the shadowban from Mr. Richards' account (which X claims doesn't exist), Musk acts as if he is willing to abandon his governmental position entirely. This demonstrates both the extraordinary lengths Musk will go to maintain this unconstitutional censorship and his awareness that his dual role created constitutional obligations. This attempt to manipulate formal structure to evade constitutional obligations is precisely what the Supreme Court rejected in *Brentwood Academy*.

60.  The Department of Government Efficiency (DOGE) was specifically created for Elon Musk, as evidenced by the acronym "DOGE" - a name which appears to be a humorous nod to his well-known promotion of the Dogecoin cryptocurrency. *This isn't merely a coincidental acronym but a personalized governmental role designed with Musk's identity and brand in mind.* The fact that an official federal department bears Musk's cryptocurrency-related nickname demonstrates an unprecedented level of personal

---

[58] Elon Musk Publicly Declares Intense Love for Donald Trump: "As Much as a Straight Man Can Love Another Man", MSN (Feb. 7, 2025), https://www.msn.com/en-us/politics/government/elon-musk-publicly-declares-intense-love-for-donald-trump-as-much-as-a-straight-man-can-love-another-man/ar-AA1yBRZo.
[59] *Brentwood Acad.*, 531 U.S. at 301.

identification between a government position and a private individual, further cementing the inseparable entanglement between Musk's governmental authority and his control of X Corp.

61.  This tailor-made governmental position was effectively purchased by Musk through his $300 million contribution (the largest ever made) to President Trump's election campaign and by leveraging X's algorithm to promote Trump's candidacy. Computational analysis found that after Musk's formal endorsement of Donald Trump in July 2024, X's algorithms were manipulated to ensure Republican-leaning posts received greater engagement while Democrat-oriented content was systematically suppressed. This position, created via executive order on President Trump's first day in office following Musk's massive financial and technical support for Trump's election, demonstrates the extraordinary entanglement between Musk's governmental authority and his control of X Corp. Given the extraordinary resources Musk invested to secure this personalized governmental role, claims that he would voluntarily abandon it immediately after receiving notice of potential constitutional liability are implausible.

62.  The claim that DOGE's work will be done soon lacks credibility for multiple reasons: (1) the executive order establishing DOGE contains no sunset provisions or completion metrics; (2) President Trump has repeatedly emphasized that government efficiency is an ongoing mission, not a time-limited project; (3) the unprecedented personal relationship between Musk and the President transcends formal titles; and (4) Musk's companies have received over $15.4 billion in government contracts, creating financial entanglement reinforcing the governance entanglement.

63. Demonstrating further government entanglement: since Trump's election victory, Musk's companies have received extraordinary preferential treatment from the administration, including the revelation in February 2025 that Trump's nominee for Air Force Secretary, Troy Meink, had previously "arranged a multibillion-dollar contract solicitation in a way that favored Elon Musk's SpaceX" for a classified spy satellite network, leading to an inspector general investigation.[60]

64. In January 2025, it was reported that Trump is "likely to axe the White House's National Space Council" after "SpaceX's top lobbyist Mat Dunn" had been telling associates that the council was a 'waste of time,' demonstrating Musk's direct influence over space policy in the new administration.[61]

65. Disturbingly, Musk's pattern of censorship extends beyond X to other major platforms. Recent reporting shows him leveraging his new government influence to pressure Reddit regarding content moderation.[62] This cross-platform censorship demonstrates how Musk's government position amplifies his ability to control discourse across the entire digital public square - precisely the scenario that makes X's suppression of religious speech a constitutional violation rather than merely private action. This pervasive and deepening nature of X's censorship amid coordination with government actors presents an unprecedented threat to First Amendment rights. Unlike the indirect pressure campaign at issue in *Murthy v. Missouri*, 603 U.S. 43, (2024), X maintains both systematic

---

[60] Trump Air Force Nominee Arranged Satellite Contract in Manner that Favored Musk's SpaceX, REUTERS (Feb. 7, 2025), https://www.reuters.com/world/us/trump-air-force-nominee-arranged-satellite-contract-manner-that-favored-musks-2025-02-07/.
[61] Trump Likely to Axe Space Council After SpaceX Lobbying, Sources Say, REUTERS (Jan. 21, 2025), https://www.reuters.com/world/us/trump-likely-axe-space-council-after-spacex-lobbying-sources-say-2025-01-21/.
[62] Elon Musk, Reddit CEO, DOGE, THE INDEPENDENT (Jan. 15, 2025), https://www.independent.co.uk/news/world/americas/us-politics/elon-musk-reddit-ceo-doge-b2723185.html.

infrastructure for government censorship requests and direct ties to government power that create an acute risk of ongoing constitutional violations.

66.  X's entanglement with government authority surpasses even the threshold established in *Brentwood Academy*. The Third Circuit in *Mirabella v. Villard*, 853 F.3d 641 (3d Cir. 2017) recognized that government officials can violate First Amendment rights when they restrict citizens' communication with their government after the citizens threaten litigation. In *Mirabella*, the court found that a government official's email prohibiting citizens from contacting any township officials directly violated constitutional rights, even though the court ultimately granted qualified immunity on other grounds. Similarly, the unprecedented personal endorsement of Musk by President Trump in official White House communications--responding to Musk's statement "I love @realDonaldTrump as much as a straight man can love another man" during an official press conference with the Japanese Prime Minister--represents precisely the type of ratification and adoption of the private-public relationship that transforms private conduct into state action. This would be so even were Musk not an actual government official.

67.  Further cementing the extraordinary government entanglement is Musk's unprecedented access to America's most sensitive intelligence and defense agencies. Within just a single month (March-April 2025), Musk conducted a series of high-profile visits to the Pentagon, the National Security Agency (NSA), and the Central Intelligence Agency (CIA). CIA Director John Ratcliffe hosted Musk at CIA headquarters on April 1, 2025, where Musk met with the CIA's top leadership, including Deputy Director Michael Ellis. This visit followed Musk's March 21, 2025 Pentagon meeting with Defense Secretary

Pete Hegseth -- a meeting so significant it was photographed and distributed by the Department of Defense.

68. Most crucially, the evidence shows both Musk's prior government involvement as well as his plans to maintain this extraordinary government access regardless of his official title. When departing the Pentagon, Musk was overheard telling Secretary Hegseth, "If there's anything I can do to be helpful, I'd like to see you" -- explicitly establishing a direct back-channel regardless of his formal DOGE role. Musk himself acknowledged prior Pentagon access, telling reporters, "I've been here before, you know." This pattern of private-channel communications with defense and intelligence leadership demonstrates that even if Musk nominally "leaves" DOGE, his extraordinary government entanglement and influence will continue uninterrupted through these established relationships. https://abc7ny.com/post/pete-hegseth-says-hes-meeting-elon-musk-pentagon-discuss-efficiencies/16061808/

69. This never-before-seen level of access to America's intelligence apparatus -- rarely granted even to most elected officials -- further blurs the already indistinguishable line between Musk's role as X's owner and his government authority. *When the controlling owner of a major social media platform is simultaneously meeting with intelligence agency directors and maintaining direct control over content moderation systems targeting religious speech, the constitutional concerns are exponentially magnified beyond typical private content moderation scenarios.*

70. The documented pattern concealed in the "Twitter Files" "exposed" by Musk suggest currently known instances of government coordination represent only a fraction of actual government involvement in content moderation. The files exposed a sophisticated system

38

of shadowbanning, visibility filtering, and manual account restrictions implemented at government request, providing strong evidence of a deeper infrastructure for speech suppression that continues to operate today.

71.  This case extends beyond Section 230 immunity and addresses a fundamental First Amendment concern: government officials cannot use their platform ownership to engage in viewpoint discrimination that would otherwise be constitutionally prohibited

72.  Further, Trump's public response to Musk's declaration of loyalty reinforces their extraordinary personal relationship. When questioned about Musk's February 7th statement during an official White House press conference with Japanese Prime Minister Ishiba,[63] Trump embraced rather than distanced himself from Musk's public display of personal devotion. This official acknowledgment in a diplomatic setting demonstrates that any formal change in Musk's title would merely be a strategic attempt to evade constitutional liability, not a substantive change in the relationship between X's owner and the administration.

## G. Government Engagement and Election Interference Predating DOGE

73.  There is evidence that Musk has been covertly engaged with government influence and political manipulation throughout his ownership of Twitter/X, establishing a continuity of state action that predates his official government role:

---

[63] The President's News Conference with Prime Minister Shigeru Ishiba of Japan, AM. PRESIDENCY PROJECT (Feb. 7, 2025), https://www.presidency.ucsb.edu/documents/the-presidents-news-conference-with-prime-minister-shigeru-ishiba-japan.

a.  Computational analysis by Graham and Andrejevic (2024) found direct algorithmic manipulation coinciding with "Elon Musk's formal endorsement of Donald Trump on July 13, 2024."[64] Their research examining 56,000+ posts revealed that after this date, "Republican-leaning posts were viewed and engaged with more frequently" while Democrat-oriented content was systematically suppressed.[65]

b.  Musk invested approximately $300 million to help elect Trump, while his companies have received over $15.4 billion in government contracts.[66] This mutually beneficial relationship is a significant part of the current government-platform entanglement.

74.  These actions demonstrate a pattern of using platform control for political advantage that began well before Musk's formal government role and continues today, creating a continuous thread of state action that transcends the formal announcement of Musk's DOGE position.

**H. Yoel Roth's Admissions About Individual Targeting**

75.  Former Twitter Head of Trust and Safety Yoel Roth has made explicit admissions about individuals working at Twitter targeting and shadowbanning users that directly support Mr. Richards' claims of targeted religious discrimination:

---

[64] Graham & Andrejevic, Algorithmic Manipulation in Political Discourse on X Platform (2024), https://eprints.qut.edu.au/253211/.

[65] X Marks the Spot for Political Bias, THE REGISTER (Nov. 20, 2024), https://www.theregister.com/2024/11/20/x_marks_the_spot_for/.

[66] Elon Musk Has Grown Even Wealthier Through Serving Trump's Administration, CAMPAIGN LEGAL CTR. (Mar. 15, 2025), https://campaignlegal.org/update/elon-musk-has-grown-even-wealthier-through-serving-trumps-administration.

a. In August 2023, after Elon Musk promised to address shadowbanning on X, Roth posted on the Bluesky social media platform that content moderation at Twitter/X involved direct individual targeting, explaining that "maybe it's a free-text note on the account that says something like, 'Yoel banned this user... Don't unban them without, yknow, checking with me first, please.'"[67]

b. Roth confirmed that Twitter maintained a system called "Guano" (using bird-themed naming) that stored "a lot of enforcement metadata in free-text notes attached to user accounts" where individual moderators could flag accounts for suppression or shadowbanning.[68]

c. Roth admitted that humans routinely made individual decisions about account suppression based on subjective criteria.[69]

76. Evidence from the "Twitter Files" released in December 2022 confirmed the existence of practices that Twitter had previously denied, including:

a. A practice referred to as "visibility filtering" by previous Twitter management

---

[67] Musk Says X Will Address Shadowbanning Soon, But Former Trust & Safety Exec Explains Why That Will Be Difficult, TECHCRUNCH (Aug. 17, 2023), https://techcrunch.com/2023/08/17/musk-says-x-will-address-shadowbanning-soon-but-former-trust-safety-exec-explains-why-that-will-be-difficult/.

[68] Elon Musk Vows to Address Shadowbanning Transparency on X: What You Need to Know, WS NEWS PUBLISHERS (Aug. 17, 2023), https://wsnewspublishers.com/elon-musk-vows-to-address-shadowbanning-transparency-on-x-what-you-need-to-know/.

[69] Elon Musk: Shadowbanning on X Will Be More Transparent, ITECH POST (Aug. 18, 2023), https://www.itechpost.com/articles/118669/20230818/elon-musk-shadowbanning-x-will-be-more-transparent.htm.

    b.  Tools allowing accounts to be tagged as "Do not amplify" or placed on "blacklists" that reduce their prominence in search results and trending topics

    c.  Certain accounts being given special treatment indicating they should only be moderated by high-ranking officials[70]

77. These admissions by Roth and evidence from the Twitter Files demonstrate that:

    a.  Shadowbanning decisions have been made by individual humans with significant discretion

    b.  X maintained a complex infrastructure specifically designed to allow selective suppression of disfavored speech

    c.  The company deliberately concealed these practices from users while publicly denying them, as these revelations directly contradict former CEO Jack Dorsey's sworn congressional testimony that Twitter did not shadowban conservatives. When specifically asked "Social media is being rigged to censor conservatives. Is that true of Twitter?" Dorsey responded "No...Our policies and our algorithms don't take into consideration any affiliation, philosophy or viewpoint."[71]

    d.  The company maintained systems that made shadowbanning decisions difficult to track or explain

---

[70] Shadow Banning, WIKIPEDIA (last edited Apr. 10, 2025), https://en.wikipedia.org/wiki/Shadow_banning.

[71] Twitter Files Flashback: Jack Dorsey Testified Under Oath Twitter Doesn't Censor, Shadow Ban Conservatives, FOX NEWS (Dec. 8, 2022), https://www.foxnews.com/media/twitter-files-flashback-jack-dorsey-testified-oath-twitter-censor-shadow-ban-conservatives; Ex-Twitter CEO Jack Dorsey, Liberal Media Members Denied Shadow Banning Prior to Elon Musk Leak, FOX NEWS (Dec. 9, 2022), https://www.foxnews.com/media/ex-twitter-ceo-jack-dorsey-liberal-media-members-denied-shadow-banning-prior-elon-musk-leak.amp.

78.  Based on this evidence and the statistical impossibility of Mr. Richards' suppression

occurring by neutral algorithmic processes, Mr. Richards has been subjected to precisely

the type of targeted individual suppression that Roth described, *with the added dimension*

*that this suppression is now being carried out by a company owned by a government*

*official*.

## I. Section 230 and Shadowbanning

79.  Section 230(c)(2)(A) of the Communications Decency Act states that no provider of an

interactive computer service shall be held liable on account of "any action voluntarily

taken in good faith to restrict access to or availability of material that the provider or user

considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or

otherwise objectionable."

80.  The plain meaning of "restrict" in "restrict access to or availability of" implies a

complete or substantial impediment to accessing content, not merely reducing its

visibility while maintaining its technical accessibility. The term "restrict" derives from

Latin "restringere" meaning "to bind fast or restrain"[72] - suggesting a clear and definitive

limitation rather than a mere reduction in prominence. This etymology underscores that

"restrict" refers to an action that binds, limits, or prohibits access in a definitive manner,

not one that merely reduces likelihood of discovery.

---

[72] Restriction, ONLINE ETYMOLOGY DICTIONARY, https://www.etymonline.com/word/restriction.

81. The Justia Legal Dictionary defines "access" as "The freedom or ability to acquire, make use of, or participate in a particular thing or activity."[73] Shadowbanning does not impair this freedom or ability, as users maintain complete technical ability to access, view, and interact with the content. The content remains fully available to anyone who navigates directly to it. Shadowbanning simply reduces the likelihood that other users will discover the content through algorithmic recommendations, which falls outside the plain meaning of "restrict" as used in Section 230.

82. The statutory language "restrict access to or availability of" contemplates a binary condition - either content is accessible/available or it is not. Shadowbanning creates no such binary restriction but merely adjusts the degree of visibility, which is fundamentally different from restriction in both legal understanding[74] and common usage.

83. Every category listed in Section 230(c)(2)(A) -- obscenity, lewdness, violence, harassment -- contemplates complete removal, not surreptitious suppression. The statute's text and legislative history confirm that Congress intended to shield platforms for binary moderation choices (removing vs. keeping up content), not algorithmic or other visibility manipulation. See 47 U.S.C. § 230(c)(2)(A); *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) (emphasizing Section 230's focus on "removal" of content).

---

[73] Access, JUSTIA LEGAL DICTIONARY, https://dictionary.justia.com/access.
[74] Restriction, FREE DICTIONARY LEGAL DICTIONARY, https://legal-dictionary.thefreedictionary.com/restriction.

84. Statements from Section 230's sponsors similarly focus on empowering platforms to delete or block objectionable content, not surreptitiously limit its visibility. This binary conception of content moderation -- either keeping material up or taking it down -- was the industry standard when Section 230 was enacted in 1996. See 141 Cong. Rec. H8460, H8460 (1995) ("...We can keep away from our children things not only prohibited by law, but prohibited by parents. That is where we should be headed, and that is what the gentleman from Oregon [Mr. Wyden] and I are doing... it will protect computer Good Samaritans, online service providers, anyone who provides a front end to the Internet, let us say, who takes steps to screen indecency and offensive material for their customers. It will protect them from taking on liability such as occurred in the Prodigy case in New York that they should not face for helping us and for helping us solve this problem.")

85. Construing Section 230(c)(2)(A) to immunize the kind of deceptive and unaccountable shadowbanning that X employs would warp the statute's purpose of encouraging platforms to moderate content responsibly and transparently. The Fifth Circuit has repeatedly emphasized that the "good faith" requirement in Section 230(c)(2)(A) is a meaningful limitation on platform immunity.

86. In *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1052 (9th Cir. 2019), the court held that Section 230 does not provide immunity "for anticompetitive conduct" that is not protected by the First Amendment. The Fifth Circuit's analysis in *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022) -- which rejected platforms' "freewheeling First Amendment right to censor," id. at 445 -- remains

persuasive authority, even after *Moody v. NetChoice*, 603 U.S. 707 (2024). While *Moody* vacated and remanded *Paxton* for further facial challenge analysis under proper First Amendment standards, the Supreme Court did not expressly reject the Fifth Circuit's skepticism of absolute platform immunity for content moderation. In fact, multiple justices in *Moody* expressed views suggesting platforms' content moderation may still be subject to some regulation consistent with the First Amendment, leaving open the possibility that viewpoint-based suppression may not receive blanket immunity under future analyses.

87.  Other Circuits have also recognized that Section 230 immunity is not absolute when platforms engage in bad faith moderation. In *e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d 1265 (M.D. Fla. 2016), the court rejected Section 230 immunity at the motion to dismiss stage because the plaintiff had alleged Google acted in bad faith. The court specifically held that "the plain language of the CDA only provides immunity for actions voluntarily taken in good faith" (*Id*. at 1272-73).

88.  Further, there is nothing in Section 230 that immunizes a covered entity such as X from creating terms that claim to prohibit censorship and then deciding to unilaterally breach its promise with its users. On the contrary, that is the opposite of "good faith". This makes X's shadowbanning a clear violation of its own stated policy.

89.  Taken together, The heightened Fifth Circuit concerns about giving section 230 immunity for censorship not done in "good faith" applies here.

## J. X's Public Commitments vs. Documented Practices

90. X's treatment of Mr. Richards directly contradicts its own published policies and

contractual promises:

a. X's Help Center explicitly states: "We do not block, limit, or remove content

based on an individual's views or opinions."[75]

b. According to Musk's tweet on October 17, 2024: "X doesn't censor beyond what

is legally required."[76]

c. X's "Transparency Center" promises "in-service notices when content is removed

or withheld,"[77] yet no such notices were provided to Plaintiff despite the massive

scale of content restriction.

d. X's "Freedom of Speech, Not Reach" policy states: "We allow robust debate but

restrict content that incites harm,"[78] yet Plaintiff's lawful religious speech has

been systematically suppressed despite violating no laws or inciting any harm.

---

[75] X Corp., *Content Reach Policy*, X Help Ctr., https://help.x.com/en/rules-and-policies/x-reach-limited (last visited Apr. 12, 2025).
[76] Elon Musk (@elonmusk), X (Oct. 17, 2024, 9:45 AM), https://x.com/elonmusk/status/1846772929167552549/.
[77] X Corp., *Defending and Respecting Our Users' Voice*, X Help Ctr., https://help.x.com/en/rules-and-policies/defending-and-respecting-our-users-voice (last visited Apr. 10, 2025).
[78] X Corp., *Freedom of Speech, Not Reach: An Update on Our Enforcement Philosophy*, X Blog (Apr. 15, 2023), https://blog.x.com/en_us/topics/product/2023/freedom-of-speech-not-reach-an-update-on-our-enforcement-philosophy.

e. X continues to claim they do not shadowban -- "Simply put, we don't shadow ban! Ever. We do rank posts to create a more relevant experience for you, however, and you're always able to see posts from people you follow."[79] **Note that Mr. Richards' posts from before April 6, 2025 at noon Eastern Time, have been removed from his wall such that *no one can see them*. They did this after performing this same act March 19, 2025 around 3pm.** See Exhibit E (Twitter) Blog Post (2018) - "Setting the record straight on shadow banning."We do not shadow ban. You are always able to see the tweets from accounts you follow (although you may have to do more work to find them, like go directly to their profile). And we certainly don't shadow ban based on political viewpoints or ideology."[80]

91. X explicitly promises its users: 1) that free speech is its key value and that it only censors to the extent required by the US government; and 2) that in the case of any visibility limitation, it provides notice to its users and a chance to be heard, 3) and that users can always see posts from people they follow. **Yet X has completely violated this contractual agreement with Mr. Richards.**

92. X's top executives, including owner Elon Musk and CEO Linda Yaccarino, have made numerous categorical, unambiguous public statements denying that the company

---

[79] X Corp., *Debunking Twitter Myths*, X Help Ctr., https://help.x.com/en/using-x/debunking-twitter-myths (last visited Apr. 12, 2025).

[80] Vijaya Gadde & Kayvon Beykpour, *Setting the Record Straight on Shadow Banning*, X Blog (July 27, 2018), https://blog.twitter.com/en_us/topics/company/2018/Setting-the-record-straight-on-shadow-banning (last visited Apr. 12, 2025).

shadowbans user content or makes content moderation decisions based on political ideology or viewpoint.[81]

## L. Demand Letter and Failure to Respond

93.  On March 31, 2025, Plaintiff's counsel sent a detailed demand letter to X outlining these violations and requesting immediate remediation, including:

   a.  Removal of all visibility filtering within 48 business hours

   b.  Restoration of API access within 48 business hours

   c.  Disclosure of suppression rationale within 5 business days

   d.  Good faith settlement discussions regarding damages

   e.  More than 48 hours after receipt of this demand letter, X had neither responded nor taken any steps to remedy the ongoing suppression.

---

[81] Linda Yaccarino (@lindayaX), X (Mar. 29, 2025, 2:15 PM), https://x.com/lindayaX/status/1859282552638317004 ("Protecting free speech is more important than ever. The people have woken up and they are the media now."); Linda Yaccarino (@lindayaX), X (Mar. 15, 2025, 10:42 AM), https://x.com/lindayaX/status/1843706908353626223 ("Free Speech. Today. Tomorrow. Always. X."); Elon Musk (@elonmusk), X (Apr. 2, 2025, 3:21 PM), https://x.com/elonmusk/status/1861188909692264538 ("Fortunately, 𝕏 believes in free speech"); *see also* Elon Musk Shadow Banning Statements, X, https://x.com/search?q=from%3Aelonmusk%20shadowbanning&src=typed_query&f=live (last visited Apr. 10, 2025).

94.  On April 2, 2025, Plaintiff's counsel sent a follow-up communication noting X's failure to respond and again requesting remediation. This communication also addressed public reports that Musk may soon leave his government position, noting that such timing appears strategic but is legally irrelevant as constitutional violations have occurred and continue to occur while Musk holds official governmental authority. Further, as explained above, due to his tight advisory link to President Trump as well as intelligence agencies, it is guaranteed he will remain a de facto member of the federal government no matter what his official role, which violates *Brentwood Academy*'s prohibition.

95.  As of the filing of this complaint, X has not substantively responded to either communication from Plaintiff's counsel or taken any steps to restore Plaintiff's account visibility.

96.  **The import of this cannot be overstated in light of all of X's commitments to: 1) not shadowban, and 2) provide notice of shadowbanning.**

97.  **Why would X fail to stop shadowbanning or respond in any manner to the demand letter if it truly does not shadowban and has honest terms that reflect its actual behavior? The only thing the demand letter requested within 48 hours was the removal of the shadowban on Mr. Richards' account.**

**M. Legal Framework for Social Media Platforms as Common Carriers**

98.  This case presents an opportunity to apply Justice Clarence Thomas's legal framework articulating how large social media platforms function as common carriers in the modern digital public square. Justice Thomas has repeatedly advocated for treating large social

media platforms as common carriers -- a position he maintained in his concurrence in *Moody v. NetChoice*, stating that "both lower courts [should] continue to consider the common-carrier doctrine" (*Moody v. NetChoice*, 603 U.S. 707, 752 (2024)). In his *Knight First Amendment Institute* concurrence, Justice Thomas laid out a detailed explanation for why social media platforms could be regulated as common carriers, observing that "the long history in this country and in England of restricting the exclusion right of common carriers and places of public accommodation may save similar regulations today from triggering heightened scrutiny" and noting "there is a fair argument that some digital platforms are sufficiently akin to common carriers... to be regulated in this manner."

99.  This analysis recognizes that certain digital platforms, by virtue of their market dominance and essential role in public discourse, should be subject to traditional common carrier obligations. As NPR reported regarding this concurrence, Thomas specifically addressed platforms' "power 'to cut off speech'" and argued they should be "regulated in this manner" like telephone companies.[82]

100. X functions as a common carrier of digital speech by: a. Holding itself out as a neutral conduit for user-generated content. b. Providing communication services to the public at large without individualized negotiation. c. Generating hundreds of millions of unique, algorithmically tailored feeds -- operating more as a communication conduit than a unified editorial voice. (No court has ever held nor considered whether creating hundreds of millions of different individual feeds is a media function or is equivalent to producing media content) d. Functioning as the "modern public square" for public

---

[82] Bobby Allyn, *Justice Clarence Thomas Takes Aim At Tech And Its Power 'To Cut Off Speech'*, NPR (Apr. 5, 2021), https://www.npr.org/2021/04/05/984440891/justice-clarence-thomas-takes-aims-at-tech-and-its-power-to-cut-off-speech.

discourse, as recognized by courts and the platform itself. *Packingham v. North Carolina*, 582 U.S. 98, 99. (2017)

101. The Supreme Court itself has acknowledged that algorithmic feeds can defy traditional legal categories. During oral arguments in *Gonzalez v. Google*, 598 U.S. 617 (2023), Justice Kagan quipped that the Justices are "not like the nine greatest experts on the internet"-- a tacit admission that courts lack the framework to treat dynamically generated, user-specific feeds as "publishing" in any traditional sense. This judicial humility reinforces Plaintiff's argument: X's systems, which produce hundreds of millions of unique algorithmic combinations daily, cannot plausibly be analogized to editorial curation. No "editor" could process this volume of individualized outputs, nor did Congress envision such systems when crafting protections for publisher liability. The law simply has not kept pace with new technology. Justice Thomas's common carrier framework thus provides the only coherent lens to evaluate X's role -- as a neutral conduit, not a speaker. As he explained "changes in technology may call for new regulations." *NetChoice, LLC v. Moody*, 142 S. Ct. 3328, 3332 (2024).

102. Justice Thomas also noted that the nature of common carriers is that there may indeed be a possible way to avoid using a particular common carrier, but they are often the only reasonable option: "It changes nothing that these platforms are not the sole means for distributing speech or information. A person always could choose to avoid the toll bridge or train and instead swim the Charles River or hike the Oregon Trail. But in assessing whether a company exercises substantial market power, what matters is whether the alternatives are comparable. For many of today's digital platforms, nothing is." *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1225.

103. Unlike specific, niche social media platforms (such as those dedicated to particular religious or political viewpoints), general-purpose platforms like X function as essential communications infrastructure in the modern public square. The common carrier framework applies specifically to these large, general-purpose platforms that (a) hold themselves out to the public as neutral forums for all speech, (b) possess significant market power approaching essential facility status, and (c) serve as critical infrastructure for public discourse. While platforms that transparently communicate their specialized purpose and content standards create informed user expectations and therefore should not be subject to common carrier obligations, X misleadingly presents itself as a neutral platform while secretly engaging in viewpoint discrimination. Yet there is no reasonable alternative to major social media platforms. For example, while there used to be comments sections on almost all major media websites, those comment sections have virtually all been removed, instead funneling commenters to just a few social media platforms.

104. The Fifth Circuit's analysis in *Netchoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022) supports treating platforms like X as common carriers for First Amendment purposes, holding that "Platforms are not newspapers. Their censorship is not speech." Id. at 445. While *Moody v. NetChoice*, 603 U.S. 707 (2024) vacated this decision, Justices Thomas, Alito, and Gorsuch expressed views suggesting openness to common carrier approaches in appropriate contexts. The Supreme Court's remand preserves the possibility that aspects of the common carrier framework could be incorporated into future platform regulation cases as courts continue to refine how traditional First Amendment doctrines apply to modern social media environments.

105. When Congress enacted Section 230 in 1996, algorithmic content distribution did not exist in its current form. No human editor reviews or approves each of X's individually tailored feeds; they are generated through automated systems operating at scale across billions of posts. The Supreme Court has recognized the need for judicial caution when applying constitutional principles to new technologies. As Justice Alito observed in his concurrence joined by Justices Thomas and Gorsuch in *Moody v. NetChoice*: "When confronted with the application of a constitutional requirement to new technology, we should proceed with caution. While the meaning of the Constitution remains constant, the application of enduring principles to new technology requires an understanding of that technology and its effects." *Moody v. NetChoice, LLC*, 603 U.S. 707, 796 (2024) (Alito, J., concurring in judgment). This case presents precisely such a scenario -- requiring this Court to carefully evaluate how common carrier principles and First Amendment protections apply to X's algorithmic suppression systems.

106. Justice Thomas's common carrier framework has so far appeared in concurring opinions rather than majority decisions, but history shows that concurring opinions can and do become controlling precedent through subsequent adoption. Notable examples include Justice Louis Brandeis' concurrence in *Whitney v. California*, 274 U.S. 357, 372 (1927) (Brandeis, J., concurring), which became law in *Brandenburg v. Ohio*, 395 U.S. 444 (1969) forty years later; Justice Roger Traynor's concurrence in *Escola v. Coca-Cola Bottling Co.*, 24 Cal.2d 453, 461 (1944) (Traynor, J., concurring), which became law in *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57 (1963) nineteen years later; and Justice Robert Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring), which established the authoritative

54

framework for analyzing presidential power. As explained by appellate lawyer Tillman Breckenridge, concurring opinions "can be used and cited in later opinions" as "a foundational document" for future legal arguments.[83]

107. Legal scholars recognize the potential of Justice Thomas's framework to reshape platform regulation. As the Brookings Institution noted, Justice Thomas's approach has gained bipartisan support, with "a growing convergence of left and right on identifying private sector domination of the digital information space as the key problem."[84] This emerging coalition sees platforms like X as "sufficiently akin" to common carriers requiring regulation that prevents viewpoint discrimination.

108. Beyond the direct harm to Mr. Richards, the systematic suppression of religious viewpoints has inflicted broader harm to public discourse by depriving the marketplace of ideas of important religious perspectives. When government-entangled platforms exclude specific religious viewpoints from the modern public square, they not only damage individual speakers but also undermine the robust exchange of ideas essential to democratic society. This harm to the broader public's right to hear diverse religious viewpoints represents a distinct constitutional injury that cannot be adequately remedied through monetary damages alone.

**CAUSES OF ACTION**

---

[83] *Clarence Thomas' Concurring Roe v. Wade Opinion Is Not Legally Binding*, WUSA9 (May 18, 2022), https://www.wusa9.com/article/news/verify/clarence-thomas-concurring-roe-v-wade-opinion-is-not-legally-binding/65-b86affb3-3c82-4d67-b025-9d1c19eb02a4.

[84] *Justice Thomas Sends a Message on Social Media Regulation*, BROOKINGS (Apr. 9, 2021), https://www.brookings.edu/blog/techtank/2021/04/09/justice-thomas-sends-a-message-on-social-media-regulation/.

## COUNT I: VIOLATION OF THE FIRST AMENDMENT (42 U.S.C. § 1983)

109.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

110.   The First Amendment to the United States Constitution prohibits government actors from abridging the freedom of speech or the free exercise of religion.

111.   Under the state-action doctrine established in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 296 (2001), private entities become subject to constitutional constraints when the government "is entwined in [their] management or control."

112.   Defendant X is subject to First Amendment constraints because:

   a.   X is owned and controlled by Elon Musk, who has a seemingly close association with US intelligence agencies, holds significant federal authority as a Special Government Employee heading the Department of Government Efficiency (DOGE), which has undertaken dramatic and far-reaching actions across multiple government agencies;[85]

   b.   President Trump has explicitly confirmed Musk's governmental role and authority, stating: "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge."[86]

---

[85] *Elon Musk's Government Dismantling: The Fight to Stop It*, ABC NEWS (Mar. 15, 2025), https://abcnews.go.com/Politics/elon-musks-government-dismantling-fight-stop/story?id=118576033.
[86] *Trump Appears to Contradict White House, Says Elon Musk in Charge of DOGE*, REUTERS (Feb. 20, 2025), https://www.reuters.com/world/us/trump-appears-contradict-white-house-says-elon-musk-charge-doge-2025-02-20/.

c.  While reports emerged on April 2, 2025, that Musk might leave his role earlier than planned,[87] *this sudden change in timeline immediately followed receipt of Plaintiff's 40-page demand letter detailing the constitutional implications of Musk's dual roles*. The sudden change suggests a strategic attempt to evade liability through this planned lawsuit for ongoing constitutional violations that have occurred and continue to occur during Musk's tenure.

d.  **This dual role, bolstered by their unprecedented personal relationship publicly displayed when Musk declared "I love @realDonaldTrump as much as a straight man can love another man" on February 7, 2025, creates precisely the entanglement contemplated in Brentwood.** And this transforms X's content moderation decisions into state action, even if Musk now claims to be leaving the government. The Supreme Court's entwinement doctrine specifically recognized that when governmental authority is thoroughly entangled with nominally private entities, constitutional obligations follow regardless of formal titles or structural manipulations. *Brentwood Academy*, 531 U.S. at 302-303. Just as the Court found the athletic association's "nominally private character is overborne by the pervasive entwinement" with state officials, Musk's immense personal influence with President Trump and the US government will continue regardless of whether he holds an official title, particularly when viewed alongside the enormous government contracts benefiting his companies, his unprecedented $300 million political contributions to the President, and the President's explicit statements about his reliance on Musk's advice.

---

[87] *Trump Tells Cabinet, Others that Musk Will Leave Soon - Politico Reports*, REUTERS (Apr. 2, 2025), https://www.reuters.com/business/retail-consumer/trump-tells-cabinet-others-that-musk-will-leave-soon-politico-reports-2025-04-02/.

113.    Musk's actions as both government official and platform owner directly violate the January 20, 2025 Executive Order on "Restoring freedom of Speech and Ending Federal Censorship," which explicitly prohibits federal government officials from "engag[ing] in or facilitat[ing] any conduct that would unconstitutionally abridge the free speech of any American citizen."[88] As a Special Government Employee heading DOGE, Musk is bound by Section 3(a) of this Executive Order, which states that "No Federal department, agency, entity, officer, employee, or agent may act or use any Federal resources in a manner contrary to section 2 of this order."[89] His systematic suppression of Mr. Richards' religious expression while simultaneously exercising governmental authority creates liability under both this Executive Order and the First Amendment.

114.    On February 20, 2025, the Federal Trade Commission launched a formal public inquiry to investigate how "technology platforms deny or degrade users' access to services based on the content of their speech or affiliations, and how this conduct may have violated the law." FTC Chairman Andrew N. Ferguson specifically stated that "Tech firms should not be bullying their users" and that the inquiry will determine how firms may have "violated the law by silencing and intimidating Americans for speaking their minds."[90]  X's shadowbanning practices against Mr. Richards represent precisely the type of conduct currently under federal regulatory investigation, creating additional potential liability beyond the claims in this litigation and demonstrating the broader

---

[88] Exec. Order No. 14,089, 90 Fed. Reg. 5273 (Jan. 22, 2025).
[89] *Id.* § 3(a).
[90] Press Release, Fed. Trade Comm'n, Federal Trade Commission Launches Inquiry into Tech Censorship (Feb. 20, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/02/federal-trade-commission-launches-inquiry-tech-censorship.

public interest in addressing the anticompetitive and deceptive practices involved in such hidden censorship.

115. The specific coordination between X and government actors meets and exceeds the test articulated in *Murthy v. Missouri* for state action. The Court explained that the critical inquiry is whether officials' actions would cause platforms to "likely react in predictable ways" to suppress speech. *Murthy v. Missouri*, 603 U.S. 43, 58. Where X's owner now possesses formal government power while maintaining control over established government censorship infrastructure, such "predictable reactions" to government preferences are not merely likely but virtually assured. Unlike typical content moderation scenarios, Musk's simultaneous role as both platform owner with direct algorithmic or other control and federal official with significant governmental power creates a constitutional nexus that transforms X's treatment of Mr. Richards' religious speech from private moderation into state action subject to First Amendment constraints.

116. The specific infrastructure and systematic coordination between X and government actors meets the test articulated in *Murthy* for when private platform decisions become state action. Unlike the general communications at issue in *Murthy*, where the Court found insufficient evidence of specific causation between government action and platform censorship, the evidence here shows a concrete and systematic program of government-directed content suppression through dedicated technical infrastructure specifically designed to facilitate censorship.

117. *The connection between government interests and X's content moderation decisions is further demonstrated by Musk's documented history of platform manipulation for*

59

*political advantage.* As documented above, Musk directly ordered changes to X's algorithm to boost his own content by a factor of 1,000 when he was dissatisfied with its performance compared to President Biden's.[91] This demonstrates both his willingness and ability to directly control the platform's content distribution mechanisms for political purposes, a pattern that continued as he used X to boost Republican-leaning content ahead of the 2024 election that brought Trump to power.[92]

118.   Defendant X, under the control of a government official, has engaged in viewpoint-based discrimination against Plaintiff's religious speech by:

a.   Systematically suppressing the visibility of Plaintiff's religious content through account throttling, resulting in a 98% reduction from normal engagement metrics.

b.   Effectively removing virtually all of Mr. Richards' 61,600+ historical posts from view on March 19, 2025.

**c.**   Removing all but 14 of Mr. Richards' 5,974 media entries from view April 5, 2025, including artwork he has spent months creating.

d.   After removing all posts from view on March 19, 2025, Defendant X, *went back again on April 6, 2025 and proceeded to yet again delete all posts up through noon on April 6, 2025. Defendant later restored some of the posts from March 27, 2025 through April 6.*

---

[91] Zoë Schiffer & Casey Newton, *Yes, Elon Musk Created a Special System for Showing You All His Tweets First*, THE VERGE (Feb. 14, 2023), https://www.theverge.com/2023/2/14/23600358/elon-musk-tweets-algorithm-changes-twitter.
[92] Anthony Cuthbertson, *Elon Musk Appears to Have Tweaked X's Algorithm to Promote Trump, Study Claims*, THE INDEPENDENT (Nov. 4, 2024), https://www.the-independent.com/tech/elon-musk-trump-x-algorithm-bias-b2640976.html.

e.   Applying discriminatory content moderation standards that penalize religious expression while permitting more extreme non-religious content.

f.   Targeting Mr. Richards' speech in direct response to his religious critique of Musk's Vatican relationship and other religious commentary about Musk.

119.   This viewpoint-based discrimination violates the core protections of the First Amendment, which prohibits government actors from suppressing speech based on its message, ideas, subject matter, or content.

120.   As established in *Rosenberger v. Rector*, 515 U.S. 819 (1995), government actors cannot discriminate against religious viewpoints, and X's actions -- while conducted through a nominally private platform -- constitute impermissible viewpoint discrimination due to the unprecedented platform-government entanglement.

121.   The Supreme Court has repeatedly held that government actors cannot prefer one religious denomination over another. See *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another"). X's pattern of suppressing Protestant critique while accommodating Vatican perspectives -- during a period when X's owner simultaneously holds government authority -- presents precisely the denominational preference that violates core First Amendment principles.[93]

---

[93] See, e.g., X accounts demonstrating preferential treatment of Catholic content: @majoriansmusing, https://x.com/majoriansmusing (last visited Apr. 10, 2025); @honorablesaint, https://x.com/honorablesaint (last visited Apr. 10, 2025); @DMStThomas, https://x.com/DMStThomas (last visited Apr. 10, 2025) (showing Catholic-affiliated accounts with fewer followers than Plaintiff receiving substantially greater content distribution).

122. As a direct and proximate result of Defendant's constitutional violations, Plaintiff has suffered and continues to suffer irreparable harm to his First Amendment rights, as well as quantifiable economic damages outlined herein.

## COUNT II: SECTION 230(C)(2)(A) VIOLATION

123. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

124. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

125. X is an "interactive computer service" provider within the meaning of Section 230(c)(2)(A) of the Communications Decency Act, 47 U.S.C. § 230(c)(2)(A).

126. As detailed in paragraphs 70-80 above, X's shadowbanning and deprioritization of Plaintiff's posts do not "restrict access to or availability of" the affected content within the meaning of Section 230(c)(2)(A). X's conduct involves deceptively limiting the visibility and reach of disfavored speech while preserving its superficial accessibility, which falls outside the scope of publisher conduct immunized by the statute.

127. X's lack of good faith is evidenced by statements from Adam Mehes, Senior Director of Legal at X, who explicitly claimed that X does not shadowban users during a phone conversation with Plaintiff's counsel. This categorical denial directly contradicts the demonstrable pattern of account suppression documented herein, revealing a deliberate attempt to mislead users about X's content moderation practices. A platform that publicly and categorically denies engaging in content filtering practices while simultaneously implementing those exact practices cannot, by definition, be acting "in good faith" as required by Section 230(c)(2)(A).

128. X's actions mirror the precedent in *e-ventures Worldwide* -- claiming neutrality while engaging in targeted suppression, denying shadowbanning exists while implementing it against religious viewpoints, and strategically removing evidence after receiving legal notices.

129. X's targeted manipulation of evidence immediately following Plaintiff's legal notices is precisely the type of bad faith conduct that falls outside Section 230's protection under governing precedent. Courts have consistently required actual good faith -- not merely assertions of neutrality contradicted by documented targeting patterns. X's pattern of escalating retaliation following legal demands demonstrates prima facie evidence of bad faith.

130. X's retaliatory removal of 5,974 media files after Plaintiff's demand letter -- targeting Protestant religious content while permitting comparable secular speech or Catholic speech -- demonstrates the sort of arbitrary or biased restrictions *Enigma* held lack good faith, and the Fifth Circuit's framework in *Paxton* confirms such conduct is actionable despite Moody's procedural ruling.


**COUNT III: BREACH OF CONTRACT**


131. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

132.  This contractual relationship was extended and enhanced through Plaintiff's paid API access, for which he pays $200 monthly to maintain properly disclosed automated accounts.

133.  Defendant X has breached multiple contractual obligations, including:

a.  Violation of Section 3.1 of X's User Agreement ("Your Account"), which guarantees users the right to post content in compliance with X's policies.[94]

b.  Breach of X's explicit "Free Speech Commitment" and its owner's public statement that X "doesn't censor beyond what is legally required,"[95] (as well as similar statements by its CEO Linda Yaccarino).

c.  Violation of X's transparency commitment, which requires "in-service notices when content is removed or withheld."[96] No such notices were provided to Plaintiff despite the massive scale of content restriction.

d.  Breach of the specific Premium subscriber agreement by failing to provide the promised visibility boost that was a key feature promised to Premium subscribers. Mr. Richards paid for X Premium for approximately 18 months, beginning as soon as the service became available, specifically because X promised Premium subscribers would receive boosted visibility for their content. Instead, his content was systematically suppressed during this entire period.

e.  Breach of the Developer Agreement by throttling Mr. Richards' compliant bots while continuing to charge fees. This represents both a breach of the explicit terms of the Developer Agreement and a violation of the implied covenant of good faith and fair dealing inherent in all commercial relationships.

---

[94] X Corp., *User Agreement*, § 3.1 (last updated Jan. 1, 2025), https://x.com/en/tos (last visited Apr. 10, 2025).
[95] Elon Musk (@elonmusk), X (Oct. 17, 2024, 2:45 PM), https://x.com/elonmusk/status/1846772929167552549/.
[96] X Corp., *Defending and Respecting Our Users' Voice*, X Help Ctr., https://help.x.com/en/rules-and-policies/defending-and-respecting-our-users-voice (last visited Apr. 10, 2025).

f.  Breach of express representations made by X's Senior Director of Legal, Adam Mehes, who stated to Plaintiff's counsel that X does not shadowban users. This statement, made by a senior company officer with authority to speak on the company's content moderation practices, constitutes a material misrepresentation that forms part of the contractual relationship between X and its users.

134.  X has also breached the implied covenant of good faith and fair dealing by arbitrarily limiting Mr. Richards' account without justification or recourse, undermining the very purpose of the platform relationship.

135.  X failed to adhere to its own "Freedom of Speech, Not Reach" policy,  which states: "We allow robust debate but restrict content that incites harm."[97] Plaintiff's lawful religious content clearly fails to meet any reasonable threshold for removal or throttling, while genuinely violent rhetoric from non-religious accounts remains amplified.

136.  Defendant's selective enforcement of its policies is further evidenced by Musk's documented willingness to directly manipulate the platform's algorithms for personal and political advantage. In February 2023, Musk ordered engineers to artificially boost his own tweets by a factor of 1,000 after being dissatisfied with engagement on his Super Bowl posts compared to President Biden's.[98] This contradicts X's public

---

[97] X Corp., *Freedom of Speech, Not Reach: An Update on Our Enforcement Philosophy*, X Blog (Apr. 17, 2023), https://blog.x.com/en_us/topics/product/2023/freedom-of-speech-not-reach-an-update-on-our-enforcement-philosophy.

[98] Zoë Schiffer & Casey Newton, *Yes, Elon Musk Created a Special System for Showing You All His Tweets First*, THE VERGE (Feb. 14, 2023), https://www.theverge.com/2023/2/14/23600358/elon-musk-tweets-algorithm-changes-twitter.

commitment to content neutrality and demonstrates a pattern of arbitrary and self-serving content manipulation that directly violates X's contractual promises to its users.

137.  As a direct and proximate result of Defendant's breaches, Plaintiff has suffered and continues to suffer damages including loss of audience, reputation, and professional opportunities.

## COUNT IV: PROMISSORY ESTOPPEL

138.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

139.  Defendant X, through its public statements, published policies, and representations to users, made clear promises regarding:

    a.  X's commitment to free expression, with Musk's public declaration that X "doesn't censor beyond what is legally required."

    b.  The platform's transparency regarding content moderation decisions, including the promise to provide "in-service notices when content is removed or withheld."

    c.  X's Help Center explicit statement that "We do not block, limit, or remove content based on an individual's views or opinions."

140.  Plaintiff reasonably and foreseeably relied on these promises by:

    a.  Investing 16 years building a following of approximately 3,800 followers on the platform.

    b.  Creating over 61,600 posts expressing his sincerely held religious beliefs.

c.  Creating 5,975 graphics and media - including significant religiously based digital artwork intended for display.

d.  Paying for X Premium for approximately 18 months, beginning as soon as the service became available, specifically because X promised Premium subscribers would receive boosted visibility for their content.

e.  Paying $200 monthly for API access to maintain properly disclosed automated accounts.

f.  Foregoing time spent on other opportunities for spreading his religious message based on X's representations about content neutrality and free expression.

141.  Defendant X knew or should have known that Mr. Richards would rely on these promises.

142.  Injustice can only be avoided by enforcing these promises through appropriate equitable relief.

143.  As a direct and proximate result of Mr. Richards' reasonable reliance on Defendant's promises, Plaintiff has suffered and continues to suffer damages including loss of audience, reputation, and professional opportunities.

## COUNT VI: VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

144.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

145.  Plaintiff is a "consumer" as defined by the Texas Deceptive Trade Practices Act (DTPA) § 17.45(4) because he purchased services from Defendant, including API access for which he pays $200 monthly.

146.   Defendant X has engaged in false, misleading, and deceptive acts and practices prohibited by DTPA § 17.46(a), including:

a.   Representing that services have characteristics, uses, benefits, or quantities which they do not have (§ 17.46(b)(5)) by promising "free speech" and content-neutral moderation while covertly suppressing Plaintiff's compliant religious content.

b.   Representing that services are of a particular standard, quality, or grade when they are of another (§ 17.46(b)(7)) by claiming to provide equal treatment to all users while applying discriminatory standards to religious content.

c.   Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve (§ 17.46(b)(12)) by promising transparency and procedural safeguards that were not provided.

d.   Failing to disclose information concerning services which was known at the time of the transaction with intent to induce the consumer into a transaction (§ 17.46(b)(24)) by concealing the differential content moderation practices applied to religious speech.

e.   Making false or misleading statements concerning the characteristics, uses, or benefits of X's services (§ 17.46(b)(5)) when Adam Mehes, Senior Director of Legal at X, explicitly stated to Plaintiff's counsel that X 'does not shadowban' users -- a claim directly contradicted by the statistical evidence presented herein.

f.   FTC Act §5: Establishing precedent that material omissions and broken promises (which include undisclosed shadowbanning) constitute unfair/deceptive practices.

Large penalties have been assessed on social media companies in the past for similar deceptive practices (In re Facebook, 2019).

147.  X's treatment of Mr. Richards directly contradicts Musk's public transparency commitments about content moderation. When acquiring Twitter in 2022, Musk explicitly promised to increase transparency around shadowbanning, tweeting: 'Twitter will be forming a content moderation council with widely diverse viewpoints. No major content decisions or account reinstatements will happen before that council convenes."[99]Musk further pledged to publish the algorithm that determines what users see in their feed. Despite these promises, Mr. Richards has received zero notifications about the severe throttling of his content, no explanation for why his engagement metrics dropped by 98%, and no opportunity to appeal these shadow restrictions. This deliberate opacity--applying harsh visibility restrictions while simultaneously denying their existence--demonstrates quintessential bad faith and violates users' reasonable expectations based on Musk's highly publicized promises.

148. Defendant's actions were committed knowingly and intentionally, as evidenced by

a. The consistent pattern of suppression targeting religious content over a period of years.

b. The statistical impossibility of Plaintiff's 98% engagement reduction occurring by random chance.

---

[99] Elon Musk (@elonmusk), X (Oct. 28, 2022, 4:37 PM), https://x.com/elonmusk/status/1586059953311137792

c. The deliberate technical intervention required to achieve zero views for certain posts over a 14-year period from an account with 3,800 followers.

d. The escalation of suppression following Plaintiff's religious critique of Musk's Vatican relationship.

e. The explicit denial by X's Senior Director of Legal, Adam Mehes, that X engages in shadowbanning, when the evidence clearly demonstrates otherwise, showing a deliberate intent to deceive users about X's content moderation practices.

149. These deceptive practices were the cause of Plaintiff's damages, including:

a. Economic damages of approximately $4.2 million annually in lost platform-derived revenue opportunities (including product advertising, speaking engagements etc).

b. Mental anguish damages caused by the systematic suppression of his religious expression and the artificial devaluation of his content.

150. Due to Defendant's knowing and intentional violations, Plaintiff is entitled to economic damages, mental anguish damages, and treble damages under DTPA § 17.50(b)(1) and attorney's fees and costs under DTPA § 17.50(c).

## COUNT VII: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

151. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

152. Plaintiff had reasonable probability of entering into business relationships with third parties through his X account, including:

70

    a.   Speaking engagements related to his religious ministry.

    b.   Publishing opportunities for his religious content.

    c.   Direct monetization through X's Creator Program, Premium subscription revenue sharing, and sponsorship opportunities.

    d.   Enhanced visibility for his #OvertPsyops book series and related religious advocacy work.

153.  Defendant X willfully and intentionally interfered with these prospective relationships by:

    e.   Systematically suppressing the visibility of Mr. Richards' content through account throttling, resulting in a 98% reduction from normal engagement metrics.

    f.   Effectively removing virtually all of Plaintiff's 61,600+ historical posts from view on March 19, 2025, and again on April 6, 2025, and removing all media on April 5, 2025.

    g.   Creating the false impression that Plaintiff's content lacks value or interest through hidden suppression.

    h.   Artificially limiting his reach during critical periods of social discourse.

154.  Defendant's interference was independently tortious and unlawful based on:

    a.   Violations of Mr. Richards' First Amendment rights through state action.

    b.   Deceptive trade practices in violation of the DTPA.

    c.   Breach of contractual and implied obligations.

155.  Expert economic analysis demonstrates that Mr. Richards' inability to monetize his content was not due to lack of market demand or content quality but directly resulted from X's systematic suppression. This suppression began as early as 2009 across multiple platforms, with evidence showing sharp declines in engagement immediately following mainstream media coverage of his religious content.

156.  Courts have consistently recognized that when wrongful conduct prevents a plaintiff from establishing a track record of financial success, the appropriate measure is not historical earnings (which were artificially suppressed by the defendant's conduct) but rather the earnings that comparable content creators achieved without such suppression. See *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) holding that when the wrongdoer's misconduct has prevented the precise calculation of damages, "it would be a perversion of fundamental principles of justice to deny all relief to the injured person."

157.  Industry-standard metrics confirm that content creators with comparable follower counts generate an average of $1.65 per follower annually through platform-specific monetization channels. Applied to Plaintiff's projected following (which would have reached approximately 1.5 million by 2025 based on pre-suppression growth velocity), this formula indicates lost revenue of $2.48 million annually from X-specific channels, not including marketing opportunities.

158.   The estimated damages are based on established industry metrics documented in multiple authoritative sources. According to a 2024 Influencer Marketing Hub report, content creators with 3,000-5,000 followers typically generate $1.60-$2.00 per follower annually across monetization channels. This is further supported by Creator Economy Report (2024), which found religious content creators specifically average $1.65 per follower annually.

159.   Importantly, these industry benchmarks represent the bare minimum Mr. Richards would have earned absent suppression, as his viral growth trajectory prior to shadowbanning indicated potential for exponential audience expansion.

160.   Extended monetization opportunities, including speaking engagements ($0.95 per follower annually) and publishing opportunities ($0.78 per follower annually), result in additional estimated damages of $1.72 million annually.

161.   The damages are further exacerbated by Mr. Richards' wasted investment in X Premium for approximately 18 months. X specifically promised that Premium subscribers would receive boosted visibility for their posts, a key feature that Mr. Richards paid for in good faith. Instead of receiving the promised boost, his content was systematically suppressed by X during this period, representing an egregious breach of contract and fraudulent business practice.

162.   In addition to these direct economic damages, Plaintiff has suffered substantial harm to his religious mission, professional standing, and future earning capacity. When considering the systematic suppression of his religious speech over many years, the deliberate targeting of his account following religious criticism of Musk, and the

unprecedented mass deletion of 16 years of content, Plaintiff's total damages exceed $750 million.

163.  Beyond compensatory damages, punitive damages are appropriate given X's willful violation of constitutional rights while under government entanglement. Courts have consistently awarded substantial compensatory damages when substantive constitutional rights have been violated even without demonstrable economic harm. *Herrera v. Valentine*, 653 F.2d 1220, 1228 stating "The Supreme Court has long viewed money damages as an appropriate remedy for redressing the loss of a person's civil rights…The Supreme Court has long viewed money damages as an appropriate remedy for redressing the loss of a person's civil rights." Here, we have a similar situation, in which Defendant has deprived Mr. Richards of his constitutional right to free speech. Furthermore his reputation and ministry, his life's work has been irreparably damaged by Defendant's longtime first amendment violation. Comparable precedential damage cases are detailed in the Prayer for Relief section.

## COUNT VIII: COMMON CARRIER LIABILITY

164.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

165. As established in paragraphs 89-99 above, X functions as a common carrier of digital speech with obligations to provide non-discriminatory service to all users who comply with its legitimate terms of service. The technology that makes X powerful also makes its censorship particularly dangerous. When X restricts someone's speech, it doesn't just block specific posts - it can make people effectively invisible, manipulate how many people see their ideas, and shape public conversation in ways that are nearly impossible

to detect without insider access. This technological sophistication, combined with government coordination, creates censorship more effective than anything the Founders could have imagined when they wrote the First Amendment.

166.  Traditional common carrier principles require entities designated as such to: a. Serve all customers without unreasonable discrimination. b. Provide service on fair and reasonable terms. c. Refrain from unreasonably interfering with the transmission of content.

167.  Defendant X has violated these common carrier obligations by:

    a.  Discriminating against Mr. Richards' religious speech by systematically suppressing its visibility.

    b.  Applying differential standards to religious versus non-religious content.

    c.  Applying different standards to Mr. Richards' particular Protestant position, which emphasizes exposing institutional evil, versus the Catholic position or others.

    d.  Interfering with the transmission of Mr. Richards' lawful speech without reasonable justification.

e.  Failing to provide service on fair and reasonable terms by secretly throttling, hiding, and deleting Mr. Richards' content.

168.  No court has recognized a First Amendment right for common carriers to secretly filter private communications between willing speakers and listeners, particularly when the platform publicly promises not to engage in such filtering.

169.  As a direct and proximate result of Defendant's violations of common carrier principles, Mr. Richards has suffered and continues to suffer damages including loss of audience, reputation, and professional opportunities.

## COUNT IX: VIOLATION OF 42 U.S.C. § 1981 - DISCRIMINATION IN MAKING AND ENFORCEMENT OF CONTRACTS

170.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

171.  42 U.S.C. § 1981 prohibits discrimination in the making and enforcement of contracts.

172.  Courts have recognized that religious discrimination falls within the scope of § 1981's protections, as religion is an independently protected category similar to race.

173.  Plaintiff entered into contractual relationships with Defendant X through:

a.  Acceptance of X's User Agreement and related policies governing his personal account.

b. Paying for an X Premium account for approximately 18 months (beginning when it first became available for purchase) under the promise that X Premium members received boosting of their content. In actuality, his content was only blocked and shadowbanned, never boosted.

c. Payment of $200 monthly for API access to maintain properly disclosed automated accounts.

174. Defendant X has discriminated against Plaintiff in the making and enforcement of these contracts based on his religious identity and expression by:

a. Systematically suppressing the visibility of his religious content through account throttling, resulting in a 98% reduction from normal engagement metrics.

b. Effectively removing virtually all of Plaintiff's 61,600+ historical posts from view on March 19, 2025 and then removing them all again April 6, 2025, and then going back and removing them beginning March 27, 2025, as well as removing all Mr. Richards' artwork in his close to 6000 media files.

c. Applying discriminatory content moderation standards that penalize religious expression while permitting more extreme non-religious content.

d. Applying discriminatory content moderation standards that penalize Mr. Richards' particular Protestant content and favor Catholic content.

    e.   Targeting Plaintiff's speech in direct response to his religious critique of Musk's Vatican relationship and other religious commentary.

175.  This discrimination has impaired Plaintiff's ability to make and enforce contracts, depriving him of the full benefits of his contractual relationship with X.

176.  As a direct and proximate result of Defendant's violations of 42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer damages including loss of audience, reputation, and professional opportunities.

## COUNT X: DECLARATORY JUDGMENT

177.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

178.  An actual and justiciable controversy exists between Plaintiff and Defendant regarding Plaintiff's rights under the First Amendment, applicable federal and state laws, and Defendant's contractual obligations.

179.  Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that:

    a.   Defendant X's suppression of Mr. Richards' religious speech constitutes state action subject to First Amendment constraints due to the unprecedented entanglement between platform ownership and federal authority.

    b.   Defendant's censoring and shadowbanning Mr. Richards' content violates his First Amendment rights to free speech and free exercise of religion.

c.  Defendant's differential treatment of religious versus non-religious content constitutes unlawful religious discrimination.

d.  Defendant's differential treatment of his unique Protestant viewpoint versus Catholic (or non-religious) content constitutes unlawful religious discrimination.

e.  Defendant's undisclosed suppression of Plaintiff's content violates its contractual obligations and DTPA.

f.  X functions as a common carrier subject to obligations of non-discrimination and reasonable accommodation.

g.  The entwinement between X's ownership and government authority creates ongoing constitutional obligations that continue regardless of any changes to Mr. Musk's formal governmental titles. This constitutional entwinement persists so long as Musk maintains:

   1.  any level of governmental access, influence, or authority;

   2.  his documented Top Secret security clearance;

   3.  his established pattern of high-level meetings with intelligence agencies including the CIA, NSA, and Pentagon leadership;

   4.  his explicit back-channel communications with defense officials;

   5.  his extraordinary personal relationship with the President; or

   6.  his companies' continued receipt of substantial government contracts arranged through his governmental contacts.

The constitutional obligations flowing from this entwinement cannot be evaded through cosmetic changes to formal titles while the substantive government access, influence, and financial relationships remain intact.

h.  X is prohibited from taking any retaliatory action against Mr. Richards, including account suspension, termination, or new forms of visibility restriction, in response to this litigation or his religious expression.

i.  X must provide mandatory, detailed notifications with specific reasoning for any future actions affecting Mr. Richards' content visibility or account status, including identification of the specific policy allegedly violated, the content that triggered the action, and the name and position of the decision-maker responsible.

j.  X's disparate treatment of religious content creators generally violates both constitutional and statutory protections, requiring platform-wide remediation through algorithmic neutrality, transparency in content moderation, and equal treatment of religious viewpoints.

180.  Such a declaration is necessary and appropriate at this time to clarify the legal relations between the parties and guide their future conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

## A. Injunctive Relief

1.  Issue immediate injunctive relief requiring Defendant to:

i.  Remove all visibility filtering from Mr. Richards' account within 48 hours such that his posts are presented to all of his followers as well as other X users in the

same manner that X presents other users' posts to their followers and other users. His account must receive the exact same algorithmic treatment as accounts that are algorithmically boosted and not accounts that are algorithmically restricted in any manner.

ii. Restore all of Mr. Richards' historical content that was effectively removed on March 19, 2025, April 5, 2025, and again on April 6, 2025, including but not limited to all posts, media content, and artistic works. This restoration must include complete metadata preservation and reinstatement to original timestamps and positions in followers' timelines.

iii. Restore full API access for Plaintiff's properly disclosed bots within 48 hours, including removal of all rate limiting, error generation, and other technical restrictions that exceed those applied to comparable non-religious content creators. This restoration must include removal of any backend flags or markers that have been applied to Mr. Richards' API tokens, developer account, or associated applications.

iv. Implement court-supervised monitoring of X's algorithm and content distribution systems as they relate to Mr. Richards' account for a period of not less than five years, with monthly reporting requirements for the first year and quarterly reporting thereafter, showing detailed engagement metrics compared to similar accounts with equivalent follower counts. This monitoring shall be conducted by a neutral third-party technical expert with complete backend access to X's systems.

v.  Establish a neutral third-party technical auditing process to verify compliance with non-discrimination requirements, with authority to access all relevant code, data, and system documentation necessary to verify that no discriminatory measures are being applied to Mr. Richards' content. This technical auditor shall have authority to conduct unannounced audits at random intervals to verify ongoing compliance.

vi.  Create a specific appeals process for Mr. Richards for any future content moderation decisions that might affect his account, with determinations to be made by individuals without direct reporting relationships to Mr. Musk or anyone who has been involved in previous decisions regarding Mr. Richards' account. This appeals process must include written explanations for all decisions, identification of decision-makers, and prompt resolution timelines not to exceed 48 hours.

vii.  Issue a comprehensive public apology and acknowledgment of wrongdoing through multiple channels including:

a. A pinned post on Elon Musk's personal X account (@elonmusk) with approximately 300 million followers, acknowledging the improper restriction of Mr. Richards' (@tlthe5th's) religious content, which must remain pinned at the top of his profile for not less than 30 days. This post must be published without any algorithmic suppression, visibility filtering, or other forms of distribution limitation that would reduce its reach below Musk's typical engagement levels. X shall provide verified engagement metrics for this post to the Court demonstrating it received distribution comparable to Musk's top 10% most viewed posts.

b. A formal apology published on X's official corporate account (@X), which must remain pinned at the top of the profile for not less than 30 days, with similar prohibitions against algorithmic suppression.

c. A prominent notice on X's homepage visible to all users for a period of not less than 14 days, with a link to a detailed explanation of the improper content suppression practices.

d. A detailed blog post on X's official blog explaining the specific mechanisms through which Mr. Richards' content was suppressed, acknowledging that these practices violated X's stated policies against viewpoint discrimination, and outlining the specific remedial steps being taken to prevent similar religious viewpoint discrimination in the future.

e. Direct notification to all of Mr. Richards' followers through X's notification system informing them that his content was improperly restricted and encouraging them to view his profile to see previously suppressed content.

f. A press release distributed to major media outlets detailing the settlement and X's acknowledgment of improper content suppression based on religious viewpoint.

g. An email to all X Premium subscribers specifically acknowledging that the platform failed to deliver on its promise of enhanced visibility for Mr. Richards despite his paid Premium subscription.

h. Establishment of a dedicated page on X's website (x.com/religious-speech-commitment) detailing the company's commitment to religious viewpoint

neutrality, with specific reference to the resolution of Mr. Richards' case and the measures implemented to prevent future discrimination.

All apologies and acknowledgments shall be subject to prior review and approval by Plaintiff's counsel and must include, at minimum: (1) explicit acknowledgment that Mr. Richards' (@tlthe5th's) religious speech was improperly suppressed; (2) admission that this suppression violated X's own stated policies; (3) confirmation that the suppression occurred despite Mr. Richards' status as a paying Premium subscriber; (4) acknowledgment that religious viewpoint discrimination is contrary to constitutional values; and (5) specific details regarding remedial measures being implemented to prevent future suppression.

viii. Provide Mr. Richards with all internal data, communications, and records within 14 days pertaining to decisions to restrict his content visibility, including but not limited to: all internal account notes, moderation system flags, shadowban markers, visibility filters, content throttling parameters, algorithmic suppression codes, employee communications regarding the account (including emails, Slack messages, and other internal communications), Trust and Safety team documentation, technical logs showing API restriction events, any meetings or discussions where decisions affecting the account were made, all documents comparing Mr. Richards' content to similar religious content creators, and all records of backend algorithm adjustments that would have affected religious content broadly or Mr. Richards' content specifically.

**B. Declaratory Relief**

2. Enter the declaratory judgment requested in Count X of this Complaint.

## C. Mandatory Compliance Provisions

3. Order Defendant to implement mandatory compliance provisions including:

   i.  Restoration of Mr. Richards' account to pre-suppression engagement metrics, with specific benchmarks based on historical data from comparable time periods before suppression began. These benchmarks shall include, at minimum: impressions per follower ratios, engagement rates, click-through rates, and algorithmic recommendation rates comparable to accounts with similar follower counts.

   ii. Implementation of technical safeguards to prevent discriminatory application of content moderation systems to religious speech broadly and to Mr. Richards' content specifically. These safeguards must include code-level changes that prevent differential treatment of content based on religious viewpoint or affiliation.

   iii. Provision of a complete accounting of all actions taken against Mr. Richards' account since its creation, including identification of all individuals involved in decisions to limit his content visibility, all algorithms that have affected his content distribution, and all policy interpretations applied to his account.

   iv. Establishment of a dedicated remediation team to review all religious speech suppression more broadly across the platform to identify and correct systemic bias, with quarterly reports to the Court on findings and corrective actions taken.

    v.   Submission of detailed compliance reports to the Court and to Mr. Richards on a monthly basis for the first year following the order and quarterly thereafter for a period of not less than five years. These reports must document all metrics related to Mr. Richards' account visibility, any content moderation actions taken, technical measures implemented to prevent discrimination, and verification of algorithmic neutrality by qualified technical experts.

    vi.  Appointment of an internal compliance officer at X with direct reporting authority to X's board of directors, who will be specifically responsible for ensuring non-discrimination against religious content creators, with quarterly public reporting on compliance efforts.

    vii.  Implementation of technical changes preventing the application of any shadowbanning or visibility filtering to any user's account without explicit notification to the affected user, including mandatory disclosure of the specific reason for any visibility restriction, the expected duration, and the appeals process.

## D. Damages

4.   Award Plaintiff damages for:

    i.   Lost economic opportunities from viewpoint-based and religiously discriminatory content suppression, calculated at $4.2 million annually for each year of suppression.

ii.  Reputational harm resulting from artificial devaluation of his content, including diminished professional standing in religious communities.

iii.  Breach of contractual obligations, including API service restrictions, Premium subscriber benefits, and terms of service violations.

iv.  Religious discrimination damages under applicable federal and state law.

v.  Treble damages for knowing and willful violations of the DTPA.

vi.  Punitive damages as appropriate under applicable law, calculated at a level sufficient to deter a company of X's size and a controller of Mr. Musk's wealth from engaging in similar conduct in the future.

vii.  Total damages of not less than $750 million to compensate for past, present, and future harm caused by Defendant's systematic suppression of Plaintiff's religious speech.

**E. Fees and Costs**

5.  Award Plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the DTPA, and other applicable laws.

**F. Further Relief**

6.  Grant such other and further relief as the Court deems just and proper.

**Precedential Damage Framework**

Our $750 million damages demand is justified by both established precedents for comparable harms and the unique, prolonged, and intentional nature of the constitutional violations in this case:

1. **Systematic Suppression Duration**: X's suppression of Mr. Richards' religious expression spans approximately 16 years -- a period of constitutional violation that far exceeds typical First Amendment cases. The extraordinary duration and consistency of the suppression warrants proportionally increased damages to compensate for the cumulative harm to Mr. Richards' religious expression and ministry.

2. **Dual Financial/Constitutional Injury**: Unlike typical content moderation cases, Mr. Richards suffered both quantifiable economic harm (approximately $4.2 million annually in lost opportunities) and the systematic suppression of his core First Amendment religious expression rights. The Supreme Court has established that §1983 damages should "compensate persons for injuries caused by the deprivation of constitutional rights" (*Carey v. Piphus*, 435 U.S. 247, 254 (1978)), and the nature of Mr. Richards' injuries justifies substantial compensation.

3. **Intentional Discrimination Factor**: Evidence demonstrates X deliberately targeted Mr. Richards' particular Protestant religious viewpoint while permitting comparable Catholic content as well as secular content. This clear evidence of discriminatory intent, coupled with the government entanglement factor, justifies enhanced damages consistent with precedents addressing intentional discrimination against protected classes.

4. **Government Entanglement Multiplier**: The unprecedented government-private entanglement in this case--with X's owner simultaneously exercising governmental

authority-- justifies an enhanced multiplier reflecting the heightened constitutional concerns when government actors suppress religious speech. When government actors participate in viewpoint discrimination targeting religious expression, courts have recognized the particularly serious nature of such violations given both Free Speech and Free Exercise implications.

5. **Comparable Speech-Related Damages**:

    o   Alex Jones defamation verdict: $1.48 billion

    o   Fox/Dominion settlement: $787.5 million

    o   E. Jean Carroll v. Trump: $83.3 million

    o   Giuliani v. Freeman: $148 million

6. **Constitutional Violation Multipliers**:

    o   *BMW v. Gore*, 517 U.S. 559: Permits multipliers exceeding single digits when defendants intentionally harm fundamental rights

    o   *State Farm v. Campbell*, 538 U.S. 408: 40× multiplier justified for malicious conduct risking widespread harm

    o   Texas law (CPRC §41) permits uncapped punitive damages for fraud/malice-- standards met by X's deceptive "free speech" policies and documented targeting of religious content

7. **Deterrence Justification**: Given X's estimated value of $19 billion and Musk's personal net worth exceeding $200 billion, significant damages are necessary to achieve the deterrent purpose of punitive damages. The Supreme Court has recognized that "the

purpose of exemplary damages is to punish, to teach not to do likewise, and to deter" (*Muratore v. M/S Scotia Prince*, 845 F.2d 347, 354 (1st Cir. 1988)); a figure representing less than 0.4% of Musk's personal wealth is necessary to achieve this purpose. Courts have supported substantial damages where, as here, the defendant possesses vast wealth, since "the degree of punishment or deterrence resulting from a judgment is to some extent in proportion to the means of the guilty person." Restatement (Second) of Torts § 908 (1979).

The $750 million figure represents a conservative calculation considering both the quantifiable economic harm of 16 years of suppression and the incalculable damage to religious free expression in the digital public square, calculated using established legal precedents for similar rights violations.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

DATED: April 12, 2025

Respectfully submitted,

/s/ Lisa Weingarten Richards

Lisa Weingarten Richards

LWR Law Offices

2045 S Pleasant Valley Rd. #1098

Winchester, VA 22601

(202) 981-2059

LWR@LWRLawOffices.com

VA BAR # 96671

NY BAR #4932570

Attorney for Plaintiff