# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS

# DALLAS DIVISION

THOMAS RICHARDS

        *Plaintiff,*

    *v.*

X Corp.

        *Defendant*

Case No. _____

Lisa Weingarten Richards, Esq.
VSB #96671
LWR Law Offices
2045 S Pleasant Valley Rd. #1098
Winchester, VA 22601
*Tel.:* (202) 981-2059
lwr@lwrlawoffices.com
*Counsel for Plaintiff*

## PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER TO PRESERVE EVIDENCE, PREVENT FURTHER CONTENT MANIPULATION, AND ENSURE LITIGATION INTEGRITY

TABLE OF AUTHORITIES

Cases

Brentwood Academy v. Tennessee Secondary School Athletic Association, 531 U.S. 288 (2001)……………………………………………………………………………………7, 10, 13

Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753 (1995)……………….……17

Elrod v. Burns, 427 U.S. 347 (1976).....................................................................................15

Enigma Software Group USA, LLC v. Malwarebytes, Inc., 946 F.3d 1040 (9th Cir. 2019).......12

Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423 (1974).....................10

Janvey v. Alguire, 647 F.3d 585 (5th Cir. 2011).................................................................11

NetChoice, L.L.C. v. Paxton, 49 F.4th 439 (5th Cir. 2022).......................................................13

Newby v. Enron Corp., 302 F.3d 295 (5th Cir. 2002)................................................................11

Nichols v. Alcatel USA, Inc., 532 F.3d 364 (5th Cir. 2008)........................................................10

Packingham v. North Carolina, 137 S. Ct. 1730 (2017)...........................................................17

Rimkus Consulting Group, Inc. v. Cammarata, 688 F. Supp. 2d 598 (S.D. Tex. 2010)...............11

Stewart v. Dunn, 363 F.2d 591 (5th Cir. 1966).......................................................................11

Texans for Free Enter. v. Tex. Ethics Comm'n, 732 F.3d 535 (5th Cir. 2013).............................16

Statutes

47 U.S.C. § 230(c)(2)(A)..........................................................................................................12

Rules

Federal Rule of Civil Procedure 37(e).......................................................................................11

Federal Rule of Civil Procedure 65.........................................................................................3, 19

**NOTICE REGARDING FORTHCOMING EXHIBITS**

Due to the emergency nature of this filing and the immediate, ongoing risk of irreparable harm, Plaintiff submits this Emergency Motion for Temporary Restraining Order with reference to evidence detailed in the Complaint and accompanying declarations. Additional supporting exhibits for all filings will be submitted forthwith as a supplement to these initial filings.

Plaintiff Thomas Richards, through his undersigned counsel, hereby moves this Court for an Emergency Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 65. This motion seeks to halt Defendant's pattern of strategic evidence manipulation initiated in direct response to counsel's pre-litigation communications - actions that threaten the integrity of judicial proceedings, removing key evidence, and constitute ongoing retaliation against Plaintiff's exercise of his legal rights.

**INTRODUCTION**

This emergency motion addresses a documented pattern of targeted, retaliatory conduct by X Corp. that escalated immediately following Plaintiff's demand letter and threatens both the evidence necessary for adjudication and the constitutional rights at stake. As detailed in the accompanying Complaint, Defendant has engaged in three increasingly aggressive rounds of content manipulation directly timed to Plaintiff's legal communications - a pattern of conduct that would prejudice this Court's ability to evaluate the full scope of Defendant's actions without immediate intervention.

The timing of Defendant's actions reveals their retaliatory and evidence-suppressive intent:

1. On March 31, 2025, Plaintiff's counsel sent X Corp. a detailed demand letter addressing Defendant's secretly limited the visibility of his posts (shadowbanning) and thus preventing Plaintiff's religious expression.

2. After receiving this letter, rather than addressing the concerns or preserving relevant account data, X Corp. took the extraordinary step on April 5, 2025 of removing 5,974 of Plaintiff's media files from his wall (including 99.75% of his artistic religious expression) -- content that had been accessible for years.

3. On April 2, 2025, Plaintiff's counsel sent a follow-up communication noting potential litigation.

4. On April 6, 2025, just four days after this second communication, X Corp. further escalated by removing virtually all posts from March 19 to April 6, 2025 from public visibility on his wall -- the precise period documenting Plaintiff's attempts to address the earlier manipulations.

This sequential pattern of content removal -- triggered specifically by legal notices and targeting evidence relevant to litigation -- demonstrates a systematic attempt to obscure the historical record of Defendant's conduct and undermines the integrity of judicial proceedings. The fact that these removals affect only visibility on his wall while presumably (though this is not certain because the archives are difficult to search) maintaining content in private archives further reveals the tactical nature of Defendant's actions -- removing evidence from public view while preserving plausible deniability.

This Court's immediate intervention is necessary not merely to prevent further irreparable harm to Plaintiff's constitutional rights, but to prevent the deliberate manipulation of evidence central

to adjudicating those rights. The requested TRO focuses on preserving the integrity of the judicial process while addressing the immediate, escalating harm to Plaintiff's protected expression.

**FACTUAL BACKGROUND**

The facts establishing immediate need for relief include:

1. **Continuous Government Entanglement Regardless of Title**: Musk's government access transcends his formal DOGE position. He has maintained a "Top Secret" security clearance since at least 2022 and conducted visits to the Pentagon, NSA, and CIA within a single month (March-April 2025). Most significantly, when departing the Pentagon, Musk was overheard telling Secretary Hegseth, "If there's anything I can do to be helpful, I'd like to see you" - establishing a direct back-channel that will continue regardless of formal role.

2. **Targeted Removal of Critical Evidence Following Legal Notices**: Within days of receiving counsel's March 31 demand letter, Defendant X Corp. initiated an unprecedented purge of 5,974 media files from Plaintiff's account on April 5, 2025. This was followed by removal of posts from March 27 through April 6, 2025 on April 6, 2025, just days after counsel's April 2 follow-up letter. This timing establishes a direct causal relationship between legal notices and content removals.

3. **Pattern of Selective Visibility Manipulation with Risk of Complete Deletion**: While Defendant may have currently only removed content from public view while perhaps maintaining it in Plaintiff's private archive, the archive is difficult to access (one must put in a request, which may be granted by X a few days). Then the archive must be searched

and parsed, and all content may not be present. This pattern of escalating retaliation following legal notices also creates substantial risk that Defendant will next restrict or eliminate archive access itself. Defendant has demonstrated both the technical capability and retaliatory intent to systematically eliminate evidence relevant to this litigation, and there is no technical or contractual barrier preventing Defendant from blocking archive access or permanently deleting content without notice.

4. **Documented Pattern of Algorithmic Suppression**: Statistical evidence demonstrates that Plaintiff's account @tlthe5th (with approximately 3,800 followers) receives typically 9-50 "impressions" per post compared to the platform average of 2,121 impressions -- representing a 98% reduction from typical engagement metrics for accounts of comparable size.

5. **Systematic Targeting of Religious Content**: The pattern of suppression specifically targets Plaintiff's religious expression. Plaintiff is a born-again Christian bible believer and former Catholic. His posts which critique the Catholic institution -- particularly clerical sex abuse – experience some of the most severe visibility restrictions. This content-specific targeting against his religion raises substantial First Amendment concerns that require preservation of evidence for proper adjudication.

6. **Contradictory Public Statements vs. Internal Conduct**: Adam Mehes, Senior Director of Legal at X, explicitly stated to Plaintiff's counsel on a phone call around December 2024 that X does not shadowban users -- a statement directly contradicted by both the statistical evidence and the subsequent strategic removals following legal notices. This contradictory behavior demonstrates consciousness of wrongdoing and a potential attempt to conceal evidence of the very practices Defendant publicly denies.

6

7. **Government Entanglement Creating State Action**: As detailed in the Complaint, X's owner, Elon Musk, simultaneously holds significant governmental authority as a Special Government Employee heading the Department of Government Efficiency created by executive order. This unique entanglement easily satisfies the state-action test under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), making the preservation of evidence of content moderation practices essential to adjudicating the constitutional claims.

8. The Department of Government Efficiency (DOGE) was specifically created for and apparently named by Elon Musk, as evidenced by the acronym "DOGE" - which references his well-known promotion of the Dogecoin cryptocurrency. *This isn't merely a coincidental acronym but a personalized governmental role designed with Musk's identity and brand in mind.* The fact that an official federal department bears Musk's cryptocurrency-related nickname demonstrates an unprecedented level of personal identification between a government position and a private individual, further cementing the inseparable entanglement between Musk's governmental authority and his control of X Corp.

9. Musk's Unprecedented Intelligence Agency Access: The government entanglement extends to America's intelligence community. His privileged access and visits to their offices discussed above demonstrates that Musk's government entanglement will continue even if he nominally "leaves" DOGE, making any change in title legally irrelevant to the constitutional analysis. https://abc7ny.com/post/pete-hegseth-says-hes-meeting-elon-musk-pentagon-discuss-efficiencies/16061808/

10. This tailor-made governmental position appears to have been effectively purchased by Musk through his unprecedented $300 million political contributions to President Trump's election and by leveraging X's algorithm to promote Trump's candidacy. Computational analysis found that after Musk's formal endorsement of Donald Trump in July 2024, X's algorithms were deliberately manipulated to ensure Republican-leaning posts received greater engagement while Democrat-oriented content was systematically suppressed. This extraordinary investment of both financial and technical resources to secure Trump's election, followed by the immediate creation right when Trump entered office of a personalized government department (bearing Musk's branding, "DOGE"), demonstrates the extraordinary entanglement between Musk's governmental authority and his control of X Corp. Given the resources Musk expended to obtain this position, any claim that he would voluntarily abandon it immediately after receiving notice of constitutional violations lacks credibility.

11. While reports emerged on April 2, 2025, that Musk might soon leave his governmental role, this timing-- occurring less than 48 hours after receipt of Plaintiff's detailed demand letter outlining the constitutional violations-- appears transparently strategic and does not mitigate the constitutional violations that have occurred while Musk exercises official authority. The claim that DOGE's work will be done soon lacks credibility for several reasons:

  a. The executive order establishing DOGE contains no sunset provisions or completion metrics;

    b.   President Trump has repeatedly emphasized that government efficiency is an ongoing mission, not a time-limited project;

    c.   The unprecedented personal relationship between Musk and the President transcends formal titles (with Musk publicly declaring on February 7, 2025: "I love @realDonaldTrump as much as a straight man can love another man");

12.  The Supreme Court in *Brentwood Academy* specifically rejected attempts to manipulate formal structures to evade constitutional obligations, noting that changes in formalities 'affected candor but not the momentum' of state involvement.

13.  Rather than simply complying with constitutional requirements by removing the shadowban from Mr. Richards' account (which X claims doesn't exist) when counsel requested it, Musk appears willing to claim to abandon his governmental position entirely - demonstrating both the importance of maintaining this unconstitutional censorship and awareness that his dual role created constitutional obligations.

**ARGUMENT**

**I. Legal Standard for Temporary Restraining Order**

A temporary restraining order is warranted when the moving party establishes: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to

the defendant; and (4) that the injunction will not disserve the public interest." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

## II. Plaintiff Has a Substantial Likelihood of Success on the Merits of This Motion

The "likelihood of success" prong for a TRO focuses specifically on whether Plaintiff is likely to succeed on the particular relief requested in the motion, not necessarily on all claims in the underlying complaint. See *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 441-43 (1974) (noting that TROs are designed to preserve the status quo pending further proceedings). Here, Plaintiff seeks only to preserve evidence and restore content that was visible for years until Defendant's recent actions following pre-litigation communications.

Furthermore, the Fifth Circuit has recognized that the focus at the TRO stage is on whether the movant has shown "a substantial likelihood of success on the merits" of his claim. *Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011); (emphasizing that the analysis focused on the specific claims supporting the requested injunctive relief, not the dispute as a whole, which was subject to an arbitration agreement). Here, the primary relief requested is evidence preservation and content restoration.

## A. Evidence Preservation and Restoration of Status Quo

Courts have inherent authority to issue orders preserving evidence relevant to pending litigation. See *Newby v. Enron Corp, 302 F.3d 295*. And "The law is clear that… a District Court has the power to issue a temporary restraining order in order to preserve existing conditions." Stewart v. Dunn, 363 F.2d 591, 598.

Plaintiff has substantial concern that Defendant may be disregarding standard litigation hold obligations. Plaintiff's demand letter explicitly requested preservation of "all data related to this

account and associated API usage per FRCP 37(e)" and maintenance of "complete logs of all visibility decisions and algorithmic settings." Instead of acknowledging these preservation obligations, Defendant responded by systematically removing evidence crucial to this litigation. This pattern of post-notice content removals raises serious questions about whether Defendant is complying with its duty to preserve evidence, further justifying this Court's immediate intervention.

This pattern of conduct raises serious spoliation concerns under Federal Rule of Civil Procedure 37(e), which governs the consequences of failing to preserve electronically stored information. As noted in *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, courts can impose sanctions when evidence is intentionally destroyed to prevent its use in litigation. The timing of Defendant's content removal actions -- occurring precisely after receipt of Plaintiff's demand letters -- creates a compelling inference of retaliatory, evidence-suppressive intent.

Plaintiff has demonstrated a clear likelihood of success on the claim that Defendant is systematically removing evidence crucial to this litigation. The removal of 5,974 media files within days of counsel's first letter, followed by removal of additional posts within days of the follow-up letter, establishes a clear pattern of evidence manipulation directly triggered by legal notices. suggesting potential bad faith conduct that warrants immediate judicial intervention to prevent further evidence destruction.

## B. Protection Against Ongoing Retaliation

The requested non-retaliation protection is supported by the documented pattern of escalating adverse actions following each legal communication. Courts have recognized their authority to enjoin retaliatory conduct that threatens the integrity of judicial proceedings. The timeline of

content removals provides compelling evidence of retaliatory intent sufficient to establish likelihood of success on this aspect of the requested relief.

The retaliatory pattern also demonstrates the lack of "good faith" required for Section 230 immunity. *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1052 (9th Cir. 2019) held §230 does not protect platform actions driven by anticompetitive animus or deception-- exactly the conduct shown here through: (1) Senior Director Adam Mehes' false denial of shadowbanning while implementing it (*id.* at 1049); and (2) the removal of 5,974 media files days after Plaintiff's demand letter.

The Fifth Circuit's *NetChoice* framework-- which rejected platforms' "freewheeling First Amendment right to censor," 49 F.4th 439, 445 (5th Cir. 2022)-- remains persuasive post-*Moody*, as SCOTUS remanded only for facial challenge analysis without disturbing *NetChoice*'s core holdings on viewpoint discrimination

**IMPORTANT NOTE REGARDING THE UNDERLYING CLAIMS:**

The Court need not reach any conclusions about the ultimate merits of Plaintiff's constitutional and contractual claims at this preliminary stage. The requested TRO seeks only to preserve evidence and maintain the status quo that existed for years prior to the recent, targeted removals. The Court's authority to preserve evidence and prevent retaliatory conduct exists independent of its eventual determination on the underlying claims, which will be fully briefed at later stages of this litigation.

That said, should the Court determine that analysis of the underlying claims is necessary for its TRO determination, Plaintiff submits the following abbreviated discussion of those claims:

**C. Additional Substantive Claims for the Underlying Complaint If Needed to Support TRO Relief**

1. **First Amendment Violations through State Action**

Plaintiff has demonstrated a substantial likelihood of success on his First Amendment claim based on the documented entanglement between X's ownership and federal authority through Elon Musk's dual role. Under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), such entanglement can satisfy the state-action requirement for constitutional claims. The evidence of content manipulation targeting religious speech -- demonstrated through both statistical evidence and the strategic post-demand letter content removals -- establishes a pattern of viewpoint discrimination that cannot withstand constitutional scrutiny.

2. **Violations of Platform Policies and Contractual Promises**

The documented pattern of content removals directly contradicts X's public statements and contractual promises. X's Help Center explicitly states: "We do not block, limit, or remove content based on an individual's views or opinions." Defendant's Senior Director of Legal has explicitly denied that shadowbanning occurs on the platform. The dramatic contrast between these representations and Defendant's documented conduct following legal notices establishes a substantial likelihood of success on claims that these removals violate both platform policies and contractual obligations.

Additionally, Musk's actions directly violate the January 20, 2025 Executive Order on "RESTORING FREEDOM OF SPEECH AND ENDING FEDERAL CENSORSHIP," https://www.whitehouse.gov/presidential-actions/2025/01/restoring-freedom-of-speech-and-

13

ending-federal-censorship/  which explicitly prohibits federal government officials from engaging in conduct that would unconstitutionally abridge Americans' free speech. As a Special Government Employee heading DOGE, Musk is bound by this Executive Order, creating heightened violation of law for impeding Mr. Richards' speech rights.

### III. Plaintiff Will Suffer Irreparable Harm Absent Emergency Relief

### A. Evidence Manipulation Threatens Judicial Integrity

The most immediate irreparable harm is to the integrity of the judicial process itself. Defendant's pattern of removing evidence in direct response to legal notices represents an attempt to manipulate the factual record this Court will evaluate. Without immediate intervention, Defendant will likely continue this documented pattern of removing evidence relevant to its content moderation practices.

The threat extends beyond public visibility to the archives themselves. Given X Corp's escalating pattern of evidence manipulation following legal communications, there is substantial risk that Defendant will next restrict or eliminate archive access entirely. (Aside from which, the archive is much more difficult to view, search, and to parse than is content available on X itself, often requiring the skill of a software developer to make the content usable). This would irreparably destroy evidence central to this litigation and prevent the Court from properly evaluating the claims. The demonstrated willingness to retaliate against legal notices with increasingly aggressive content manipulation creates an urgent need for preservation before archives are similarly targeted.

### B. First Amendment Harms Are Inherently Irreparable

The Fifth Circuit has consistently held that "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The sudden removal of years of Plaintiff's religious expression from public visibility -- content that had been accessible for years -- imposes precisely this irreparable constitutional injury.

## C. Ongoing Retaliation Chills Protected Activity

The pattern of escalating content removals directly following legal notices creates a chilling effect on Plaintiff's protected speech and right to petition. This documented timeline of retaliation -- with content removals occurring within days of demand letters -- demonstrates that further irreparable harm is not merely possible but actively ongoing.

## IV. The Balance of Equities Weighs Heavily in Plaintiff's Favor

The requested relief imposes minimal burden on Defendant while preventing substantial harm to Plaintiff:

1. **Defendant Claims These Practices Don't Exist**: X Corp.'s Senior Director of Legal has explicitly denied that shadowbanning occurs on the platform. A TRO prohibiting visibility manipulation that Defendant claims it doesn't engage in cannot, by definition, impose any legitimate business burden.

2. **Relief Preserves Status Quo As It Existed For Years**: The requested relief merely prevents further manipulation of content that was publicly visible for years until days after Plaintiff's demand letters. This represents the true status quo that should be preserved pending litigation.

3. **Documented Technical Capability for Implementation**: X has demonstrated the technical capability to instantly manipulate content visibility, as evidenced by the targeted removals after receiving demand letters. The same technical capability can be used to restore visibility and prevent further manipulation without technical burden.

4. **Preservation of Critical Evidence**: The requested relief ensures preservation of evidence central to adjudicating the claims at issue -- evidence that would be irretrievably compromised without intervention.

## V. The Public Interest Strongly Favors Relief

"Injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). This principle applies with particular force where, as here, the First Amendment concerns involve religious expression -- speech that occupies a special position within First Amendment jurisprudence. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

The public interest in addressing platform censorship is further evidenced by the FTC's February 20, 2025 formal inquiry into how "technology platforms deny or degrade users' access to services based on the content of their speech." https://www.ftc.gov/news-events/news/press-releases/2025/02/federal-trade-commission-launches-inquiry-tech-censorship This federal regulatory action confirms the substantial public interest in addressing precisely the type of conduct at issue in this case.

Beyond the constitutional interests, the public interest is further served by preserving evidence integrity in cases involving major platforms that function as the "modern public square" for millions of Americans. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). The

documented pattern of post-legal notice evidence manipulation threatens not just the individual constitutional rights at stake but the judiciary's ability to effectively adjudicate claims of broad public importance.

**REQUESTED RELIEF**

For the foregoing reasons, Plaintiff respectfully requests that this Court:

1. Issue a Temporary Restraining Order requiring Defendant to:

   a. **Cease Further Evidence Manipulation**: Immediately halt any further removal, hiding, or manipulation of Plaintiff's account content (@tlthe5th), including posts, media, engagement metrics, and visibility settings, and maintain all current and historical data in its current state both internally and in public view;

   b. **Preserve Archive Access and Content**: Maintain uninterrupted access to Plaintiff's complete account data archive, preserving all historical posts, media files, engagement metrics, and account settings in their current form without deletion, corruption, or access restriction;

   c. **Restore Public Visibility**: Restore public visibility to:

all content made invisible after March 19, 2025, including specifically:

   i. The approximately 61,600 posts removed from public view on March 19, 2025

   ii. The approximately 5,974 media items removed from public view on April 5, 2025

   iii. All posts removed from view on or after April 6, 2025.

Also ensure that all of Plaintiff's posts are viewable and searchable in his account.

This restoration must ensure that:

1. All posts are returned to their original visibility settings with their original creation dates and timestamps preserved;

2. All content is properly indexed so it appears in search results when users search Plaintiff's account;

3. X's algorithms deliver Plaintiff's posts to his followers' feeds with the same priority and frequency as posts from other accounts with similar follower counts;

4. No artificial downranking, throttling, or suppression is applied to reduce the distribution of Plaintiff's content.

   d. **Preservation of Algorithm and all Shadowbanning Documentation**: Preserve all internal records, communications, code repositories, and change logs relating to content visibility algorithms, shadowbanning protocols (both automated and controlled or partially controlled by a human), and account throttling systems that have been or may have been applied to Plaintiff's account;

   e. **Non-Retaliation Provision**: Refrain from any further adverse actions against Plaintiff's account in response to this litigation or pre-litigation communications;

   f. **Certification of Compliance**: Provide written certification of compliance with these requirements within 48 hours;

2. Require no bond or a nominal bond under Federal Rule of Civil Procedure 65(c), as Defendant claims it does not engage in the practices this TRO would prohibit, and therefore cannot suffer damages from being enjoined from engaging in them;

18

3. Schedule a hearing on Plaintiff's Motion for Preliminary Injunction at the Court's earliest convenience; and

4. Grant such other and further relief as the Court deems just and proper.

  g. **Detailed Compliance Reporting**: Submit weekly compliance reports to the Court during the pendency of this TRO documenting all steps taken to restore content visibility, remove algorithmic restrictions, and prevent further content manipulation. These reports must include specific metrics showing engagement rates compared to accounts with similar follower counts and must be certified under penalty of perjury by a senior technical officer with knowledge of X's content distribution systems.

h. **Compliance Officer Designation**: Designate a specific senior officer responsible for ensuring compliance with this order who shall have direct reporting responsibility to X's board of directors regarding implementation and verification of all required actions.

**NOTICE OF APPLICATION**

Pursuant to Federal Rule of Civil Procedure 65(b) and Local Rules of the Northern District of Texas, Plaintiff provides notice as follows:

1. Immediately upon filing this Emergency Motion for Temporary Restraining Order with the Court on April 13, 2025, Plaintiff will provide notice to Defendant X Corp. through the following methods: a. Email to Adam Mehes, Senior Director of Legal at X Corp., at amehes@x.com and to legal@x.com, which will include complete copies of the Complaint, Motion for Temporary Restraining Order, Motion for Preliminary Injunction, and any supporting documents as filed with this Court; and b. Phone call to Adam Mehes, Senior Director of Legal at X Corp., at (347) 417-4940.

19

2. The notice to be provided to Defendant will include: a. Complete copies of all documents filed with this Court; b. Information regarding the relief sought, including halting further content manipulation and restoring content made invisible after March 19, 2025; c. Information on X Corp.'s pattern of evidence manipulation following Plaintiff's demand letter; and d. An offer to address any questions regarding the filings.

3. The circumstances necessitating emergency relief include X Corp.'s documented pattern of removing content in direct response to legal communications, including the removal of 5,974 media files on April 5, 2025 (just days after Plaintiff's demand letter) and the removal of posts from March 27-April 6, 2025 on April 6, 2025, creating substantial risk of further evidence destruction without immediate court intervention.

4. Within one hour of providing notice to Defendant, Plaintiff will file a Supplemental Certificate of Notice with this Court confirming the exact time, method, and content of the notice provided.

Dated: April 12, 2025

Respectfully submitted,

/s/ Lisa Weingarten Richards

Lisa Weingarten Richards

LWR Law Offices

2045 S Pleasant Valley Rd. #1098

Winchester, VA 22601

(202) 981-2059

LWR@LWRLawOffices.com

VA BAR # 96671

NY BAR #4932570

Attorney for Plaintiff