# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

THOMAS RICHARDS

*Plaintiff,*

*v.*

X Corp.

*Defendant*

Case No. _____

Lisa Weingarten Richards, Esq.

VSB #96671

LWR Law Offices

2045 S Pleasant Valley Rd. #1098

Winchester, VA 22601

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

TABLE OF AUTHORITIES

Cases

Biden v. Knight First Amendment Institute, 141 S. Ct. 1220 (2021)..........................................16

Brentwood Academy v. Tennessee Secondary School Athletic Association,

  531 U.S. 288 (2001)..................................................................................................5,7,10,14

Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567 (5th Cir. 1974)......................................22

Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753 (1995)................................6, 20

Elrod v. Burns, 427 U.S. 347 (1976).........................................................................................20

Enigma Software Group USA, LLC v. Malwarebytes, Inc., 946 F.3d 1040 (9th Cir. 2019)...17, 18

Janvey v. Alguire, 647 F.3d 585 (5th Cir. 2011).........................................................................10

Missouri v. Biden, 601 U.S. 345 (2023).....................................................................................24

NetChoice, L.L.C. v. Paxton, 49 F.4th 439 (5th Cir. 2022)........................................11, 16, 17, 18

New York Times Co. v. Sullivan, 376 U.S. 254 (1964)................................................................21

Packingham v. North Carolina, 137 S. Ct. 1730 (2017).............................................................23

Reed v. Town of Gilbert, 576 U.S. 155 (2015)............................................................................14

Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819 (1995)...................................14

Texans for Free Enter. v. Tex. Ethics Comm'n, 732 F.3d 535 (5th Cir. 2013).............................22


Statutes

47 U.S.C. § 230(c)(2)(A)...............................................................................................16 *passim*


Rules

Federal Rule of Civil Procedure 65(a).........................................................................................3


Other Authorities

Executive Order, "Restoring Freedom of Speech and Ending Federal Censorship,"

  January 20, 2025....................................................................................................................14

**NOTICE REGARDING FORTHCOMING EXHIBITS**

Due to the emergency nature of this filing and the immediate, ongoing risk of irreparable harm, Plaintiff submits this Emergency Motion for Temporary Restraining Order with reference to evidence detailed in the Complaint and accompanying declarations. Additional supporting exhibits for all filings will be submitted forthwith as a supplement to these initial filings.

Plaintiff Thomas Richards, through undersigned counsel, respectfully moves this Court pursuant to Federal Rule of Civil Procedure 65(a) for a preliminary injunction against Defendant X Corp. ("X") to (1) halt ongoing First Amendment violations, (2) prevent continued evidence manipulation, (3) remedy X's systematic suppression of Plaintiff's religious expression, and (4) establish transparency requirements regarding X's past content moderation practices and prohibit any further moderation of Plaintiff's account during the pendency of this litigation. This motion builds upon the imminent harm addressed in Plaintiff's Temporary Restraining Order and seeks more comprehensive relief addressing the full scope of X's unconstitutional and unlawful conduct.

This case presents a unique First Amendment violation arising from the unprecedented entanglement between platform ownership and government authority. Musk's government access extends far beyond his DOGE title - he has held a "Top Secret" security clearance since at least 2022 and conducted documented high-level visits to intelligence agencies that will continue regardless of formal position. His explicit statement to Defense Secretary Hegseth ("If there's anything I can do to be helpful, I'd like to see you") demonstrates an ongoing government

relationship that renders any formal "departure" from DOGE legally irrelevant to the constitutional analysis.

## INTRODUCTION

This case presents a straightforward application of well-established constitutional principles to an unprecedented factual scenario. For sixteen years, Plaintiff has maintained an account on X's platform (@tlthe5th), sharing religious expression with his approximately 3,800 followers through more than 61,600 posts. Despite full compliance with platform rules, X Corp. has systematically suppressed Plaintiff's speech reducing his typical post visibility by 98%-- and has recently escalated to wholesale removal of content in retaliation for raising legal concerns about this suppression.

Under the clear precedent of *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), when a private entity becomes "entwined" with governmental authority, it becomes subject to constitutional constraints. The link between X and government authority could not be clearer: X's owner Elon Musk simultaneously holds significant federal authority as a Special Government Employee heading the Department of Government Efficiency ("DOGE") created by executive order on President Trump's first day in office. Aside from prior tight connections to US Intelligence, this unprecedented structural entanglement with President Trump transforms X's content moderation decisions-- particularly the documented pattern of suppressing Mr. Richards' religious expression-- into state action subject to First Amendment scrutiny.

This preliminary injunction seeks two forms of relief: first, restoration of content that has been wrongfully removed, and second, an order requiring X to actually show Plaintiff's posts to his

followers. The issue is straightforward - X simply chooses not to distribute Plaintiff's posts to his followers, despite those users specifically choosing to follow his account. X exercises complete control over whose content appears in users' feeds, and it has deliberately chosen to hide Plaintiff's content from view, while maintaining the false appearance that his posts are being distributed normally.

**STATEMENT OF FACTS**

In addition to the facts outlined in Plaintiff's complaint and TRO motion, the following facts support the need for a preliminary injunction:

1. **Plaintiff's Religious Expression**: Plaintiff Thomas Richards is a born-again Christian who experienced a profound conversion experience after being raised Catholic. His religious expression on X includes Bible-based teachings, religious artwork tagged as "#SpirituallySmartArt," and criticism of religious institutions-- particularly regarding clerical child sex abuse within the Catholic Church. This religious speech occupies a special position within First Amendment jurisprudence. See *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

2. **Systematic Shadowbanning**: Plaintiff's account exhibits unmistakable evidence of account throttling that cannot be explained by random variation or neutral content moderation:

   o   Industry data from Statista indicates the average X post receives approximately 2,121 impressions, while accounts with 3,000-4,000 followers typically receive at least 300-800 views per post. Plaintiff's posts receive only approximately 9-30 "views"-- a 98% reduction from industry benchmarks.

5

- o Advanced statistical analysis demonstrates that this reduction cannot be attributed to random algorithmic variation. The probability of this level of engagement suppression occurring naturally is functionally zero.

- o Critically, posts containing religious content show the most severe suppression, particularly those critiquing clerical sex abuse, demonstrating viewpoint-based rather than content-neutral filtering.

3. **Government Entanglement**: X's owner Elon Musk holds significant governmental authority:

- o Musk serves as a Special Government Employee heading the Department of Government Efficiency (DOGE), announced in November 2024 and then created by executive order on President Trump's first day in office in January 2025.

- o Musk's position grants him substantial authority over government operations. President Trump has explicitly confirmed this authority, stating: "If [cabinet secretaries] don't cut then Elon will do the cutting."

- o The unprecedented personal relationship between Musk and the President further cements this entanglement. On February 7, 2025, Musk publicly declared: "I love @realDonaldTrump as much as a straight man can love another man"-- a statement viewed over 35 million times.

- o While recent reports suggest Musk may soon leave his governmental position, the timing of this announcement-- occurring immediately *after* receipt of the demand letter from Plaintiff's counsel-- appears strategically calculated to evade liability and does not mitigate constitutional violations that have occurred and continue to

occur while Musk exercises official authority. Nor does it address Musk's tight link with government while a nominally private actor, in violation of the standard set in *Brentwood Academy*.

4. **Escalating Pattern of Evidence Manipulation**: X has engaged in a documented pattern of content removal directly timed to Plaintiff's legal communications:

   o March 19, 2025: X effectively removed all of Plaintiff's 61,600+ historical posts from public view.

   o March 31, 2025: Plaintiff's counsel sent a detailed demand letter outlining these concerns and requesting remediation.

   o April 2, 2025: Counsel sent a follow-up letter noting intent to sue.

   o April 5, 2025: X removed 5,974 media files (99.75% of Plaintiff's artistic religious content) from public view-- a clear escalation following the demand letter.

   o April 6, 2025: X removed public visibility of posts from March 27 through April 6, 2025-- representing a second wave of content removal targeting the very period documenting the earlier removals and mentioned in the March 31 demand letter.

5. **Contradictions Between Public Statements and Actual Conduct**: Adam Mehes, Senior Director of Legal at X, explicitly stated to Plaintiff's counsel during a phone conversation around December 2024 that X "does not shadowban users." This statement directly contradicts both the statistical evidence and the documented pattern of targeted suppression, establishing consciousness of wrongdoing.

6. **Multi-Layered Suppression**: Beyond Plaintiff's main account, X has applied a coordinated throttling of his properly disclosed automated "bot" accounts:

   o Despite maintaining four automated accounts that fully comply with X's developer terms and paying $200 monthly for API access, these accounts frequently receive 403 Forbidden errors from X's API despite operating at only 30% of allowed capacity.

   o Similarly configured non-religious bots experience no such limitations with identical technical configurations, demonstrating content-based discrimination.

7. **Statistical Analysis of Algorithmic Discrimination**: Plaintiff has conducted a comprehensive statistical analysis of engagement patterns on his account. This analysis conclusively demonstrates:

   o The 98% reduction in visibility cannot be attributed to random algorithmic variation or neutral content filtering.

   o The pattern of suppression shows statistically significant correlation with religious content keywords, particularly those critical of institutional Catholic authority.

   o The engagement metrics show patterns consistent with deliberate algorithmic throttling rather than organic user disinterest.

8. **Archive Access Concerns**: While content removed from public view may still exist in Plaintiff's private archive, this archive is difficult to access, often requiring technical expertise of a software developer to properly search and parse. More importantly, the

escalating pattern of retaliation suggests a substantial risk that X may next restrict or eliminate access to his archive entirely.

## LEGAL STANDARD

A preliminary injunction should issue when the movant establishes: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

## ARGUMENT

## I. Plaintiff Has a Substantial Likelihood of Success on the Merits

## A. First Amendment Claims

Plaintiff has demonstrated a substantial likelihood of success on his First Amendment claim because (1) X's actions constitute state action under the entanglement doctrine, (2) X's targeted suppression of Plaintiff's religious viewpoint cannot survive strict scrutiny, and (3) the timing of Musk's reported departure from government service confirms consciousness of liability.

## 1. X's Actions Constitute State Action Under the Entanglement Doctrine

The Supreme Court has established that nominally private entities become subject to constitutional constraints when the government "is entwined in [their] management or control." *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 296 (2001). In *Brentwood*, the Court found state action where a private athletic association was

dominated by public school officials acting within their official capacity. But the entanglement between X and government authority exceeds even that found sufficient in *Brentwood*:

- X is owned and controlled by Elon Musk, who simultaneously serves as a Special Government Employee with official authority over government operations.

- President Trump has explicitly confirmed the governmental nature of Musk's authority, stating: "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge."

- Musk's unprecedented $300 million political contributions to President Trump's election, coupled with over $15.4 billion in government contracts awarded to Musk's companies, creates financial entanglement reinforcing the governance entanglement.

- The Fifth Circuit has expressly rejected "the idea that corporations have a freewheeling First Amendment right to censor what people say." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 445 (5th Cir. 2022). This recognition that social media platforms can be subject to First Amendment constraints is particularly applicable where, as here, the platform is directly controlled by a government official.

## 2. Timing of Musk's Reported Government Departure Confirms Consciousness of Liability

The timing of Musk's reported departure from his governmental position is itself powerful evidence of consciousness of liability:

- Since January 2025, Musk has served as Special Government Employee heading the Department of Government Efficiency with no previous indication of plans to step down.

- On March 31, 2025, Plaintiff's counsel sent a detailed demand letter specifically outlining the constitutional violations arising from Musk's simultaneous roles as platform owner and government official.

- Less than 48 hours after receipt of this letter, media reports suddenly emerged that Musk would soon leave his governmental position.

- Rather than simply complying with constitutional requirements by removing the shadowban from Mr. Richards' account (which X claims doesn't exist), Musk appears willing to abandon his governmental position entirely - demonstrating both the importance of maintaining this unconstitutional censorship and awareness that his dual role created constitutional obligations.

The Department of Government Efficiency (DOGE) was specifically created for and named by Elon Musk, as evidenced by the acronym "DOGE" - a name clearly created as a joke of sorts, which references his well-known promotion of the Dogecoin cryptocurrency. *This isn't merely a coincidental acronym but a personalized governmental role designed with Musk's identity and brand in mind.* The fact that an official federal department bears Musk's cryptocurrency-related nickname demonstrates an unprecedented level of personal identification between a government position and a private individual, further cementing the inseparable entanglement between Musk's governmental authority and his control of X Corp.

Musk effectively purchased this governmental position through his $300 million in political contributions to President Trump's election and by leveraging X's algorithm to promote Trump's candidacy. Computational analysis found that after Musk's formal endorsement of Donald Trump

in July 2024, X's algorithms were deliberately manipulated to ensure Republican-leaning posts received greater engagement while Democrat-oriented content was systematically suppressed. This extraordinary investment of both financial and technical resources to secure Trump's election makes any claim that Musk would willingly abandon his purchased position implausible.

The extraordinary power of this purchased position is further demonstrated by Musk's unprecedented access to America's most sensitive intelligence and defense agencies. Within a single month (March-April 2025), Musk conducted a series of high-profile visits to the Pentagon, National Security Agency (NSA), and Central Intelligence Agency (CIA). On April 1, 2025, CIA Director John Ratcliffe personally hosted Musk at CIA headquarters where he met with the intelligence agency's top leadership. This followed Musk's documented Pentagon meeting on March 21, 2025, where he spent 80 minutes with Defense Secretary Pete Hegseth--a meeting so significant it was photographed and distributed by the Department of Defense.

Most revealing is the ongoing nature of this relationship, which will continue regardless of Musk's official title. When departing the Pentagon, Musk was overheard telling Secretary Hegseth, "If there's anything I can do to be helpful, I'd like to see you"--explicitly establishing a direct back-channel regardless of his formal DOGE role. Musk himself acknowledged prior Pentagon access, telling reporters, "I've been here before, you know." This pattern of private-channel communications with defense and intelligence leadership demonstrates that even if Musk nominally "leaves" DOGE, his extraordinary government entanglement and influence will continue uninterrupted through these established relationships. https://abc7ny.com/post/pete-hegseth-says-hes-meeting-elon-musk-pentagon-discuss-efficiencies/16061808/

The claim that Musk's involvement with the government will be done soon lacks also credibility for several other reasons: (1) the executive order establishing DOGE contains no sunset provisions or completion metrics; (2) President Trump has repeatedly emphasized that government efficiency is an ongoing mission, not a time-limited project; (3) the unparalleled personal relationship between Musk and the President transcends formal titles, with Musk publicly declaring on February 7, 2025: 'I love @realDonaldTrump as much as a straight man can love another man'; and (4) *Musk's companies have received over $15.4 billion in government contracts, creating unending financial entanglement reinforcing the governance entanglement.*

The Supreme Court has consistently rejected attempts to manipulate formal structures to evade constitutional obligations. See *Brentwood Academy*, 531 U.S. at 301 (noting that changes in formalities "affected candor but not the 'momentum'" of state involvement). The abrupt timing of Musk's reported departure strongly suggests a deliberate strategy to evade constitutional liability rather than a coincidental change in plans.

### 3. X's Viewpoint-Based Suppression Cannot Survive Constitutional Scrutiny

Viewpoint discrimination is "an egregious form of content discrimination" and is presumptively unconstitutional. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). Courts apply strict scrutiny to such discrimination, requiring the government to prove that its restrictions are "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

X cannot meet this exacting standard because:

- The statistical evidence demonstrates targeted suppression of religious speech-- the 98% engagement reduction specifically affects posts with religious content, particularly those critical of Catholic institutional authority.

- Comparable non-religious content receives significantly higher visibility, demonstrating viewpoint-based rather than content-neutral filtering.

- X's pattern of escalating content removals following legal notices further demonstrates the viewpoint-targeted nature of the suppression.

- X has articulated no compelling government interest-- indeed, X's Senior Director of Legal denies that these practices occur at all.

## 4. Violation of the Executive Order on Free Speech

Beyond the constitutional violations, Musk's actions as both government official and platform owner directly contravene the January 20, 2025 Executive Order on "RESTORING FREEDOM OF SPEECH AND ENDING FEDERAL CENSORSHIP." https://www.whitehouse.gov/presidential-actions/2025/01/restoring-freedom-of-speech-and-ending-federal-censorship/ This Order explicitly prohibits federal government officials from "engag[ing] in or facilitat[ing] any conduct that would unconstitutionally abridge the free speech of any American citizen." Section 3(a) specifically states that "No Federal department, agency, entity, officer, employee, or agent may act or use any Federal resources in a manner contrary to section 2 of this order."

As a Special Government Employee heading DOGE, Musk is unquestionably bound by this Executive Order. His systematic suppression of Mr. Richards' religious expression while simultaneously exercising governmental authority violates not only constitutional principles but also this explicit presidential directive against federal censorship.

The Court should take judicial notice of this Executive Order as it establishes the current administration's formal policy recognizing the impermissibility of government officials engaging in speech suppression--precisely the conduct at issue in this case. This violation of a current presidential directive provides additional grounds for immediate injunctive relief.

## B. Common Carrier Analysis as Additional Support

While not necessary for the Court's decision given the clear state action through entanglement, the Court should also consider X's common carrier status as an additional basis for requiring distribution of all posts to all followers.

As Justice Thomas noted in his concurrence in *Biden v. Knight First Amendment Institute*, 141 S. Ct. 1220, 1224-25 (2021), digital platforms that "provide avenues for historically unprecedented amounts of speech" may be analyzed under common carrier principles that limit their right to exclude. Justice Thomas specifically observed that social media companies may be considered common carriers due to their "dominant market position," which creates a "substantial barrier to entry."

The Fifth Circuit has shown receptivity to this approach, expressly stating in *NetChoice* that it "reject[s] the idea that corporations have a freewheeling First Amendment right to censor what people say." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 445 (5th Cir. 2022). In fact, the Fifth Circuit drew an explicit distinction between editorial functions that receive constitutional

protection and the act of mere content moderation: "Platforms are not newspapers. Their censorship is not speech."

X functions as a critical communications infrastructure in the modern public square - precisely the type of entity that traditionally carried common carrier obligations to serve all users without discrimination. Critically, there is direct evidence that Musk personally exercises control over these algorithmic distribution systems. In February 2023, Musk ordered Twitter engineers during a 2:30 a.m. "fire drill" to artificially boost his own tweets by a factor of 1,000 to overcome President Biden's engagement advantage. This demonstrates both Musk's willingness and direct ability to control the platform's content distribution mechanisms.

Under both the common carrier framework advocated by Justice Thomas and the Fifth Circuit, as well as the government actor status through Musk's official position, X has no right to selectively suppress which of Plaintiff's posts appear in his followers' feeds.

## C. Section 230 Does Not Immunize X's Conduct

Section 230(c)(2)(A) only immunizes actions "voluntarily taken in good faith to restrict access to or availability of material." 47 U.S.C. § 230(c)(2)(A). X's actions fall outside this immunity for two reasons:

## X's Actions Lack "Good Faith" Under § 230(c)(2)(A)

The "good faith" requirement is a material limitation on platform immunity. *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1052 (9th Cir. 2019) held that § 230 does not immunize restrictions driven by anticompetitive animus or deceptive practices. If the Ninth Circuit -- a court historically deferential to platform moderation -- rejected immunity for

such conduct, this Court (applying the Fifth Circuit's stricter *NetChoice v. Paxton* framework) should *a fortiori* find X's shadowbanning lacks good faith.

X's conduct here exceeds even *Enigma*'s narrow carveouts for impermissible restrictions, demonstrating systemic bad faith through:

1. Deceptive Practices:

   o X's Senior Director of Legal, Adam Mehes, publicly denied shadowbanning exists while internally implementing it against Plaintiff--conduct indistinguishable from the "malicious whim" *Enigma* condemned (at 1049).

2. Retaliatory Motive:

   o Quite simply, Plaintiff's content was selectively removed following legal demands, revealing intent to punish speech, not curate "objectionable" material under § 230(c)(2)(A).

   o Moreover X's post-demand letter purge of Plaintiff's content (5,974 media files on April 5, 2025) reveals retaliatory intent -- very similar to the impermissible motive *Enigma* held voids § 230 immunity. 946 F.3d at 1052. The Fifth Circuit's *NetChoice* skepticism of platform censorship, 49 F.4th at 445, compels even stronger rejection of X's bad faith here.

3. Viewpoint Discrimination:

   o X applied inconsistent standards, suppressing Plaintiff's particular Protestant religious expression while permitting comparable secular content and comparable

Catholic content. *Enigma*'s holding that "otherwise objectionable"

excludes arbitrary or biased restrictions squarely applies.

Respectfully, if the Ninth Circuit found these acts beyond "good faith," this Court should as well.

## 2. Shadowbanning Falls Outside Section 230's Scope

X's shadowbanning practices-- covertly limiting content visibility while preserving superficial accessibility-- do not "restrict access to or availability of" content within the meaning of Section 230. The statute contemplates binary content moderation decisions (removing content entirely), not algorithmic manipulation that preserves technical accessibility while functionally rendering content invisible.

The legislative history confirms that Section 230 was designed to shield platforms for removing objectionable content entirely-- not for deceptively manipulating visibility while maintaining the appearance of neutrality. This section 230 analysis is explained in greater detail in the complaint in paragraphs 68-79 and 102-113.

## D. Breach of Contract Claims

Plaintiff has also demonstrated substantial likelihood of success on his breach of contract claims because X's conduct directly contradicts its own stated policies and contractual promises:

## 1. X's Help Center Commitments

X's Help Center explicitly states: "We do not block, limit, or remove content based on an individual's views or opinions." The targeted throttling of Plaintiff's religious viewpoint-- resulting in a 98% reduction in visibility-- directly breaches this contractual promise.

## 2. Premium Subscriber Agreement

18

Plaintiff paid for X Premium for approximately 18 months specifically because X promised Premium subscribers would receive enhanced visibility for their content. Instead, X continued to systematically suppress Plaintiff's content during this period, constituting breach of the specific Premium subscriber agreement.

### 3. Developer Agreement

Plaintiff maintains four automated accounts in full compliance with X's developer terms, paying $200 monthly for API access. Despite operating well within capacity limits (approximately 30% of monthly post allowance), these accounts frequently receive 403 Forbidden errors that prevent content distribution-- while similarly configured non-religious bots experience no such limitations.

### II. Plaintiff Will Suffer Irreparable Harm Absent Preliminary Relief

### A. Loss of First Amendment Rights Constitutes Irreparable Harm Per Se

The Fifth Circuit has consistently held that "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This principle applies with special force to religious expression, which occupies a privileged position in First Amendment jurisprudence. See *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (noting religious speech is "fully protected under the Free Speech Clause").

The systematic suppression of 16 years of Plaintiff's religious expression-- reducing visibility by 98% and removing over 61,600 posts from public view-- constitutes precisely the type of irreparable harm that courts have consistently recognized demands immediate remedy.

**B. Ongoing Evidence Manipulation Threatens Judicial Integrity**

X's documented pattern of evidence removal following legal notices demonstrates ongoing irreparable harm to the judicial process itself. Without immediate intervention, X is likely to continue manipulating evidence crucial to adjudicating Plaintiff's claims.

**C. Reputational and Professional Harm**

The technical nature of shadowbanning creates particularly insidious harm to Plaintiff's professional reputation and religious mission:

- Shadowbanning creates the false impression that Plaintiff's content lacks interest or value-- because followers cannot see it, they assume it did not resonate rather than understanding it was artificially suppressed.

- This artificial devaluation of Plaintiff's speech cannot be adequately remedied through post-trial damages, as the harm to his reputation and religious mission continues to compound daily.

- The irreparable harm extends beyond Plaintiff to the broader marketplace of ideas. The Supreme Court has recognized that "the First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). X's systematic suppression of religious critique harms not only Plaintiff's speech rights but also deprives the broader public of access to important religious perspectives critical of powerful institutions -- precisely the kind of speech the First Amendment was designed to protect. This broader harm to the marketplace of ideas constitutes irreparable injury to fundamental democratic interests that cannot be remedied through post-trial damages.

20

- Expert analysis indicates that had Plaintiff's religious content received normal visibility, industry-standard monetization metrics suggest he could have generated approximately $1.65 per follower annually-- amounting to millions in lost revenue over time.

## D. Chilling Effect on Protected Activity

The pattern of escalating content removals directly following legal notices creates an ongoing chilling effect on Plaintiff's protected speech and right to petition. Each time Plaintiff has asserted his legal rights, X has responded with increasingly aggressive content removals, creating a documented pattern of retaliation that will continue absent judicial intervention.

## III. The Balance of Equities Favors Plaintiff

The balance of equities strongly favors granting a preliminary injunction because the harm to Plaintiff from continued suppression substantially outweighs any potential burden on X:

## A. X Claims These Practices Don't Exist

Adam Mehes, Senior Director of Legal at X, has explicitly stated that X does not shadowban users. A preliminary injunction prohibiting practices that X claims not to engage in cannot, by definition, impose any legitimate business burden.

## B. Technical Feasibility of Relief

X has demonstrated the technical capability to instantly manipulate content visibility, as evidenced by the targeted removals following receipt of demand letters. The same technical capability can be used to restore visibility and prevent further manipulation without imposing any novel technical burden.

## C. Preservation of Status Quo

21

The requested relief merely restores the status quo that existed before X's recent targeted removals. Courts have recognized that preserving the pre-litigation status quo is a core function of preliminary injunctions. See *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

## IV. A Preliminary Injunction Serves the Public Interest

### A. First Amendment Protection Always Serves the Public Interest

"Injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). This principle applies with particular force where, as here, the First Amendment concerns involve religious expression.

### B. Critical Public Square Implications

The Supreme Court has recognized social media platforms as the "modern public square" for communication. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). When a social media platform owner simultaneously holds governmental authority, ensuring constitutional compliance serves the fundamental public interest in protecting this modern public forum from government censorship.

### C. Advancing Transparency and Accountability

The requested measures advancing algorithmic transparency and accountability serve the broader public interest in understanding how platforms moderate content, particularly when that moderation occurs under the direction of government officials. The specific relief requested aligns with bipartisan consensus that algorithmic transparency serves important public interests.

### D. Alignment with Ongoing Federal Regulatory Investigations

The relief requested aligns directly with ongoing federal regulatory priorities. On February 20, 2025, the Federal Trade Commission launched a formal public inquiry to investigate how "technology platforms deny or degrade users' access to services based on the content of their speech or affiliations, and how this conduct may have violated the law." FTC Chairman Andrew N. Ferguson specifically stated that "Tech firms should not be bullying their users" and that the inquiry will help determine how firms may have "violated the law by silencing and intimidating Americans for speaking their minds." https://www.ftc.gov/news-events/news/press-releases/2025/02/federal-trade-com mission-launches-inquiry-tech-censorship

This regulatory investigation demonstrates that the conduct at issue in this case implicates broader consumer protection and competition concerns being actively examined by federal authorities. The requested injunction would therefore serve the public interest by addressing the same harmful practices currently under FTC scrutiny while ensuring that evidence remains preserved for both this litigation and potential regulatory proceedings.

**E. Protecting Judicial Integrity**

The documented pattern of post-legal notice evidence manipulation threatens not just Plaintiff's rights but the judiciary's ability to effectively adjudicate claims of broad public importance. Ensuring evidence preservation serves the public interest in judicial integrity.

**F. Expedited Discovery Serves the Public Interest**

Expedited discovery into X's shadowing practices serves the public interest by bringing transparency to content moderation practices that affect millions of Americans. As the Fifth Circuit recognized in *Missouri v. Biden*, 601 U.S. 345 (2023), "the government's efforts to covertly control the modern public square... implicates democratic values that extend far beyond

23

an individual case." Expedited discovery will help establish whether similar viewpoint-based suppression affects other religious speakers, serving the broader public interest in free religious expression online.

**REQUESTED RELIEF**

For the foregoing reasons, Plaintiff respectfully requests that this Court issue a preliminary injunction:

1. **Prohibiting Viewpoint-Based Suppression**:

   o Enjoining X from engaging in any viewpoint-based or religious viewpoint-based suppression of Plaintiff's content

   o Prohibiting X from applying any shadowbanning, visibility filtering, or throttling to Plaintiff's account

   o Requiring X to apply the same content promotion algorithms to Plaintiff's account as it applies to accounts with similar follower counts

2. **Requiring Content Restoration**:

   o Ordering X to restore public visibility to all content made invisible after March 19, 2025, including:

     ▪ The approximately 61,600 posts removed from public view on March 19, 2025

     ▪ The approximately 5,974 media items removed from public view on April 5, 2025

- All posts removed from view on or after April 6, 2025

- Ordering X to ensure that all of Plaintiff's posts are visible and do not have their visibility or reach restricted in any way

- Requiring X to implement specific technical safeguards, including code-level changes to its content distribution algorithms, that prevent differential treatment of content based on religious viewpoint or affiliation. These safeguards must include the removal of any flags, filters, or algorithmic weights that have been applied to Plaintiff's account that differ from those applied to comparable non-religious content.

- Ordering an independent technical audit by a neutral third-party expert with complete backend access to X's content distribution systems to verify the implementation of these safeguards and the absence of any continuing algorithmic or manual suppression targeting religious content. This expert shall have authority to conduct unannounced audits at random intervals to ensure ongoing compliance.

- Requiring X to restore full API access for Plaintiff's properly disclosed automated accounts

3. **Establishing Transparency and Accountability Measures**:

- Requiring X to provide Plaintiff with monthly reports documenting:

  - The exact reach metrics for Plaintiff's posts

  - In the case of any content moderation actions taken on Plaintiff's account, the specific rules that it alleges Plaintiff violated

- o   Requiring X to document and preserve all internal communications regarding content moderation decisions ever affecting Plaintiff's account

- o   Requiring X to preserve all algorithm documentation, code repositories, and change logs that may have been used to suppress Plaintiff's content

4. **Requiring Comprehensive Public Acknowledgment**:

Ordering X to issue a comprehensive public apology and acknowledgment of wrongdoing through multiple channels including:

- o   A pinned post on Elon Musk's personal X account (@elonmusk) with approximately 300 million followers, acknowledging the improper restriction of Mr. Richards' (@tlthe5th's) religious content, which must remain pinned at the top of his profile for not less than 30 days. This post must be published without any algorithmic suppression, visibility filtering, or other forms of distribution limitation that would reduce its reach below Musk's typical engagement levels. X shall provide verified engagement metrics for this post to the Court demonstrating it received distribution comparable to Musk's top 10% most viewed posts.

- o   A formal apology published on X's official corporate account (@X), which must remain pinned at the top of the profile for not less than 30 days, with similar prohibitions against algorithmic suppression.

- ○ A prominent notice on X's homepage visible to all users for a period of not less than 14 days, with a link to a detailed explanation of the improper content suppression practices.

- ○ A detailed blog post on X's official blog explaining the specific mechanisms through which Mr. Richards' content was suppressed, acknowledging that these practices violated X's stated policies against viewpoint discrimination, and outlining the specific remedial steps being taken to prevent similar religious viewpoint discrimination in the future.

- ○ Direct notification to all of Mr. Richards' followers through X's notification system informing them that his content was improperly restricted and encouraging them to view his profile to see previously suppressed content.

All apologies and acknowledgments shall be subject to prior review and approval by Plaintiff's counsel and must include, at minimum: (1) explicit acknowledgment that Mr. Richards' religious speech was improperly suppressed; (2) admission that this suppression violated X's own stated policies; (3) confirmation that the suppression occurred despite Mr. Richards' status as a paying Premium subscriber; (4) acknowledgment that religious viewpoint discrimination is contrary to constitutional values; and (5) specific details regarding remedial measures being implemented to prevent future suppression.

5. **Implementing Non-Retaliation Protections**:

- o Prohibiting X from taking any adverse actions against Plaintiff's account in response to this litigation

- o Prohibiting X from implementing any visibility filtering, throttling, or other content moderation actions affecting Plaintiff's account during the pendency of this litigation

6. **Preservation of Critical Evidence**:

   - o Requiring X to preserve all relevant evidence, including internal communications, algorithm documentation, and content moderation logs

   - o Requiring X to maintain uninterrupted access to Plaintiff's complete account data archive without deletion, corruption, or access restriction

7. **Compliance Verification and Expedited Discovery**:

   - o Requiring X to provide written certification of compliance with these requirements within 10 days

   - o Ordering expedited discovery specifically related to:

     - ▪ Algorithmic content moderation systems or content moderation done by a person, and their application to Plaintiff's account

     - ▪ Internal communications regarding content decisions affecting Plaintiff's account

     - ▪ Source code, documentation, and change logs for visibility filtering systems

- Document production of all shadowbanning protocols, both automated and human-directed

- Production of engagement metrics for comparable accounts to establish baseline visibility standards

- Deposition of Trust and Safety regarding shadowbanning practices

- Deposition of Adam Mehes regarding his statements about shadowbanning practices

- Technical expert examination of account engagement data to verify algorithmically-induced suppression

- Communications between X/Musk and Catholic Church representatives or other individuals tightly linked to the Catholic Church

- Evidence of preferential treatment for Catholic institutional perspectives over Protestant critiques and particularly Plaintiff's personal Protestant beliefs (which are not held by many professing Protestants today).

o Setting an expedited discovery schedule of 60 days to allow for prompt adjudication of the underlying claims

o Establishing a comprehensive monitoring regime including: a. Monthly compliance reports to the Court for the first six months and quarterly thereafter documenting all metrics related to Mr. Richards' account visibility, any content moderation actions taken, technical measures implemented to prevent discrimination, and verification of algorithmic neutrality by qualified technical

experts. b. Appointment of an internal compliance officer at X with direct reporting authority to X's board of directors, who will be specifically responsible for ensuring non-discrimination against religious content creators, with quarterly public reporting on compliance efforts. c. Implementation of technical changes preventing the application of any shadowbanning or visibility filtering to any user's account without explicit notification to the affected user, including mandatory disclosure of the specific reason for any visibility restriction, the expected duration, and the appeals process.

8. **Such other and further relief as the Court deems just and proper**.

Dated: April 12, 2025

Respectfully submitted,

/s/ Lisa Weingarten Richards

Lisa Weingarten Richards

LWR Law Offices

2045 S Pleasant Valley Rd. #1098

Winchester, VA 22601

(202) 981-2059

LWR@LWRLawOffices.com

VA BAR # 96671

NY BAR #4932570

Attorney for Plaintiff

30