# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS

# DALLAS DIVISION

THOMAS RICHARDS

*Plaintiff,*

v.

X Corp.

*Defendant*

Case No. 3:25-cv-916

Lisa Weingarten Richards, Esq.

VSB #96671

NY BAR #4932570

LWR Law Offices

2045 S Pleasant Valley Rd. #1098

Winchester, VA 22601

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

**PLAINTIFF'S RENEWED EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

COMES NOW Plaintiff Thomas Richards ("Plaintiff"), by and through his undersigned counsel, and files this Renewed Emergency Motion for Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 65, showing the Court as follows:

## I. INTRODUCTION

Plaintiff appreciates the Court's reconsideration of the procedural matters in this case through its April 16, 2025 Order vacating both the expedited service requirement and the transfer order. In light of the Court's decision to retain the case in this division, Plaintiff respectfully renews his request for emergency injunctive relief to address ongoing, irreparable harm to his First Amendment rights.

This renewed motion is necessary because Defendant X Corp. -- a massive social media company for which there is no comparable service -- continues to systematically suppress Plaintiff's religious expression on its platform, including through content removal, visibility filtering, and algorithmic or manual throttling. As detailed below, these actions constitute viewpoint-based discrimination and religious discrimination against protected speech, facilitated through unprecedented entanglement between governmental authority and platform ownership which violate Plaintiff's First Amendment rights to freedom of speech and freedom of religion.

## II. FACTUAL BACKGROUND

### A. Plaintiff's Religious Expression on X's Platform

1. Plaintiff has maintained a compliant account on X's platform (@tlthe5th) for approximately 16 years, amassing approximately 3,800 followers and sharing over 61,600 posts expressing his sincerely held religious beliefs along with criticism of the US government and other entities.

2. Plaintiff's content primarily focuses on: 1) unique spiritual insights based upon the bible as the absolute authority, which draw upon but transcend historically Protestant theological perspectives, 2) institutional critique and commentary on government and social issues from a biblical viewpoint, 3) Bible messages relating to modern life and society including a strong usage of AI, and 4) his own artwork and media.

3. At no time has Plaintiff violated X's Terms of Service or engaged in any conduct that would justify content restriction under X's published policies.

**B. Defendant's Pattern of Content Suppression**

1. On March 19, 2025, X took the extraordinary step of effectively purging Plaintiff's account of approximately 16 years of lawful religious expression, removing over 61,000 posts from public visibility without warning, explanation, or recourse.

2. On March 31, 2025, Plaintiff's counsel sent a detailed 40 page demand letter to X outlining the unlawful suppression and requesting immediate remediation.

3. In direct retaliation for this legal communication, on April 5, 2025 -- less than one week after receipt of Plaintiff's demand letter -- X escalated its censorship by completely blocking all 5,974 photos and videos previously shared on Plaintiff's account, allowing only the most recent 14 images to remain. This targeted removal specifically affected Plaintiff's "#SpirituallySmartArt" content, representing countless hours of religiously-inspired creative work.

4. On April 6, 2025, continuing this pattern of retaliation, X deleted all remaining posts in Plaintiff's timeline through noon that day, effectively rendering his account a blank slate despite 16 years of content creation.

5. After the demand letter:

    a. Media reports suddenly emerged for the first time that Musk would be leaving DOGE – a transparent attempt to undermine Plaintiff's constitutional claims by suggesting Musk was no longer affiliated with the government, despite his ongoing access to intelligence agencies and defense leadership.

    b. X selectively boosted exactly one of Plaintiff's posts – containing no bible content but mentioning a plan for a new AI. This selective amplification (reaching nearly 8,000 views compared to his typical 10-50 views) represents a sophisticated attempt to manipulate evidence relevant to this litigation. Notably, the only post X chose to amplify involved Plaintiff's Bible-based AI development – a field directly related to Musk's primary business interests through XAI and his attempted acquisition of OpenAI. This manipulation demonstrates both X's complete algorithmic control over content visibility and its deliberate attempt to create a false impression of content neutrality after receiving the demand letter.

6. Since the filing of this action, X has continued this pattern of suppression.

**C. Evidence of Government-Platform Entanglement**

1. X is owned and controlled by Elon Musk, who simultaneously holds significant federal authority as a Special Government Employee heading the Department of Government Efficiency (DOGE), created by executive order on President Trump's first day in office, and using Musk's branding (a nod to Musk's interest in the cryptocurrency dogecoin).

2. Recent reporting has documented that Musk's DOGE team is using artificial intelligence to monitor federal employees' communications for language critical of Musk or Trump

while simultaneously controlling a platform that suppresses religious expression critical of institutions Musk has publicly embraced. As government ethics expert Kathleen Clark told Reuters regarding the federal employees, this "sounds like an abuse of government power to suppress or deter speech that the president of the United States doesn't like." (https://www.reuters.com/technology/artificial-intelligence/musks-doge-using-ai-snoop-us-federal-workers-sources-say-2025-04-08/)

3. Musk maintains a top secret security clearance and direct, high-level access to America's intelligence apparatus through multiple documented visits to the Pentagon, NSA, and CIA within a single month (March-April 2025). When departing the Pentagon on March 21, 2025, Musk was overheard telling Defense Secretary Hegseth, "If there's anything I can do to be helpful, I'd like to see you" -- explicitly establishing back-channel communications that will continue to operate regardless of formal title. (https://abc7ny.com/post/pete-hegseth-says-hes-meeting-elon-musk-pentagon-discuss-efficiencies/16061808/)

4. The systematic suppression of Plaintiff's content began to intensify specifically after Plaintiff posted content critical of Musk's July 2, 2022 meeting with Pope Francis. Plaintiff's criticism addressed the Pope's statements and practices that contradict biblical teachings despite his claiming to be Christ's representative on earth, and the Catholic Church's handling of child abuse scandals. In 2023, Pope Francis described sex abusers as "children of God" who are "deserving of love," a statement widely criticized by abuse survivors (https://www.nypost.com/2023/05/11/pope-calls-sex-abusers-children-of-god-deserving-of-love/). Pope Francis has also demonstrated hostility toward abuse victims, as when he angrily dismissed Chilean victims as engaging in slander ("calumny") in

2018, stating "The day they bring me proof against Bishop Barros, I'll speak. There is not one shred of proof against him. It's all calumny. Is that clear?" (https://www.pbs.org/newshour/world/pope-francis-early-blind-spot-on-sex-abuse-threatens-legacy). The fact that content suppression intensified after Plaintiff's critique of Musk's Vatican relationship (which Musk described as an "honor") demonstrates that the censorship is content-specific, viewpoint-discriminatory, and targets Plaintiff's Protestant religious speech.

## III. LEGAL STANDARD

A temporary restraining order may be issued without notice to the adverse party only if: "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

While Rule 65 does not specifically define "notice," courts generally interpret "notice" in this context to require reasonable efforts to inform the opposing party of the pendency of the motion, which may be accomplished through various methods including electronic communication. See Advisory Committee Notes to 1966 Amendment to Rule 65(b) (noting that "informal notice, which may be communicated to the attorney" can satisfy the notice requirement). The purpose of the notice requirement is to ensure the opposing party has an opportunity to be heard, not to impose formalistic service requirements.

In this case, Plaintiff has provided ample notice to Defendant through multiple channels:

1. Plaintiff's counsel sent a detailed demand letter by email to X Corp. on March 31, 2025, outlining the constitutional violations and requesting remediation noting the intent to sue if the matter could not be resolved amicably;

2. On April 2, 2025, Plaintiff again provided an email that due to their non-response, Plaintiff would be proceeding with litigation;

3. Plaintiff's counsel has provided courtesy copies of all filings to X Corp.'s legal department via email to amehes@x.com and legal@x.com. For communications to Adam Mehes, counsel has never received an undeliverable email error (though emails to legal@x.com provide an automated form response). For the filing of the complaint and initial TRO, Plaintiff's counsel also called Adam Mehes at his work number previously listed in the Texas bar website 347-417-4940, a number counsel had previously used to successfully communicate with Mr. Mehes;

4. Plaintiff does not seek an ex parte hearing but rather requests the Court's prompt consideration with Defendant's participation.

Plaintiff notes that while formal "service" of process has not yet occurred under FRCP 4, Defendant has actual notice of these proceedings through multiple electronic communications. In the digital age, the distinction between formal service and actual notice has diminished in significance, particularly in emergency situations involving online platforms that operate entirely in the digital realm.

## IV. ARGUMENT

**A. Plaintiff Is Likely to Succeed on the Merits**

1. First Amendment Violations Through State Action

Under the state-action doctrine established in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 296 (2001), private entities become subject to constitutional constraints when the government "is entwined in [their] management or control."

The entanglement between X and government authority exceeds even that found sufficient in *Brentwood Academy*:

a. X is owned and controlled by Elon Musk, who simultaneously holds significant federal authority through his official role in DOGE;

b. This entanglement is further cemented by extraordinary financial ties -- Musk invested approximately $300 million to help elect Trump, and his companies have received over $15.4 billion in government contracts;

c. President Trump has explicitly confirmed Musk's governmental power, stating: "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge" (https://www.reuters.com/world/us/trump-appears-contradict-white-house-says-elon-musk-charge-doge-2025-02-20/) and "I couldn't find anyone smarter" (President Donald Trump Claims He Couldn't 'Find Anyone Smarter' Than Elon Musk to Run DOGE)

d. This case presents an unprecedented scenario where the controlling owner of a major platform is simultaneously leading a government agency deploying AI to target speech critical of that same individual.

Through this extraordinary government-platform entanglement, X's actions against Plaintiff constitute state action subject to First Amendment constraints.

2. Viewpoint-Based Discrimination Against Religious Speech

X's actions against Plaintiff's account constitute viewpoint discrimination against protected religious speech:

a. The timing and pattern of content suppression directly correlates with Plaintiff's religious critique of Musk's Vatican relationship -- content suppression intensified specifically after Plaintiff posted content critical of Musk's Vatican visit.

b. X applies a demonstrable double standard that systematically disadvantages bible-believing Protestant religious speech -- while removing Plaintiff's religious content, X permits and even promotes accounts with millions of followers who post content explicitly calling for violence;

c. The pattern of removal specifically targets Plaintiff's Protestant religious critique of Catholic institutions after Musk publicly described meeting Pope Francis as an "honor" on July 1, 2022 (https://x.com/elonmusk/status/1543050489050402816) demonstrating content-specific, viewpoint-discriminatory censorship rather than neutral platform moderation.

3. Section 230 Does Not Immunize X's Actions

X's shadowbanning practices fall outside Section 230's protections because:

a. Section 230(c)(2)(A) only immunizes actions "voluntarily taken in good faith to restrict access to or availability of material";

b. X's deceptive practices -- publicly denying shadowbanning while simultaneously engaging in it -- fail the statute's explicit "good faith" requirement;

c. Adam Mehes, Senior Director of Legal at X, explicitly stated to Plaintiff's counsel that X does not shadowban users -- a categorical denial that directly contradicts the demonstrated pattern of account suppression documented herein;

d. The Fifth Circuit has consistently emphasized that the "good faith" requirement in Section 230(c)(2)(A) is a meaningful limitation on platform immunity, not a rubber stamp for deceptive practices. See *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 445 (5th Cir. 2022) (rejecting platforms' "freewheeling First Amendment right to censor"). Courts across jurisdictions have reinforced this view, with the Ninth Circuit holding in *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1052 (9th Cir. 2019) that Section 230 does not immunize content restrictions driven by improper motives. Even after *Moody v. NetChoice*, 603 U.S. 707 (2024), the Supreme Court did not expressly reject this skepticism of absolute platform immunity, leaving open the possibility that viewpoint-based suppression executed in bad faith falls outside statutory protection.

   4. X Functions as a Common Carrier Subject to Non-Discrimination Requirements

As Justice Thomas has persuasively argued in his concurrence in *Biden v. Knight First Amendment Institute*, 141 S. Ct. 1220, 1224-25 (2021), large social media platforms like X function as de facto common carriers due to their dominant market position and essential role in public discourse. Justice Thomas specifically observed that for platforms like X, "it changes nothing that these platforms are not the sole means for distributing speech or information. A person always could choose to avoid the toll bridge or train and instead swim the Charles River or hike the Oregon Trail. But in assessing whether a company exercises substantial market power, what matters is whether the alternatives are comparable. For many of today's digital platforms, nothing is."

X possesses all the characteristics that Justice Thomas identified as warranting common carrier treatment:

a. It holds itself out to the public as a neutral platform for all lawful expression;

b. It functions as critical communications infrastructure in the modern public square;

c. It exercises substantial market power with no comparable alternatives;

d. It generates individualized feeds for hundreds of millions of users, functioning more as a communications conduit than a unified editorial voice.

e. When users choose to "follow" an account on X, they are making an affirmative choice to receive content from that account. X's own Help Center explicitly states that "Following someone on X means: You are subscribing to their posts as a follower." (https://help.twitter.com/en/using-twitter/following-faqs). This creates a reasonable expectation that followers will actually see the content they subscribed to receive. X's deliberate suppression of Plaintiff's content from his own followers constitutes a form of digital bait-and-switch - accepting the follower relationship while secretly nullifying its purpose through algorithmic suppression. Courts have recognized that when platform functionality differs from reasonable user expectations based on platform representations, this can form the basis for valid legal claims. See *In re Facebook, Inc., Consumer Privacy User Profile Litigation*, 402 F. Supp. 3d 767, 789-90 (N.D. Cal. 2019) (holding that when reasonable users could plausibly interpret platform terms differently from how the platform actually operates, the platform cannot obtain dismissal based on claimed user consent). This principle directly supports Plaintiff's request for algorithmic neutrality, as followers who have "subscribed" to Plaintiff's content have a

reasonable expectation to actually receive it, rather than having it deliberately hidden through shadowbanning.

The Fifth Circuit has shown receptivity to this framework, expressly stating in *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 445 (5th Cir. 2022) that "Platforms are not newspapers. Their censorship is not speech." Under this emerging legal framework, X has no right to selectively suppress which of Plaintiff's posts appear in his followers' feeds, particularly when such suppression targets religious viewpoints.

**B. Plaintiff Will Suffer Irreparable Harm Without Emergency Relief**

1. Ongoing First Amendment Violations

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Each day that passes without judicial intervention permits the continuing suppression of Plaintiff's religious expression.

Statistical analysis confirms this harm is not theoretical but demonstrable -- Plaintiff's account metrics show a 98% reduction from typical engagement benchmarks for accounts with similar follower counts, with certain posts receiving near-zero visibility despite Plaintiff's substantial follower base.

2. Active Evidence Destruction and Manipulation

Plaintiff has documented a clear pattern of content removal and manipulation timed directly to legal communications:

a. Mass deletion of 61,600+ historical posts occurred on March 19, 2025; b. Removal of 5,974 media files occurred within days of counsel's March 31 demand letter; c. Further post deletions occurred on April 6, 2025, days after counsel's follow-up letter; d. Selective algorithmic amplification of a single, non-religious post immediately after receipt of the demand letter, creating a misleading impression of content neutrality.

This pattern of evidence destruction and manipulation not only shows consciousness of wrongdoing but also represents a deliberate attempt to undermine the judicial process by eliminating evidence central to this litigation. Without emergency intervention, X will likely continue these practices, permanently prejudicing Plaintiff's ability to prove his claims.

   3. Irreparable Damage to Religious Ministry

The systematic suppression of Plaintiff's religious speech has irreparably damaged his 16-year digital ministry, artificially restricting his ability to share religious expression with his established audience and the broader public. No monetary damages can adequately compensate for this ongoing spiritual and expressive harm.

X's shadowbanning creates a damaging "Joshua Bell effect" – named after the 2007 experiment in which world-class violinist Joshua Bell performed incognito in a Washington D.C. Metro station and was largely ignored. When high-quality content is artificially presented as having minimal engagement, observers incorrectly assume the content lacks value. By throttling visibility, X creates a false impression that Plaintiff's content is worthless or uninteresting, when in reality his followers are simply prevented from seeing it. This artificial devaluation of religious expression cannot be remedied through damages alone.

**C. The Balance of Equities Favors Plaintiff**

1. The requested relief merely requires X to: a. Restore content that was previously visible for years; b. Cease discriminatory suppression of religious viewpoints; c. Allow Mr. Richards' followers, who affirmatively chose to follow him, to be able to see his content; d. Put his work on the news feeds of non-followers in the same manner it does for other users' posts.

2. This relief imposes no legitimate burden on X: a. X publicly claims not to engage in viewpoint-based filtering; b. X's own policies promise content-neutral moderation; c. X possesses the technical capability to immediately implement these measures, as demonstrated by its ability to selectively amplify certain posts while suppressing others.

3. X possesses the technical capability to immediately implement these measures, as demonstrated by its ability to selectively amplify certain posts while suppressing others. In February 2023, Musk even ordered engineers to artificially boost his own tweets by a factor of 1,000 when he was dissatisfied with engagement on his Super Bowl posts compared to President Biden's (https://www.theverge.com/2023/2/14/23600358/elon-musk-tweets-algorithm-changes-twitter). This demonstrates both the precise control X has over content visibility and Musk's willingness to manipulate algorithms for personal advantage.

4. By contrast, without relief, Plaintiff continues to suffer irreparable constitutional harm and permanent damage to his religious expression.

D. The Public Interest Strongly Favors Relief

"Injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).

This principle applies with particular force in this case, which implicates:

1. Religious freedom in the digital public square;

2. Unprecedented entanglement between government surveillance and platform censorship;

3. The broader functioning of the First Amendment in the digital age; and

4. The public's right to access diverse religious viewpoints free from government-influenced suppression.

## V. TIERED RELIEF REQUESTED

Plaintiff respectfully requests tiered injunctive relief as follows:

**Primary Relief (Content Restoration)**

1. An order requiring X to immediately restore all of Plaintiff's historical content that was removed from public visibility on March 19, 2025, April 5, 2025, and April 6, 2025, including: a. The approximately 61,600 posts removed from public view; b. The approximately 5,974 media items removed from public view; and c. All posts removed from view on or after March 19, 2025.

2. This restoration must ensure that: a. All posts are returned to their original visibility settings with their original creation dates and timestamps preserved, with linked posts linked together and not separated (which changes the meaning of the posts); b. All content is properly indexed so it appears in search results when users search Plaintiff's account; c. No artificial downranking or suppression is applied specifically to the restored content.

3. This relief is necessary to protect the judicial process itself. X's documented pattern of removing evidence in direct response to legal notices represents an attempt to manipulate the factual record this Court will evaluate. The timing of content removals following Plaintiff's demand letter creates a compelling inference of retaliatory, evidence-suppressive intent. Courts have recognized their inherent authority to issue orders preserving evidence relevant to pending litigation, and the Fifth Circuit has specifically held that "a District Court has the power to issue a temporary restraining order in order to preserve existing conditions." *Stewart v. Dunn*, 363 F.2d 591, 598 (5th Cir. 1966). Without immediate intervention to restore this content, critical evidence central to this litigation may be permanently compromised, undermining the Court's ability to fairly adjudicate Plaintiff's claims."

**Secondary Relief (Algorithm Neutrality)**

In addition to content restoration, Plaintiff requests that the Court order X to:

1. Remove all algorithmic throttling and visibility filtering from Plaintiff's account such that his posts are presented to all of his followers as well as other X users in the same manner that X presents other users' posts to their followers;

2. Ensure that Plaintiff's account receives the same algorithmically beneficial treatment as accounts that are algorithmically boosted and not accounts that are algorithmically restricted;

3. Restore full API access for Plaintiff's properly disclosed bots (which experience frequent 403 forbidden errors due to throttling by X), removing all rate limiting, error generation, and other technical restrictions that exceed those applied to comparable content creators;

4. Provide documentation of all visibility filters, account throttling mechanisms, and other content suppression measures that have been applied to Plaintiff's account since January 1, 2022.

This secondary relief is crucial because mere restoration of content without addressing the underlying algorithmic suppression would allow the viewpoint discrimination to continue through less visible but equally effective means. The evidence clearly demonstrates that X possesses precise technical control over content visibility -- capable of amplifying certain posts while suppressing others from the same account -- and has exercised this control in a viewpoint-discriminatory manner.

Given X's demonstrated pattern of using sophisticated technological means to suppress viewpoints while maintaining plausible deniability, comprehensive relief addressing both content restoration and algorithmic neutrality is necessary to protect Plaintiff's First Amendment rights.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court:

1. Issue an immediate temporary restraining order granting the primary and secondary relief requested above;

2. Set an expedited hearing for a preliminary injunction to extend this relief pending final resolution of this matter;

3. Order Defendant to preserve all evidence related to Plaintiff's account, including internal communications, account metrics, moderation logs, and algorithmic parameters; and

4. Grant such other and further relief as the Court deems just and proper.

The urgent nature of this matter cannot be overstated. X's documented pattern of escalating content removal--going from selective shadowbanning to mass deletion of 61,600+ posts to targeted removal of 5,974 media files immediately following legal communications--demonstrates an ongoing effort to manipulate evidence crucial to this litigation. Without immediate judicial intervention, further irreparable harm to both Plaintiff's constitutional rights and the integrity of these proceedings is inevitable.

Respectfully submitted,

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards
VSB #96671
NY BAR #4932570
LWR Law Offices
2045 S Pleasant Valley Rd. #1098
Winchester, VA 22601
Tel.: (202) 981-2059
lwr@lwrlawoffices.com
Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2025, I provided copies via email to Adam Mehes, Senior Director of Legal at X Corp., at amehes@x.com and legal@x.com.

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards