**USE OF GENERATIVE ARTIFICIAL INTELLIGENCE:** This brief was prepared with assistance from generative artificial intelligence

### IN THE UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

THOMAS RICHARDS

*Plaintiff,*

*v.*

X Corp.

*Defendant*

Case No. 3:25-cv-916

Lisa Weingarten Richards, Esq.

VSB #96671

NY BAR #4932570

LWR Law Offices

11166 Fairfax Blvd. Suite 500

#1344

Fairfax, VA 22030

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

**PLAINTIFF'S REPLY IN SUPPORT OF RENEWED EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

## I. INTRODUCTION

X Corp.'s opposition mischaracterizes both the factual record and applicable law. Most fundamentally, X Corp. ignores its explicit promises to users and the unprecedented entanglement between its ownership and government authority. This case presents a trillion-dollar platform owned by the world's richest man who: (1) explicitly promises users that "When you follow someone, *every time* they post a new message, it will appear on your X Home timeline" (emphasis added) (Exhibit A); (2) systematically breaks this promise while denying it; and (3) does this while simultaneously holding significant governmental authority.

X's opposition completely ignores the viewpoint-based nature of the suppression targeting religious critique and government criticism, instead asserting a blanket right to remove content for any reason.

## II. X CORP. FAILS TO ADDRESS CRITICAL FACTS AND ARGUMENTS

X Corp. completely fails to address several critical facts established in Plaintiff's motion:

1. **X's fundamental promise regarding content delivery** as documented in their own user guidance: "When you follow someone, every time they post a new message, it will appear on your X Home timeline" - a core platform commitment that X systematically violates with respect to Plaintiff's content.

2. **The timing of content removals** directly correlating with Plaintiff's legal communications: 61,600+ posts removed on March 19, 5,974 media files removed days after the demand letter, and additional deletions days after notice of intent to sue.

3. **Viewpoint-based suppression** that intensified specifically after Plaintiff posted content critical of Musk's Vatican visit and government role.

4. **Evidence manipulation** through selective algorithmic boosting of one AI-related post immediately after the demand letter while continuing to suppress religious content.

5. **Musk's ongoing governmental role** despite claims about "leaving DOGE," as he explicitly stated he "will continue to spend a day or two per week on government matters for as long as the president would like." (https://www.npr.org/2025/04/22/nx-s1-5371552/tesla-earnings-april-2025-elon-musk-doge)

6. **Musk's unprecedented intelligence agency access** through documented visits to the Pentagon, NSA, and CIA within a single month, with Musk overheard telling Defense Secretary Hegseth, "If there's anything I can do to be helpful, I'd like to see you." (https://www.cbsnews.com/news/hegseth-meeting-elon-musk-innovation-efficiencies/)

7. **DOGE's AI monitoring of federal employees** which, as ethics expert Kathleen Clark noted, "sounds like an abuse of government power to suppress or deter speech that the president of the United States doesn't like." ("Musk's DOGE using AI to snoop on US federal workers, sources say," https://www.reuters.com/technology/artificial-intelligence/musks-doge-using-ai-snoop-us-federal-workers-sources-say-2025-04-08/)

## III. PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Terms of Service Cannot Shield X Corp. From Constitutional Obligations

X Corp.'s reliance on its Terms of Service fundamentally misunderstands both its contractual obligations and constitutional requirements. No private contract can immunize a state actor from constitutional constraints. *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943). X's position is self-contradictory--it claims unlimited discretion while explicitly promising followers will see "every" post. Courts consistently interpret conflicting provisions against the drafter. *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990).

The FTC has recently challenged provisions that claim to allow censorship for any reason or no reason, launching a formal inquiry into platforms that "deny or degrade users' access based on speech content." ("Federal Trade Commission Launches Inquiry on Tech Censorship," (February 20, 2025) https://www.ftc.gov/news-events/news/press-releases/2025/02/federal-trade-commission-launches-inquiry-tech-censorship)

### 1. X's Selective Application of Terms of Service

X Corp's opposition to the TRO claims absolute discretion under their Terms of Service but fails to explain why Plaintiff's religious content and government criticism has been disproportionately affected. This selective enforcement targeting his specific viewpoint provides compelling evidence of government-entangled viewpoint discrimination, not legitimate content moderation. X's silence on why Plaintiff's religious content warranted removal speaks volumes--if Plaintiff had violated legitimate platform rules, X would have identified those violations rather than offering vague references to its Terms.

### B. Section 230 Does Not Apply to Government-Entangled Platforms Acting in Bad Faith

Section 230(c)(2)(A) only immunizes actions "voluntarily taken in good faith." X's promise that followers will see "every" post while secretly suppressing 98% of Plaintiff's content fails this requirement. X's attempt to rely on Section 230(c)(1) instead of (c)(2) would render the "good faith" language meaningless. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (explaining that statutory construction requires construing a statute such that nothing is meaningless). In addition, X's chosen cases almost solely address the converse 230(c)(1) situation in which claims related to *lack* of content moderation -- defamatory or harmful statements by others that the website *did not* censor.

X's cited case, *Fed. Trade Comm'n v. Match Grp.*, 2022 WL 877107 (N.D. Tex. Mar. 24, 2022), as an example, involved alleged failure of fraud prevention. In *Match*, the FTC wanted more moderation; here, X suppresses constitutionally protected speech despite promising not to.

Courts have recognized that viewpoint discrimination falls outside Section 230's protection. In *West v. Shea*, 500 F. Supp. 3d 1079, the court declined CDA immunity where the defendant blocked a user "solely because Plaintiff expressed a viewpoint she disagreed with." (at 1088)

**C. X Corp.'s Actions Constitute State Action Under Brentwood Academy**

The entanglement here exceeds that found sufficient in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). X's owner simultaneously holds governmental authority through his role in DOGE, a position created specifically for him with his cryptocurrency branding. (https://www.npr.org/2025/02/04/nx-s1-5286314/department-of-government-efficiency-doge-explainer-elon-musk)

 This entanglement is cemented by extraordinary financial relationships--Musk invested approximately $300 million to help elect Trump, and his companies have received over $15.4 billion in government contracts. (https://campaignlegal.org/update/elon-musk-has-grown-even-wealthier-through-serving-trumps-administration)

President Trump explicitly confirmed Musk's governmental power, stating: "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge" and "I couldn't find anyone smarter."(https://nypost.com/2025/02/18/us-news/trump-searched-for-someone-smarter-than-elon-musk-for-doge/)

Musk's recent statements about "leaving DOGE" (with highly unusual timing – these first appeared *shortly after* plaintiff's March 31 demand letter) demonstrate the intertwined nature of Musk's roles because although claiming to step back from DOGE, he also confirmed continuing

government work "as long as the president would like". This back-channel relationship persists regardless of title changes, a transparent attempt to evade constitutional constraints that the Supreme Court explicitly rejected in *Brentwood Academy*, where it noted changes in formalities "affected candor but not the 'momentum'" of state involvement. 531 U.S. at 301.

### D. Addressing the Draft Complaint Issue

X Corp.'s technical objection is premature. The Court has already acknowledged in its April 17 order that Plaintiff intended to file an amended complaint before formal service, prioritizing emergency relief. X Corp. received actual notice and the complaint itself, as demonstrated in its opposition. The core issues--government-entangled viewpoint discrimination and X's systematic breach of its explicit promise that followers will see "every" post--remain central to the TRO analysis regardless of procedural technicalities.

### E. X's First Amendment Claims Ignore Its Unique Structure

X Corp. misapplies *Moody v. NetChoice* by ignoring the fundamental difference between a traditional publisher and X's operation. While *Moody* recognized platforms' First Amendment rights for "expressive choices," it *never addressed X's unique structure generating over 600 million individualized feeds*--a critical distinction never addressed by the Supreme Court or any court. (And Justice Kagan also noted recently "These are not, like, the nine greatest experts on the internet,"-- https://www.scotusblog.com/2023/02/not-like-the-nine-greatest-experts-on-the-internet-justices-seem-leery-of-broad-ruling-on-section-230/ )

Unlike a unified editorial voice, X generates a different "publication" for each user--a structure far closer to a common carrier. Justice Thomas specifically noted this distinction, observing that for dominant platforms like X, "nothing is" comparable in the marketplace. *Biden v. Knight First Amendment Institute*, 141 S. Ct. 1220, 1224-25 (2021).

**F. The Policymaker Issue and Direct Evidence of Algorithm Manipulation**

X Corp. claims Plaintiff fails to identify a policymaker for Section 1983 purposes, ignoring both the facts alleged and the procedural stage. In February 2023, Musk ordered engineers to boost his own posts by a factor of 1,000, demonstrating both policy authority and willingness to manipulate visibility for personal advantage.

(https://www.theverge.com/2023/2/14/23600358/elon-musk-tweets-algorithm-changes-twitter)

This documented history of direct algorithm control, combined with the timing of content removals directly correlating with criticism of Musk's government role, creates a compelling inference that Musk directed Plaintiff's suppression.

There are also reports of censorship by X in retaliation against critics: "They told us that they're not going to retaliate against independent journalists or researchers who publish criticisms of the platform. Less than 12 hours later, multiple technology reporters have been suspended."( Rep. Lori Trahan, X Post, https://x.com/RepLoriTrahan/status/1603569307937644546)

While complete details about internal decision-making require discovery, Plaintiff has sufficiently alleged facts supporting the inference that X's controlling owner--who simultaneously exercises governmental authority--directed the suppression of content criticizing his governmental role.

**G. Common Carrier Framework Is Supported by Justice Thomas**

Justice Thomas has articulated the common-carrier framework for regulating platforms in multiple influential concurrences. In *Biden v. Knight First Amendment Institute*, 141 S.Ct. 1220 (2021), he argued that "there is a fair argument that some digital platforms are sufficiently akin to common carriers or places of public accommodation to be regulated" as such. *Id.* at 1224. He

reinforced this in *Moody*, stating that "the common-carrier doctrine should continue to guide the lower courts' examination." 603 U.S. 707, 751 (2024).

X possesses all the characteristics Thomas identified: (1) It holds itself out as a neutral platform, with Musk claiming it "doesn't censor beyond what is legally required"; (https://x.com/elonmusk/status/1846772929167552549); (2) It functions as critical communications infrastructure; (3) It exercises substantial market power with no comparable alternatives; and (4) It generates individualized feeds for hundreds of millions of users.

By systematically suppressing content from followers while promising they will see "every" post, X violates both its contractual promises and the fundamental non-discrimination principle at the heart of common carrier obligations.

## IV. PLAINTIFF HAS DEMONSTRATED IRREPARABLE HARM

### A. First Amendment Violations and Evidence Spoliation

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This applies forcefully where suppression targets both religious expression and political criticism of government officials.

X's pattern of evidence destruction demands immediate judicial intervention. The timing and precision of content removals—61,600+ posts removed just before legal action commenced, followed by deletion of 5,974 media items days after the demand letter—creates a compelling inference of deliberate evidence destruction rather than routine content moderation. The removed content contains evidence of viewpoint discrimination, making its preservation essential. Courts recognize that when parties destroy relevant evidence, immediate intervention may be necessary. *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612-13 (S.D. Tex. 2010).

Courts have consistently recognized that digital evidence requires special protection precisely because it can be permanently destroyed with minimal effort. In *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001), the Fourth Circuit recognized that courts have inherent authority to impose sanctions for spoliation, stating: "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation..." This authority is particularly important for digital evidence that, once deleted, may be impossible to recover.

**B. Money Damages Cannot Remedy Ongoing Harm**

X's shadowbanning creates the "Joshua Bell effect"--artificially presenting high-quality content as having minimal engagement causes observers to incorrectly assume the content lacks value. Statistical evidence confirms this harm--Plaintiff's posts receive only 9-50 views despite having 3,800+ followers, a 98% reduction from comparable accounts. This artificial devaluation creates permanent reputational and relationship damage that money cannot remedy.

**V. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR RELIEF**

The requested relief merely requires X to honor its explicit promise that followers will see "every" post. X possesses the technical capability to immediately implement these measures, as demonstrated by its selective content manipulation. The public interest strongly favors relief that prevents government officials from evading constitutional constraints through nominally private platforms.

"Injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). The public has a profound interest in ensuring trillion-dollar platforms honor their explicit promises and in preventing government-entangled censorship.

### 1. X Corp. Mischaracterizes the Requested Relief

X Corp. incorrectly characterizes Plaintiff's requested relief as "mandatory" rather than "prohibitory." This characterization ignores established precedent recognizing that restoring parties to their pre-violation positions constitutes prohibitory relief, particularly when the defendant's own actions disrupted the status quo. See *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051-52 (5th Cir. 1997) (finding that an order reinstating a plaintiff was a prohibitory injunction that preserved the status quo).

The primary relief requested--restoring content that was visible for years before being suddenly removed following Plaintiff's legal communications--merely preserves the status quo ante that existed before X Corp.'s retaliatory actions. Courts routinely issue orders preserving electronic evidence to maintain the integrity of judicial proceedings. See *Pueblo of Laguna v. United States*, 60 F.4th 1285, 1290 (Fed. Cir. 2023) (recognizing courts' "inherent authority to impose sanctions for the destruction of evidence").

### 2.  X Corp. Fails to Explain Its Algorithm and Selective Visibility

Despite claiming absolute discretion over content visibility, X never explains how its algorithm works or why Plaintiff's posts reach only 9-50 viewers out of 3,800+ followers--a 98% reduction that cannot be explained by any neutral factor. This failure to explain basic functionality while claiming unlimited authority to suppress viewpoints represents precisely the type of opaque conduct that Justice Thomas identified as problematic for dominant platforms.

The fact that X boosted one AI-related post to over 7,000 users after receiving the demand letter proves it exercises precise control over content visibility. This selective amplification appears deliberately mocking--after Plaintiff posted this AI-related content (see Exhibit B), he received messages from cryptocurrency scammers who assumed he was attempting to conduct a "pump and dump" scheme. This appears particularly calculated and malicious given Musk's well-

documented involvement in cryptocurrency--he likely directed the post to cryptocurrency pump-and-dump enthusiasts knowing Plaintiff has no involvement in that space, effectively subjecting Plaintiff to confusion and potential scams for Musk's amusement. This pattern of mockery is consistent with Musk's broader behavior of forcing his interests and jokes on people who likely feel mistreated by him. Musk has repeatedly used "420" marijuana references as a form of amusement in serious contexts--from his $54.20 Twitter acquisition price to DOGE recently laying off exactly "420 employees" at the Fish and Wildlife Service (https://www.cnn.com/2025/02/20/politics/doge-firing-low-performers-new-employees-reality/index.html). The timing of this selective boosting is particularly telling given Musk's enormous financial interest in AI through his company xAI, which recently acquired X in a $45 billion deal (https://www.reuters.com/markets/deals/musks-xai-buys-social-media-platform-x-45-billion-2025-03-28/). By boosting only Plaintiff's AI-related content while suppressing his religious expression and government criticism, X demonstrates both its technical capability to implement the requested relief and the viewpoint-based, self-interested nature of its suppression.

## VI. CONCLUSION

X Corp.'s opposition mischaracterizes both the factual record and applicable law. The unprecedented entanglement between X's ownership and government authority transforms its content moderation decisions into state action subject to First Amendment constraints along with breach of its customer agreement. The documented pattern of content removal timed to Plaintiff's legal communications demonstrates both an ongoing constitutional violation and a concerted effort to destroy evidence central to this litigation.

For the foregoing reasons, Plaintiff respectfully requests that this Court grant the Renewed Emergency Motion for Temporary Restraining Order.

Respectfully submitted,

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards
VSB #96671
NY BAR #4932570
LWR Law Offices
11166 Fairfax Blvd. Suite 500
#1344
Fairfax, VA 22030
Tel.: (202) 981-2059
lwr@lwrlawoffices.com
Counsel for Plaintiff


**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2025, a true and correct copy of the foregoing document was electronically transmitted to the Clerk of Court using the ECF System for filing, and was transmitted to Defendant's counsel via ECF.

/s/ Lisa Weingarten Richards

Lisa Weingarten Richards