# IN THE UNITED STATES DISTRICT

# COURT FOR THE NORTHERN DISTRICT

# OF TEXAS DALLAS DIVISION

THOMAS RICHARDS

*Plaintiff,*

*v.*

X, CORP.  and
DONALD J. TRUMP, Individually

*Defendants*

Case No. 3:25-cv-916

Lisa Weingarten Richards, Esq.

VSB #96671

NY BAR #4932570

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

## PLAINTIFF'S SECOND RENEWED EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

### Use of Generative Artificial Intelligence
This brief was prepared using generative artificial intelligence.

COMES NOW Plaintiff Thomas Richards ("Plaintiff"), by and through his undersigned counsel, and files this Renewed Emergency Motion for Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 65, showing the Court as follows:

## I. INTRODUCTION

Plaintiff renews his request for emergency injunctive relief to address ongoing, irreparable harm to his First Amendment rights. This renewed motion is necessary because Defendant X Corp., operating under unprecedented government entanglement through its owner's extensive federal contracts and ongoing government commitments, continues to systematically suppress Mr. Richards' biblical expression through content removal, visibility restrictions, and throttling. As detailed below, these actions constitute viewpoint-based discrimination against protected speech, facilitated through the unprecedented entanglement between governmental authority and platform ownership, which violate Mr. Richards' First Amendment rights to freedom of speech and freedom of religion.

This case also presents unprecedented evidence of real-time government-platform coordination through documented surveillance of attorney-client communications. On June 2, 2025, Plaintiff's counsel sent a private Gmail to Mr. Richards stating intention to add Trump as defendant but not to discuss publicly until "June 5 for a specific reason." (see Exhibit A also in amended complaint) On the exact date specified in this private communication, Trump and Musk began what appears to be a staged an elaborate public "feud." This timing correlation, combined with Musk's documented deployment of AI systems to search federal employee emails and Google's documented Vatican coordination, demonstrates that religious speech suppression operates through systematic government surveillance rather than private

business judgment.

## II. FACTUAL BACKGROUND

### A. Plaintiff's Religious Expression on X's Platform

1. Plaintiff has maintained a compliant account on X's platform (@tlthe5th) for approximately 16 years, amassing approximately 3,400 followers and sharing over 61,600 posts expressing his sincerely held religious beliefs along with criticism of the US government and other entities. Mr. Richards built this audience despite systematic suppression that reduced typical engagement from industry-standard levels of 300-800 views per post to often fewer than 10 views.

2. Mr. Richards' content primarily focuses on: 1) unique spiritual revelations (πνευματικός ἀποκάλυψις - pneumatikos apokalypsis) he has received based upon the Word/Logic (λόγος - logos) of God (Θεός - Theos) through Jesus Christ (Ἰησοῦς Χριστός - Iēsous Christos) - to whom all δόξα (doxa - glory) belongs - as the absolute authority (εξουσία - exousia). These revelations draw upon but then greatly transcend historically Protestant theological perspectives through direct reference to scripture (γραφή - graphē) in its original Greek textual context, with all credit for this work going to Χριστός (Christos), 2) institutional critique and commentary on government and social issues from a biblical viewpoint, 3) Bible messages relating to modern life and society including a strong usage of AI, and 4) his own artwork and media.

3. At no time has Plaintiff violated X's Terms of Service or engaged in any conduct that would justify content restriction under X's published policies.

**B. Defendant's Pattern of Content Suppression**

1. On March 19, 2025, X took the extraordinary step of effectively purging Plaintiff's account of approximately 16 years of lawful religious expression, removing over 61,000 posts from public visibility without warning, explanation, or recourse.

2. On March 31, 2025, Plaintiff's counsel sent a detailed 40 page demand letter to X outlining the unlawful suppression and requesting immediate remediation.

3. In direct retaliation for this legal communication, on April 5, 2025 -- less than one week after receipt of Plaintiff's demand letter -- X escalated its censorship by completely blocking all 5,974 photos and videos previously shared on Plaintiff's account, allowing only the most recent 14 images to remain. This targeted removal specifically affected Mr. Richards "#SpirituallySmartArt" content, representing countless hours of bible-based creative work.

4. On April 6, 2025, continuing this pattern of retaliation, X deleted all remaining posts in Plaintiff's timeline through noon that day, effectively rendering his account a blank slate despite 16 years of content creation.

5. Later, in early July, X again deleted all of Mr. Richards' posts remaining on his wall, that were posted before July 1, 2025.

6. After the demand letter:

    a. Media reports suddenly emerged for the first time that Musk would be leaving DOGE – which appears to have been an attempt to undermine Mr. Richards' constitutional claims by suggesting Musk was no longer affiliated with the government, despite his ongoing access to intelligence agencies and

defense leadership.

b. X selectively boosted exactly one of Plaintiff's posts – containing no bible content but mentioning a plan for a new AI. This selective amplification (reaching nearly 8,000 views compared to his typical 10-50 views) represents a sophisticated attempt to manipulate evidence relevant to this litigation. Notably, the only post X chose to amplify involved Plaintiff's Bible-based AI development – a field directly related to Musk's primary business interests through XAI and his attempted acquisition of OpenAI. This manipulation demonstrates both X's complete algorithmic control over content visibility and its deliberate attempt to create a false impression of content neutrality after receiving the demand letter.

7. Since the filing of this action, X has continued and strengthened this pattern of suppression.

## C. Evidence of Government-Platform Entanglement

1. X is owned and controlled by Elon Musk, who simultaneously held significant federal authority as a Special Government Employee heading the Department of Government Efficiency (DOGE), created by executive order on President Trump's first day in office, and using Musk's branding (a nod to Musk's interest in the cryptocurrency dogecoin).

2. Recent reporting has documented that Musk's DOGE team is using artificial intelligence to monitor federal employees' communications for language critical of Musk or Trump while simultaneously controlling a platform that suppresses religious expression critical of institutions Musk has publicly embraced. As government ethics

expert Kathleen Clark told Reuters regarding the federal employees, this "sounds like an abuse of government power to suppress or deter speech that the president of the United States doesn't like." (https://www.reuters.com/technology/artificial-intelligence/musks-doge-using-ai-snoop-us-federal-workers-sources-say-2025-04-08/)

3. Musk maintains a top secret security clearance and direct, high-level access to America's intelligence apparatus through multiple documented visits to the Pentagon, NSA, and CIA within a single month (March-April 2025). When departing the Pentagon on March 21, 2025, Musk was overheard telling Defense Secretary Hegseth, "If there's anything I can do to be helpful, I'd like to see you" -- explicitly establishing back-channel communications that will continue to operate regardless of formal title. (https://abc7ny.com/post/pete-hegseth-says-hes-meeting-elon-musk-pentagon-discuss-efficiencies/16061808/)

4. The systematic suppression of Plaintiff's content began to intensify specifically after Plaintiff posted content critical of Musk's July 2, 2022 meeting with Pope Francis. Plaintiff's criticism addressed the Pope's statements and practices that contradict biblical teachings despite his claiming to be Christ's representative on earth, and the Catholic Church's handling of child abuse scandals. In 2023, former Pope Francis described sex abusers as "children of God" who are "deserving of love," a statement widely criticized by abuse survivors (https://www.nypost.com/2023/05/11/pope-calls-sex-abusers-children-of-god-deserving-of-love/). Former pope Francis has also demonstrated hostility toward abuse victims, such as when he angrily dismissed

Chilean victims as engaging in slander ("calumny") in 2018, stating "The day they bring me proof against Bishop Barros, I'll speak. There is not one shred of proof against him. It's all calumny. Is that clear?" (https://www.pbs.org/newshour/world/pope-francis-early-blind-spot-on-sex-abuse-threatens-legacy). And the new Pope Leo XIV has never countered these statements by Poper Francis in any way. The fact that content suppression intensified after Plaintiff's critique of Musk's Vatican relationship (which Musk described as an "honor") demonstrates that the censorship is content-specific, viewpoint-discriminatory, and targets Mr. Richards' bible-based speech.

5.  Trump-Musk Coordination Evidence: On June 2, 2025, Mr. Richards' undersigned counsel sent a private Gmail communication to Mr. Richards stating intention to add Trump as defendant but not to discuss until "June 5 for a specific reason" (Exhibit A). On June 5, 2025--the exact date specified in the private communication--Trump and Musk staged an elaborate public "feud" with threats to cancel government contracts and personal attacks. This precise timing correlation, combined with documented surveillance capabilities, creates a compelling inference that private attorney-client communications were intercepted and used to coordinate defensive responses.

6.  Vatican-Government-Tech Coordination: The religious discrimination operates within a broader framework where Trump's Religious Liberty Commission prominently features Catholic Cardinal Timothy Dolan and Bishop Robert Barron as "Christian" representatives while biblical criticism of Catholic institutions faces platform suppression. (https://www.ncregister.com/cna/cardinal-dolan-bishop-barron-to-serve-on-trump-s-new-religious-liberty-commission) Both Trump and Musk have

expressed deference to Vatican authority, with Trump calling Pope Leo XIV's election "a Great Honor for our Country" -- and with Musk promoting the current Pope's tweet to be a world mediator and was "honored" to meet the prior Pope -- while Mr. Richards' biblical criticism of the same institution faces systematic suppression.

7. This governmental preference for institutional over biblical Christianity reveals extraordinary hypocrisy when considered alongside Trump's February 6, 2025 Executive Order "Eradicating Anti-Christian Bias." While claiming to protect Christianity, Trump simultaneously established a Religious Liberty Commission on May 1, 2025, that explicitly denies the fundamental doctrine of Christianity itself.

8. The commission includes "faith leaders from various traditions" including "rabbis and imams" alongside Catholic Cardinal Timothy Dolan and Bishop Robert Barron, implicitly endorsing the unbiblical premise that multiple religious paths lead to Θεός (Theos - God). (https://www.ncregister.com/cna/cardinal-dolan-bishop-barron-to-serve-on-trump-s-new-religious-liberty-commission).

9. This directly contradicts Ἰησοῦς Χριστός' (Iēsous Christos - Jesus Christ's) explicit teaching in John 14:6: "I am the way and the truth and the life. No one comes to the Father except through me."

10. By creating a commission that treats all religious paths as equally valid while Mr. Richards' biblical expression of salvation exclusively through Ἰησοῦς Χριστός (Iēsous Christos - Jesus Christ) faces systematic suppression, Trump has engaged in the most egregious form of gaslighting - claiming to defend Christianity while simultaneously promoting government policies that explicitly deny Christianity's core doctrine. This

represents governmental endorsement of religious pluralism over biblical Christianity, violating both the Establishment Clause's prohibition on denominational preferences and Trump's own Executive Order claiming to protect Christian beliefs.

11. Both Trump and Musk have expressed deference to Vatican authority, with Trump calling Pope Leo XIV's election "a Great Honor for our Country" and Musk retweeting the Pope Leo XIV's post offering to mediate world disputes, while Mr. Richards' biblical criticism of the same institution faces systematic suppression.

12. Government-Directed AI Censorship: DOGE staff have systematically "pressed officials at the Department of Homeland Security to use Grok" and "ordered staff to train AI to identify communications suggesting an employee is not 'loyal' to Trump's political agenda." The same AI technology moderating religious content on X performs core governmental functions, creating direct operational coordination between government function and private platform control.

## III. LEGAL STANDARD

A temporary restraining order may be issued if: "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

Here, Defendant X Corp. has been properly served the amended complaint and is receiving all filings through ECF. Service on Defendant Trump is forthcoming upon receipt of summons from the Court, which is likely to occur today, and this TRO will be served along with the

amended complaint as a courtesy. Further, upon information and belief, Trump is a personal contact of Musk and has already been provided actual notice of the amended complaint and will be provided notice of this TRO by Musk or others associated with him shortly after X's receipt through ECF.

## IV. ARGUMENT

### A. Plaintiff Is Likely to Succeed on the Merits

#### 1. First Amendment Violations Through State Action

Under the state-action doctrine established in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 296 (2001), private entities become subject to constitutional constraints when the government "is entwined in [their] management or control."

The entanglement between X and government authority exceeds even that found sufficient in *Brentwood Academy*:

a. X is owned and controlled by Elon Musk, who simultaneously holds significant federal authority through his official role in DOGE;

b. This entanglement is further cemented by extraordinary financial ties -- Musk invested approximately $300 million to help elect Trump, and his companies have received over $15.4 billion in government contracts;

c. President Trump has explicitly confirmed Musk's governmental power, stating: "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge" (https://www.reuters.com/world/us/trump-appears-contradict-white-

house-says-elon-

musk-charge-doge-2025-02-20/) and "I couldn't find anyone smarter" (President Donald Trump

Claims He Couldn't 'Find Anyone Smarter' Than Elon Musk to Run DOGE)

d. This case presents an unprecedented scenario where the controlling owner of a major

platform simultaneously exercises federal authority while coordinating with the President to

suppress religious expression. Trump's explicit confirmation that "Elon is really not leaving"

and DOGE is "his baby" (https://www.theguardian.com/us-news/2025/may/30/key-takeaways-

musk-trump-send-off) demonstrates continuing government entanglement regardless of formal

titles. Additionally, Musk has placed over 700 former Tesla engineers in federal agencies under

Thomas Shedd's leadership, creating permanent operational control over government AI

deployment that directly coordinates with X's content moderation systems. (See TESLARATI

(Feb. 4, 2025), This former Tesla engineer now heads a federal tech department

https://www.teslarati.com/former-tesla-engineer-federal-tech/; TECHCRUNCH (Feb. 4, 2025),

Former Tesla engineer heading government agency reportedly outlines  "AI-first strategy"

https://techcrunch.com/2025/02/04/former-tesla-engineer-heading-government-agency-

reportedly-outlines-ai-first-strategy/.) Through this extraordinary government-platform

entanglement, X's actions against Plaintiff constitute state action subject to First Amendment

constraints.

   2. **Viewpoint-Based Discrimination Against Religious Speech**

X's actions against Plaintiff's account constitute viewpoint discrimination against protected

religious speech:

a. The timing and pattern of content suppression directly correlates with Plaintiff's

religious critique of Musk's Vatican relationship -- content suppression intensified specifically after Plaintiff posted content critical of Musk's Vatican visit.

b. X applies a demonstrable double standard that systematically disadvantages bible-believing religious speech -- while removing Mr. Richards religious content, X permits and even promotes accounts with millions of followers who post content explicitly calling for violence;

c. The pattern of removal specifically targets Mr. Richards' bible-based religious critique of Catholic institutions after Musk publicly described meeting Pope Francis as an "honor" on July 1, 2022 (https://x.com/elonmusk/status/1543050489050402816) demonstrating content-specific, viewpoint-discriminatory censorship rather than neutral platform moderation.

d. AI-Powered Religious Discrimination Under Government Direction: Executive Order 14179 established comprehensive federal AI coordination requiring government agencies to coordinate with private AI development. Under this framework:

1.  Musk's Grok AI system performs both government surveillance functions (monitoring federal employees for "loyalty") and private content moderation on X;

2. The same AI technology systematically dismisses biblical authority while promoting government submission theology, as documented in the 654-page Grok conversation (Amended Complaint Exhibit C under separate docket entry);

3. DOGE's systematic deployment of Grok across federal agencies creates direct government direction of AI systems with documented anti-religious bias, transforming platform censorship from private editorial decisions into government-coordinated constitutional

violations.

### 3. Section 230 Does Not Immunize X's Actions

X's shadowbanning practices fall outside Section 230's protections because:

a. Section 230(c)(2)(A) only immunizes actions "voluntarily taken in good faith to restrict access to or availability of material";

b. X's deceptive practices -- publicly denying shadowbanning while simultaneously engaging in it -- fail the statute's explicit "good faith" requirement;

c. Adam Mehes, Senior Director of Legal at X, explicitly stated to Plaintiff's counsel that X does not shadowban users -- a categorical denial that directly contradicts the demonstrated pattern of account suppression documented herein;

d. The Fifth Circuit has consistently emphasized that the "good faith" requirement in Section 230(c)(2)(A) is a meaningful limitation on platform immunity, not a rubber stamp for deceptive practices. See *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 445 (5th Cir. 2022) (rejecting platforms' "freewheeling First Amendment right to censor"). Courts across jurisdictions have reinforced this view, with the Ninth Circuit holding in *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1052 (9th Cir. 2019) that Section 230 does not immunize content restrictions driven by improper motives. Even after *Moody v. NetChoice*, 603 U.S. 707 (2024), the Supreme Court did not expressly reject this skepticism of absolute platform immunity, leaving open the possibility that viewpoint-based suppression executed in bad faith falls outside statutory protection.

e. When AI systems operate under direct government coordination through Executive Order 14179's federal AI framework, Section 230's protection for private editorial decisions becomes

inapplicable, as the content moderation operates under color of federal law rather than private business judgment.

4. X Functions as a Common Carrier Subject to Non-Discrimination Requirements

As Justice Thomas has persuasively argued in his concurrence in *Biden v. Knight First Amendment Institute*, 141 S. Ct. 1220, 1224-25 (2021) (and which he maintained in *Moody v. NetChoice*, 603 U.S. 707, 752 (2024)), large social media platforms like X function as de facto common carriers due to their dominant market position and essential role in public discourse. Justice Thomas specifically observed that for platforms like X, "it changes nothing that these platforms are not the sole means for distributing speech or information. A person always could choose to avoid the toll bridge or train and instead swim the Charles River or hike the Oregon Trail. But in assessing whether a company exercises substantial market power, what matters is whether the alternatives are comparable. For many of today's digital platforms, nothing is."

X possesses all the characteristics that Justice Thomas identified as warranting common carrier treatment:

a. It holds itself out to the public as a neutral platform for all lawful expression;

b. It functions as critical communications infrastructure in the modern public square;

c. It exercises substantial market power with no comparable alternatives;

d. It generates individualized feeds for hundreds of millions of users, functioning more as a communications conduit than a unified editorial voice.

e. When users choose to "follow" an account on X, they are making an affirmative choice to receive content from that account. X's own Help Center explicitly states that "Following

someone on X means: You are subscribing to their posts as a follower."

(https://help.twitter.com/en/using-twitter/following-faqs). This creates a reasonable

expectation that followers will actually see the content they subscribed to receive. X's

deliberate suppression of Plaintiff's content from his own followers constitutes a form of

digital bait-and-switch - accepting the follower relationship while secretly nullifying its

purpose through algorithmic suppression. Courts have recognized that when platform

functionality differs from reasonable user expectations based on platform representations, this

can form the basis for valid legal claims. See *In re Facebook, Inc., Consumer Privacy User

Profile Litigation*, 402 F. Supp. 3d 767, 789-90 (N.D. Cal. 2019) (holding that when

reasonable users could plausibly interpret platform terms differently from how the platform

actually operates, the platform cannot obtain dismissal based on claimed user consent). This

principle directly supports Plaintiff's request for algorithmic neutrality, as followers who have

"subscribed" to Plaintiff's content have a reasonable expectation to actually receive it, rather

than having it deliberately hidden through shadowbanning.

The Fifth Circuit has shown receptivity to this framework, expressly stating in *NetChoice, L.L.C.

v. Paxton*, 49 F.4th 439, 445 (5th Cir. 2022) that "Platforms are not newspapers. Their censorship

is not speech." Under this emerging legal framework, X has no right to selectively

suppress which of Plaintiff's posts appear in his followers' feeds, particularly when such

suppression targets religious viewpoints.

**B. Plaintiff Will Suffer Irreparable Harm Without Emergency Relief**

    1.  Ongoing First Amendment Violations

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Each day that passes without judicial intervention permits the continuing suppression of Plaintiff's religious expression.

Statistical analysis confirms this harm is not theoretical but demonstrable -- Plaintiff's account metrics show a 98% reduction from typical engagement benchmarks for accounts with similar follower counts, with certain posts receiving near-zero visibility despite Plaintiff's substantial follower base.

2. Active Evidence Destruction and Manipulation

Plaintiff has documented a clear pattern of content removal and manipulation timed directly to legal communications:

a. Mass deletion of 61,600+ historical posts occurred on March 19, 2025; b. Removal of 5,974 media files occurred within days of counsel's March 31 demand letter; c. Further post deletions occurred on April 6, 2025, days after counsel's follow-up letter; d. Selective algorithmic amplification of a single, non-religious AI post (to almost 8000 views) shortly after receipt of the demand letter, creating a misleading impression of content neutrality.

This pattern of evidence destruction and manipulation not only shows consciousness of wrongdoing but also represents a deliberate attempt to undermine the judicial process by eliminating evidence central to this litigation. Without emergency intervention, X will likely continue these practices, permanently prejudicing Plaintiff's ability to prove his claims.

3. Irreparable Damage to Religious Ministry

The systematic suppression of Plaintiff's religious speech has irreparably damaged his 16-year digital ministry, artificially restricting his ability to share religious expression with his

established audience and the broader public. No monetary damages can adequately compensate for this ongoing spiritual and expressive harm.

By throttling visibility, X creates a false impression that Plaintiff's content is worthless or uninteresting, when in reality his followers are simply prevented from seeing it. This artificial devaluation of religious expression cannot be remedied through damages alone.

> 4. Ongoing Government Surveillance and Coordination

The June 2-5, 2025 timeline demonstrates through strong circumstantial evidence that Defendants maintain real-time surveillance capabilities over Plaintiff's legal communications and coordinate immediate responses. This creates an ongoing threat that transcends typical platform censorship to encompass systematic government monitoring of attorney-client communications. Without emergency intervention, this coordination will continue to undermine both Plaintiff's constitutional rights and the integrity of legal proceedings.

## C. The Balance of Equities Favors Plaintiff

1. The requested relief merely requires X to: a. Restore content that was previously visible for years; b. Cease discriminatory suppression of religious viewpoints; c. Allow Mr. Richards' followers, who affirmatively chose to follow him, to be able to see his content; d. Put his work on the news feeds of non-followers in the same manner it does for other users' posts.

2. This relief imposes no legitimate burden on X: a. X publicly claims not to engage in viewpoint-based filtering; b. X's own policies promise content-neutral moderation; c. X possesses the technical capability to immediately implement these measures, as demonstrated by its ability to selectively amplify certain posts while suppressing

others.

3.  X possesses the technical capability to immediately implement these measures, as

    demonstrated by its ability to selectively amplify certain posts while suppressing

    others. In February 2023, Musk even ordered engineers to artificially boost his own

    tweets by a factor of 1,000 when he was dissatisfied with engagement on his Super

    Bowl posts compared to President Biden's

    ([https://www.theverge.com/2023/2/14/23600358/elon-](https://www.theverge.com/2023/2/14/23600358/elon-musk-tweets-algorithm-changes-twitter)

    [musk-tweets-algorithm-changes-twitter](https://www.theverge.com/2023/2/14/23600358/elon-musk-tweets-algorithm-changes-twitter)). This demonstrates both the precise control X

    has over content visibility and Musk's willingness to manipulate algorithms for personal

    advantage.

4.  By contrast, without relief, Plaintiff continues to suffer irreparable constitutional

    harm and permanent damage to his religious expression.

5.  The requested relief addresses unprecedented government-platform coordination

    that threatens the constitutional framework itself. When the world's wealthiest

    individual can simultaneously control major communication platforms and exercise

    federal power while coordinating with the President to suppress religious

    expression, emergency judicial intervention becomes essential to preserve the

    separation between private platforms and government authority that underlies First

    Amendment protections.

**D. The  Public Interest Strongly Favors Relief**

"Injunctions protecting First Amendment freedoms are always in the public interest." *Texans for*

*Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).

This principle applies with particular force in this case, which implicates:

1. Religious freedom in the digital public square;

2. Unprecedented government surveillance of attorney-client communications;

3. Government-directed AI censorship through coordinated federal policy;

4. The separation between private platform control and government authority;

5. Protection against systematic religious viewpoint discrimination under government coordination; and

6. The public's right to access diverse religious viewpoints free from Vatican-influenced government suppression.

## V. TIERED RELIEF REQUESTED

Plaintiff respectfully requests tiered injunctive relief as follows:

**Primary Relief (Content Restoration)**

1. An order requiring X to immediately restore all of Plaintiff's historical content that was removed from public visibility on March 19, 2025, April 5, 2025, April 6, 2025, and July 3, 2025, including: a. The approximately 70,000 posts removed from public view; b. The approximately 5,974 media items removed from public view; and c. All posts removed from view on or after March 19, 2025.

2. This restoration must ensure that: a. All posts are returned to their original visibility settings with their original creation dates and timestamps preserved, with linked posts linked together and not separated (which changes the meaning of the posts); b. All content is properly indexed so it appears in search results when users search Plaintiff's

account; c. No artificial downranking or suppression is applied specifically to the restored content.

3. This relief is necessary both to protect Mr. Richards' right to bible-based speech and the judicial process itself. X's documented pattern of removing evidence in direct response to legal notices represents an attempt to manipulate the factual record this Court will evaluate. The timing of content removals following Plaintiff's demand letter creates a compelling inference of retaliatory, evidence- suppressive intent. Courts have recognized their inherent authority to issue orders preserving evidence relevant to pending litigation, and the Fifth Circuit has specifically held that "a District Court has the power to issue a temporary restraining order in order to preserve existing conditions." *Stewart v. Dunn*, 363 F.2d 591, 598 (5th Cir. 1966). Without immediate intervention to restore this content, critical evidence central to this litigation may be permanently compromised, undermining the Court's ability to fairly adjudicate Plaintiff's claims."

4. Order immediate disclosure of all government coordination regarding Plaintiff's account, including any communications between defendants about Plaintiff's case, records of the June 5, 2025 coordination, and documentation of Gmail interception capabilities or data sharing agreements between Google and government agencies.

5. 5. Order immediate preservation of all evidence related to this case, including all internal communications between defendants regarding Plaintiff or his content, all records of government coordination, all AI training data and algorithms used for content moderation, and all Gmail data sharing agreements or surveillance capabilities.

**Secondary Relief (Content Neutrality)**

In addition to content restoration, Plaintiff requests that the Court order X to:

1. Remove all algorithmic throttling and visibility filtering from Plaintiff's account such that his posts are presented to all of his followers as well as other X users in the same manner that X presents other users' posts to their followers;

2. Ensure that Plaintiff's account receives the same algorithmically beneficial treatment as accounts that are algorithmically boosted and not accounts that are algorithmically restricted;

3. Restore full API access for Plaintiff's properly disclosed bots (which experience frequent 403 forbidden errors due to throttling by X), removing all rate limiting, error generation, and other technical restrictions that exceed those applied to comparable content creators;

4. Provide documentation of all visibility filters, account throttling mechanisms, and other content suppression measures that have been applied to Plaintiff's account since January 1, 2022.

5. Prohibit the use of any AI system for content moderation that has been developed, trained, or coordinated pursuant to Executive Order 14179's federal AI framework, and require independent technical audit of Grok's content moderation algorithms to identify and remove government-directed anti-religious bias.

6. Require X to provide Plaintiff with real-time algorithmic transparency, including notification whenever any visibility restrictions, throttling, or content moderation actions are applied to his account, with specific reasoning and identification of

decision-makers responsible.

7. Order immediate disclosure to major media outlets of the constitutional violations documented herein, including systematic suppression of religious expression under government entanglement, to remedy the media blackout that has prevented public awareness of these unprecedented First Amendment violations;

This secondary relief is crucial because mere restoration of content without addressing the underlying algorithmic or manual suppression would allow the viewpoint discrimination to continue through less visible but equally effective means. The evidence clearly demonstrates that X possesses precise technical control over content visibility -- capable of amplifying certain posts while suppressing others from the same account -- and has exercised this control in a viewpoint- discriminatory manner.

Given X's demonstrated pattern of using sophisticated technological means to suppress viewpoints while maintaining plausible deniability, comprehensive relief addressing both content restoration and algorithmic neutrality is necessary to protect Plaintiff's First Amendment rights.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court:

1. Issue an immediate temporary restraining order granting the primary and secondary relief requested above;

2. Set an expedited hearing for a preliminary injunction to extend this relief pending final resolution of this matter;

3.  Order X to preserve all evidence related to Plaintiff's account, including internal communications, account metrics, moderation logs, and algorithmic parameters;

4.  Order President Trump to cease coordination with private platforms for religious speech suppression and issue executive directive prohibiting federal agencies from using AI systems with documented religious bias for government functions;

5.  Declare that the government-platform coordination documented herein violates both the First Amendment and Executive Orders claiming to protect religious freedom; and

6.  Grant such other and further relief as the Court deems just and proper.

The urgent nature of this matter cannot be overstated. X's documented pattern of escalating content removal--going from selective shadowbanning to mass deletion of 61,600+ posts to targeted removal of 5,974 media files immediately following legal communications-- demonstrates an ongoing effort to manipulate evidence crucial to this litigation. Without immediate judicial intervention, further irreparable harm to both Plaintiff's constitutional rights and the integrity of these proceedings is inevitable.

Respectfully submitted,

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards
LWR Law Offices
3060 Williams Dr
Ste 300 #510
Fairfax, VA 22031
Tel.: (202) 981-2059
lwr@lwrlawoffices.com
VA BAR # 96671

NY BAR #4932570

Counsel for Plaintiff

DATE: July 10, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2025, a true and correct copy of the foregoing document was electronically transmitted to the Clerk of Court using the ECF System for filing, and was transmitted to Defendant's counsel via ECF.

 /s/ Lisa Weingarten Richards

Lisa Weingarten Richards

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

VA BAR # 96671

NY BAR #4932570

*Counsel for plaintiff*