# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION

| | |
|---|---|
| THOMAS RICHARDS<br><br>*Plaintiff,*<br><br>v.<br><br>X, CORP. and<br>DONALD J. TRUMP, Individually<br><br>*Defendants* | Case No. 3:25-cv-916<br><br><br><br>Lisa Weingarten Richards, Esq.<br>VSB #96671<br>NY BAR #4932570<br>LWR Law Offices<br>3060 Williams Dr<br>Ste 300 #510<br>Fairfax, VA 22031<br>*Tel.:* (202) 981-2059<br>lwr@lwrlawoffices.com<br>*Counsel for plaintiff* |

**PLAINTIFF'S REPLY IN SUPPORT OF SECOND RENEWED EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER- REPLY TO X, Corp.**

**Use of Generative Artificial Intelligence**
This brief was prepared using generative artificial intelligence.

## I. INTRODUCTION

This case presents the most significant constitutional crisis in the digital age: the world's wealthiest individual simultaneously controls a major communication platform and exercises federal governmental authority, coordinating with the President to suppress religious expression. X Corp.'s Opposition mischaracterizes this as routine content moderation, ignoring the government entanglement.

**X Corp.'s Legal Team Proves There Is No Defense to Government-Coordinated Censorship.** X Corp. offers no response to the *Brentwood Academy* analysis and no explanation for how private immunity could survive when the platform owner simultaneously exercises federal authority. This proves established constitutional law compels finding government action.

**X Corp. Cannot Explain How Hundreds of Millions of Individual Feeds Constitute "Editorial" Activity.** X Corp. ignores Plaintiff's argument that it "generates individualized feeds for hundreds of millions of users, functioning as a communications conduit, not an editorial voice." **No human editor has ever reviewed nor ever *could* review all algorithmic decisions made.** This destroys X Corp.'s editorial protection claim and demonstrates why Justice Thomas has repeatedly suggested that platforms operating at this scale should be treated as common carriers rather than publishers.

**Real-Time Government Coordination Remains Uncontested.** X Corp. offers no explanation for the June 2-5, 2025 timeline, where Plaintiff's private attorney-client Gmail about adding Trump as defendant "after June 5--there's a specific reason" immediately preceded a staged "feud" on that exact date. This further demonstrates systematic government coordination transforming platform decisions into constitutional violations.

## II. X CORP.'S OPPOSITION FAILS BECAUSE IT IGNORES THE CENTRAL CONSTITUTIONAL ISSUE

**A. This Case Requires Straightforward Application of *Brentwood Academy* to Unprecedented Facts -** *Brentwood Academy v. Tennessee Secondary School Athletic Association* holds that private entities become state actors when government is "entwined in management or control." 531 U.S. 288, 296 (2001). When the same individual exercises both platform ownership and federal authority while coordinating with the President to suppress religious expression, the First Amendment violation is unambiguous. **The Entanglement Here Exceeds Even *Brentwood Academy*.** Unlike *Brentwood Academy*'s diffuse governmental connections, this case presents direct dual control where:

• **Same Individual Controls Both**: Musk simultaneously owns X Corp. and exercises federal authority through DOGE. (Trump calls "his baby" and confirms "Elon is really not leaving". With Musk declaring "this is not the end of Doge but really the beginning", adding he will continue to visit the White House as a "friend and adviser" to the president, and stating "I hope to continue to provide advice whenever the president would like," Musk said. "I hope so," Trump replied.)[1]

• **Financial Entanglement**: $15.4 billion in active government contracts while controlling major communication infrastructure, plus $300+ million investment to secure Trump's election

• **Strategic Personnel Placement**: The New York Times has identified more than 70 people within Musk's Department of Government Efficiency operation who are actively "carrying out Musk's plans" across virtually every federal agency, with many having direct ties to Musk's

---

[1] Drugs, marital advice and that black eye: key takeaways from Trump's Oval Office send-off for Elon Musk, The Guardian (May 30, 2025), https://www.theguardian.com/us-news/2025/may/30/key-takeaways-musk-trump-send-off.

companies including SpaceX, Tesla, X, and Neuralink, including many former Tesla engineers placed in federal agencies under Thomas Shedd's leadership, creating permanent operational control over federal AI deployment. Through executive order, President Trump moved DOGE into the White House itself, "a transition that effectively shielded its work from open records laws," demonstrating that rather than ending, Musk's government entanglement has become more extensive and secretive.[2]

**B. X Corp.'s Section 1983 Technicalities Cannot Avoid Constitutional Liability.** X Corp. attempts to defeat Plaintiff's constitutional claims through § 1983 technicalities, arguing Plaintiff hasn't identified specific "policymakers" or "official policies." This misses the fundamental point: when the same individual who owns the platform simultaneously exercises federal authority, every content moderation decision becomes a policy decision by a government-entangled actor. Musk himself is the "policymaker," his dual role creates the "official policy" of government-coordinated censorship, and the systematic religious discrimination is the direct result. Moreover, X Corp.'s distinction between state and federal government action is legally irrelevant under *Brentwood Academy*.

**C. Once State Action Is Established, X Corp.'s Defenses Collapse**: 1) Section 230 immunity becomes inapplicable to government-coordinated censorship; 2) Terms of Service cannot shield constitutional violations; 3) First Amendment protections thus flip to protect Plaintiff rather than X Corp.; 4) The systematic religious viewpoint discrimination becomes per se constitutional violation. **D. In addition, Justice Thomas's Common Carrier Framework Applies to X Corp.'s Unprecedented Scale, explained further in IV.A below. E. The Fifth Circuit Has Shown Receptivity to This Framework in** *NetChoice, L.L.C. v. Paxton*, **Despite** *Moody*

---

[2] The New York Times, *The People Carrying Out Musk's Plans at DOGE*, N.Y. TIMES (June 16, 2025), https://www.nytimes.com/2025/06/16/us/politics/elon-musk-doge-staff.html.

Remand, explained further in IV.A below.

III. X CORP.'S SPECIFIC LEGAL ARGUMENTS FAIL

A. Multiple Legal Theories Defeat Section 230 Immunity

**X Corp.'s *Match Group* Citation Proves the Opposite of Their Claim.** The only case X Corp. could cite purporting that good faith does not matter in content moderation involves the exact opposite legal issue: *Match Group* addressed UNDER-moderating third-party content, while this case involves OVER-moderating Plaintiff's own content. Most crucially, *Match Group* explicitly stated it "need not reach the question of whether § 230(c)(2) also bars Count I" because (c)(1) immunity applied. 2022 WL 877107, at *10. **But here, with a different question, *Match Group*'s analysis is irrelevant.**

**Courts Across Circuits Have Established Clear Section 230 Exceptions That Apply Here:**

**Bad Faith Exception**: *e-ventures Worldwide, LLC v. Google*, 188 F. Supp. 3d 1265, 1272-73 (M.D. Fla. 2016) held "the plain language of the CDA only provides immunity for actions voluntarily taken in good faith." X Corp.'s systematic false denials while implementing shadowbanning defeats any good faith claim. **Anticompetitive Animus Exception**: *Enigma Software Group USA, LLC v. Malwarebytes*, 946 F.3d 1040, 1054 (9th Cir. 2019) held Section 230 "immunity . . . does not extend to anticompetitive conduct." X Corp.'s systematic suppression of religious viewpoints while promoting competing perspectives fits precisely within this exception. **Contract-Based Claims Exception**: *Calise v. Meta* (9th Cir. June 2024) established that Section 230 does not protect platforms from contract breach claims when they make specific promises to users. X Corp.'s categorical promises--"We do not block, limit, or remove content based on an individual's views" and "Simply put, we don't shadow ban! Ever"-- create enforceable duties independent of publishing immunity.

**Government Coordination Makes Section 230 Inapplicable Entirely.** When platforms operate under government direction, including through Executive Order 14179's federal AI coordination mandate, Section 230's protection for private editorial decisions becomes inapplicable because the conduct constitutes government action disguised as private content moderation.

B. X Corp.'s Terms of Service Cannot Shield Constitutional Violations

**When Private Entities Perform Government Functions, They Become State Actors Subject to Constitutional Constraints.** The Fifth Circuit has consistently held that private entities become state actors when they perform fundamentally governmental functions or coordinate with government officials. In *Rosborough v. Management & Training Corp.*, the Fifth Circuit held that private prison corporations and their employees could be sued under § 1983 because "confinement of wrongdoers--though sometimes delegated to private entities--was a fundamentally governmental function." 350 F.3d 459, 459 (5th Cir. 2003). Similarly, in *Watts v. Northside Indep. Sch. Dist.*, the court recognized that "a public official remains a state actor when he orders others to carry out his objectives." 37 F.4th 1094, 1098 (5th Cir. 2022).

**So too here, X Corp. becomes a state actor when controlling the digital public square while its owner simultaneously exercises federal authority.** When "the State has commanded a particular result, it . . . has 'become involved' in it, and, in fact, has removed that decision from the sphere of private choice." *Watts,* 37 F.4th at 1098. Here, Musk's unprecedented dual role creates precisely this coordination between government authority and private platform control.

**X Corp.'s Public Commitments Create Binding Obligations Under Contra Proferentem.** Moreover, when state actors make public commitments, those commitments cannot be contradicted by private contract terms. X Corp. ignores its explicit public promises in FAQs and

other similar information that directly contradict their Terms of Service defense: 1) Musk's categorical statement: "X doesn't censor beyond what is legally required"[3]; 2) X Corp.'s Help Center promise: "We do not block, limit, or remove content based on an individual's views or opinions"[4]; 3) X Corp.'s explicit denial: "Simply put, we don't shadow ban! Ever"[5]; 4) X Corp.'s explicit promise about the follower relationship: "When you follow someone, every time they post a new message, it will appear on your X Home timeline."[6]; 5) X Corp.'s further promise: "Following someone on X means: You are subscribing to their posts as a follower," and "If someone follows you:... They'll see your posts in their Home timeline whenever they log in to X."[7]

When companies make explicit public promises while maintaining contradictory TOS provisions, courts interpret such contradictions against the drafter. By systematically suppressing Mr. Richards' content visibility while maintaining these explicit promises, X has engaged in a form of digital bait-and-switch by not allowing followers to see posts.

**C. The First Amendment Protects Plaintiff, Not X Corp., Under These Facts**

**X Corp. Misapplies *Moody v. NetChoice*.** While *Moody* confirmed private platforms' editorial rights, it explicitly did not address scenarios involving government entanglement. When platform owners simultaneously exercise federal authority, constitutional analysis fundamentally changes--the First Amendment protects citizens from government censorship rather than shielding government-coordinated suppression.

---

[3] Elon Musk (@elonmusk), X (Oct. 17, 2024, 12:39 AM), https://x.com/elonmusk/status/1846772929167552549/.
[4] X Corp., Content Reach Policy, X Help Ctr., https://help.x.com/en/rules-and-policies/x-reach-limited (last visited July 6, 2025).
[5] X Corp., Debunking Twitter Myths, X Help Ctr., https://help.x.com/en/using-x/debunking-twitter-myths (last visited July 6, 2025).
[6] X Help Ctr., https://help.x.com/en/resources/new-user-faq (last visited May 20, 2025).
[7] X Help Ctr., https://help.twitter.com/en/using-twitter/following-faqs (last visited May 18, 2025).

IV. PLAINTIFF SATISFIES ALL FOUR TRO ELEMENTS

A. Substantial Likelihood of Success on the Merits

1) Constitutional Law Clearly Favors Plaintiff Under *Brentwood Academy*, Exceeding that Bar. 2) Justice Thomas's Common Carrier Framework Provides Additional Path to Victory. Justice Thomas has repeatedly stated that courts should "continue to consider the common-carrier doctrine" and that "there is a fair argument that some digital platforms are sufficiently akin to common carriers . . . to be regulated in this manner." *Biden v. Knight First Amendment Institute*, 141 S. Ct. 1220, 1224-25 (2021); *Moody v. NetChoice*, 603 U.S. 707, 752 (2024).

X Corp. generates approximately 500 million individualized algorithmic feeds daily--a volume that makes human editorial review mathematically impossible. Therefore X Corp. functions as automated distribution infrastructure, like a telephone network routing millions of calls, rather than a publisher exercising editorial discretion. X Corp. possesses all characteristics Justice Thomas identified: 1) neutral platform for all lawful expression; 2) critical communications infrastructure; 3) substantial market power with no alternatives; 4) individualized feeds functioning as a communications conduit, not an editorial voice.

The Fifth Circuit has shown receptivity to this framework. In *NetChoice, L.L.C. v. Paxton*, it stated "Platforms are not newspapers. Their censorship is not speech." 49 F.4th 439, 445 (5th Cir. 2022). While *Moody v. NetChoice* vacated this for further analysis, it did not reject the Fifth Circuit's skepticism of absolute platform immunity, and Justice Thomas's *Moody* concurrence recommended using the common carrier doctrine.

**X's Massive Scale Moderation Is Legally Decisive.** When Congress enacted Section 230 in 1996, content moderation involved binary human decisions: remove content or leave it up. X

Corp.'s system of generating hundreds of millions of unique algorithmic combinations, where some content is simply "shadowbanned" (rarely shown), represents fundamentally different conduct Congress never contemplated. Moreover, "restrict", the term used in 230(c)(2)(A), (from the Latin "restringere" meaning "to bind fast") contemplates definitive limitation of access, not mere algorithmic promotion reduction while preserving full technical accessibility.

**B. Irreparable Harm**

**Ongoing Constitutional Violations Constitute Per Se Irreparable Harm.** "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

**X Corp.'s Systematic Evidence Destruction Demonstrates Consciousness of Wrongdoing:** 1) March 19, 2025: Mass deletion of 61,600+ posts; 2) April 5, 2025: Removal of 5,974 media files days after demand letter; 3) April 6, 2025: Further deletions following counsel's follow-up letter: 4) July 2025: Additional mass deletions removing all content before July 1. This pattern constitutes ongoing obstruction requiring immediate intervention.

**The June 2-5 Timeline Demonstrates Real-Time Government Coordination.** The mathematical improbability of coincidental timing between private attorney-client communications and coordinated defensive responses creates compelling inference of systematic surveillance capabilities that threaten the judicial process itself.

Recent reporting confirms this ongoing coordination, as Musk donated $15 million to pro-Trump super PACs in June 2025 following his supposed Trump "feud," indicating that their showy public disagreements serve to obscure continued financial and political collaboration.[8]

**C. Balance of Equities Strongly Favors Plaintiff--Requested Relief Merely Requires Truth**

---

[8] Peter Aitken, *Elon Musk Spent Millions to Get Back in Donald Trump's Good Graces*, NEWSWEEK (Aug. 2, 2025), https://www.newsweek.com/elon-musk-spent-millions-get-back-donald-trumps-good-graces-1934567.

in Advertising.** The injunction simply requires X Corp. to: 1) Restore content that was publicly visible for years; 2) Cease discriminatory suppression it claims not to practice; 3) Allow followers who chose to follow Mr. Richards to actually see his content; 4) Apply equal algorithmic treatment; **No Legitimate Burden Results.** X Corp.'s own policies promise content-neutral moderation. Compliance with existing promises imposes no additional burden.

**D. Preventing Government-Platform Coordination Serves Critical Public Interest.** When unprecedented wealth enables simultaneous control of major communication platforms and federal power, emergency judicial intervention becomes essential to preserve constitutional boundaries that protect all citizens' rights in the digital age.

**V. THIS CASE WILL DETERMINE THE FUTURE OF FREE SPEECH FOR HUMANITY -- Every Day of Delay Compounds the Constitutional Crisis.** The systematic pattern of evidence destruction following legal communications will continue absent emergency intervention. X Corp.'s systematic removal of content within 24-48 hours of legal correspondence requires immediate judicial response to preserve both constitutional rights and evidence integrity.

Without emergency relief, unprecedented private wealth will successfully demonstrate that constitutional protections can be evaded entirely through government-platform coordination disguised as private content moderation, fundamentally transforming citizen-government relationships in ways the Framers never contemplated.

**VI. CONCLUSION**

**X Corp.'s Opposition confirms the urgent need for emergency relief through what it omits rather than what it argues.** Their inability to address the government entanglement central to this case, combined with their silence on how hundreds of millions of *unique* automated feeds

constitute editorial activity, demonstrates that multiple independent legal theories--government entanglement, common carrier status, and Section 230 exceptions--all compel emergency relief.

Most tellingly, X Corp.'s Opposition offers no explanation for why, if their conduct is truly lawful and their Terms of Service truly grant unlimited discretion, they have systematically destroyed evidence following each legal communication. This pattern of evidence destruction--from the March 19 mass deletion immediately after the demand letter to the July 2025 elimination of all pre-July content--demonstrates consciousness of wrongdoing that no valid Terms of Service could authorize.

WHEREFORE, Plaintiff respectfully requests this Court grant his Emergency Motion for Temporary Restraining Order and provide such other relief as the Court deems just and proper.


Respectfully submitted,

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards
LWR Law Offices
3060 Williams Dr, Ste 300 #510
Fairfax, VA 22031
Tel.: (202) 981-2059
lwr@lwrlawoffices.com
VA BAR # 96671
NY BAR #4932570
Counsel for Plaintiff


CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2025, a true and correct copy of the foregoing document was electronically transmitted to the Clerk of Court using the ECF System for filing, and was transmitted to Defendants' counsels via ECF.

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards