# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS

# DALLAS DIVISION

THOMAS RICHARDS

*Plaintiff,*

*v.*

X CORP., and
DONALD J. TRUMP

*Defendants*

Case No. 3:25-cv-916

Lisa Weingarten Richards, Esq.

VSB #96671

NY BAR #4932570

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT X CORP.'S MOTION TO DISMISS

### Use of Generative Artificial Intelligence

This brief was prepared with the assistance of generative artificial intelligence.

## I. INTRODUCTION

X Corp.'s motion contains two fatal flaws that alone warrant denial: (1) complete silence on specific contractual promises creating binding obligations independent of general Terms of Service language, and (2) a fundamental legal mischaracterization that undermines their entire constitutional defense.

**First, X Corp. Completely Fails to Address Their Explicit FAQ Promises.** X Corp. dedicates substantial space attacking various theories while never addressing their unambiguous contractual commitments in their Help Center FAQs: • "When you follow someone, every time they post a new message, it will appear on your X Home timeline." • "Following someone on X means: You are subscribing to their posts as a follower." • "If someone follows you:... They'll see your posts in their Home timeline whenever they log in to X." These specific, verifiable promises create binding contractual obligations that cannot be dismissed through general disclaimer language.

**Second, X Corp.'s Constitutional Analysis Is Based on a Critical Error.** In footnote 3, X Corp. acknowledges that Plaintiff's amended complaint "no longer expressly reference[s] 42 U.S.C. § 1983" but then proceeds to analyze all constitutional claims as if brought under § 1983. This is wrong. Plaintiff asserts DIRECT constitutional violations through unprecedented government-platform coordination where the same individual exercises both federal authority and platform control— creating immediate constitutional violations that require no § 1983 statutory analysis.

The timing of X Corp.'s motion—filed on August 14, 2025, the exact same day President Trump signed an executive order specifically benefiting Musk's SpaceX company[1]—ironically demonstrates the continuing government-platform entanglement that transforms what might otherwise be private

---

[1] *Trump Hands Elon Musk Big Win With New Order*, NEWSWEEK (Aug. 14, 2025), https://www.newsweek.com/donald-trump-elon-musk-spacex-executive-order-2113401.

editorial decisions into direct constitutional violations.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Richards maintained a compliant X account (@tlthe5th) for 16 years, building 3,400+ followers through 71,500+ posts of religious expression. Despite compliance with platform rules and Premium subscriber status, his biblical viewpoints face 98% algorithmic suppression—reducing typical engagement from industry-standard levels of 300-800 views per post to often fewer than 10 views. Platform analytics show some posts from 2011 have zero impressions over 14 years despite being on prominent topics—a mathematical impossibility without deliberate technical intervention.

**This suppression violates X Corp.'s FAQ promises that followers will see "every" post from accounts they follow.** After Plaintiff's March 31, 2025 demand letter, X escalated suppression: deleting 61,600+ posts, 5,974 media files, in retaliation and consciousness of wrongdoing.

**Government Coordination Through DOGE**

On January 20, 2025, his first day in office, Trump created the Department of Government Efficiency (DOGE) specifically for Musk (using his branding "DOGE") through executive order, with X serving as DOGE's official communication platform.[2] Musk embedded many former Tesla engineers throughout federal agencies to implement coordinated AI policy.[3] This integration culminated in Trump's July 23, 2025 Executive Order "Preventing Woke AI in the Federal Government," requiring federal agencies to procure only AI models deemed free from "ideological

---

[2] Exec. Order No. 14158, Establishing and Implementing the President's "Department of Government Efficiency," 90 Fed. Reg. [page] (Jan. 20, 2025).
[3] The New York Times, *The People Carrying Out Musk's Plans at DOGE*, N.Y. TIMES (June 16, 2025), https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html.

dogmas such as DEI."[4] The same Grok AI system that moderates Plaintiff's religious content now performs core governmental functions across federal agencies under this mandate.[5]

**From Catholic Insider to Digital Influencer: The Rise and Systematic Suppression of Biblical Accountability** Mr. Richards' advocacy work stems from personal experience within the Catholic institutional system rather than external bias. At his own childhood request to learn about God, he was brought by his mother to the Catholic church where he attended Catechism and was confirmed in the faith. When he served in the U.S. Navy he had a "RC" (Roman Catholic) designation on his dog tags.

At age 9 in Hewlett, New York, he had learned firsthand how institutional secrecy operates when a 6-year-old friend Mary Dunn disclosed being molested by her priest uncle at Saint Joseph's Church in Hewlett, NY. She then engaged Plaintiff in similar activities. And he never disclosed any of this publicly until recently on X.[6] This childhood experience within the Catholic system is what shaped his later advocacy work warning about the dangers of that institution.

Mr. Richards' 2005 YouTube video warnings about the dangers of Vatican sex abuse[7] have since

---

[4] Exec. Order No. 14319, Preventing Woke AI in the Federal Government, 90 Fed. Reg. 35389 (July 23, 2025).
[5] *E.g.* Pentagon to Start Using Grok as Part of a $200 Million Contract with Elon Musk's xAI, CBS NEWS (July 16, 2025), https://www.cbsnews.com/news/grok-elon-musk-xai-pentagon-contract/; The government wants AI to fight wars and review your taxes, WASH. POST (July 15, 2025), https://www.washingtonpost.com/business/2025/07/14/trump-ai-government-war-taxes-jobs/.
[6] https://x.com/tlthe5th/status/1941853499093901632.
[7] Ted L Gunderson on "Trash TV" Geraldo Rivera Show - YouTube, https://www.youtube.com/watch?v=Uw-HOf2r6QI  See comment from 16 years ago "his motive is revealed on this show. He hid the vatican and pretended there were other entities we should be concerned with. since then about 5000 priests have been implicated in child pedophilia. wheres all the satanist gangs? wow they got a way with it. they're more covert and powerful than Rome even. i'm being sarcastic."

been validated by over $5 billion in documented settlements in the United States alone,[8] with the

Los Angeles Archdiocese recently paying $880 million to over 1,300 survivors.[9]

Following a powerful, unexpected, supernatural conversion experience, Mr. Richards became a

born-again bible believer and ultimately, a pioneering biblical critic of the Vatican. His research and

exposes -- particularly regarding the epidemic of child sex abuse by priests -- achieved extreme

digital reach, ranking his video as the second search hit on the term "Vatican" on YouTube in

2009[10]—establishing him as a leading influencer before the term "influencer" even existed. At the

same time his content reached peak visibility, the Vatican established an exclusive partnership with

YouTube[11]—the only religious institution ever granted such formal platform integration. It then

created a YouTube channel explicitly to "fight back" against videos like Plaintiff's.[12] This precedent

ultimately extended to broader Vatican-technology coordination —with Eric Schmidt's documented

2016 promise to Pope Francis, "We will make it happen,"[13] establishing the template for tech

platform coordinated censorship with Vatican authority, and extending to current Vatican AI

authority under Pope Leo XIV, who has positioned the Vatican as the global regulatory body for

---

[8] Aleja Hertzler-McCain, *More than $5 billion spent on Catholic sexual abuse allegations, new report finds*, NAT'L CATH. REP. (Jan. 17, 2025), https://www.ncronline.org/news/more-5-billion-spent-catholic-sexual-abuse-allegations-new-report-finds.

[9] *Archdiocese of Los Angeles Will Pay $880 Million to Settle Sexual Abuse Claims*, NPR (Oct. 17, 2024), https://www.npr.org/2024/10/17/nx-s1-5155654/archdiocese-of-los-angeles-will-pay-880-million-to-settle-sexual-abuse-claims.

[10] The Independent, "Vatican launches YouTube channel," available at https://www.independent.co.uk/news/world/europe/vatican-launches-youtube-channel-1514238.html. (mentioning Plaintiff's video – "Nazi Germany – A Creation of the Vatican and Jesuits"); Nazi Germany - A Creation of the Vatican and Jesuits (CENSORED by YOUTUBE/GOOGLE) https://www.youtube.com/watch?v=e9zBX4gt0eo&rco=1

[11] Catholic News Agency, "Pope channel makes debut on YouTube," available at https://www.catholicnewsagency.com/news/14866/pope-channel-makes-debut-on-youtube.

[12] *Id.*

[13] Rome Reports, "Pope Francis meets with Google executive Eric Schmidt," January 15, 2016, available at https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/.

artificial intelligence development.[14] The Vatican for several years has greatly expanded this connection both to tech companies, AI, and to all world religions *except* true bible-believers.[15]

Both Trump and Musk have publicly expressed support for Vatican leadership, with Musk describing his meeting with Pope Francis as an "honor", reposting Pope XIV's post saying that the Pope should mediate among the world's leaders, and Trump calling it the honor of a lifetime to meet Pope Francis and stating that the new American Pope is a great honor for our nation. Further, Trump's administration protects Catholic institutional interests through DOJ intervention. Following these institutional relationships, Plaintiff's content experienced systematic suppression across digital platforms, transforming a previously successful ministry with substantial organic reach into marginalized content with severely restricted visibility[16]—exactly as The 2009 Independent article spoke about when documenting the Vatican's digital counter-strategy.

This deception extends to coordinated media manipulation, as demonstrated by Mr. Richards' comprehensive early analysis. In his 2008 YouTube video featuring Geraldo Rivera show footage, Richards exposed how Father James J. LeBar was "hiding the vatican and pretended there were

---

[14] Catholic News Agency, *Pope Leo XIV shares vision for papacy in age of artificial intelligence* (May 10, 2025) https://www.catholicnewsagency.com/news/264031/the-american-pope-s-vision-leo-xiv-talks-choice-of-name-priorities-in-first-meeting-with-cardinals; Pope Leo XIV outlines his vision for the papacy, CBS NEWS (May 10, 2025), https://www.cbsnews.com/news/pope-leo-xiv-lays-out-vision-papacy-artificial-intelligence/.

[15] Why famed atheist Stephen Hawking is on a pontifical academy, CATH. NEWS AGENCY (May 16, 2025), https://www.catholicnewsagency.com/news/35014/why-famed-atheist-stephen-hawking-is-on-a-pontifical-academy; Pontifical Academy of Sciences - Index, VATICAN, https://www.vatican.va/roman_curia/pontifical_academies/acdscien/index.htm; Pontifical Biblical Commission, Interpretation of the Bible in the Church, §F, https://www.ewtn.com/catholicism/library/interpretation-of-the-bible-in-the-church-2319; Rome Call for AI Ethics, VATICAN PONTIFICAL ACAD. FOR LIFE, https://www.romecall.org/; Press Release, Vatican, AI Ethics for Peace (July 10, 2024), https://press.vatican.va/content/salastampa/en/info/2024/07/10/240710a.html; When religion (Pope Francis) met science (Stephen Hawking), ALETEIA (Dec. 3, 2016), https://aleteia.org/2016/12/03/when-religion-pope-francis-met-science-stephen-hawking/.

[16] Thomas Richards, Censorship Documentation, SPIRITUALLYSMART.COM, https://spirituallysmart.com/censorship.html.

other entities we should be concerned with,"[17] while identifying former FBI agent Ted Gunderson as complicit, questioning where his supposed "investigations" led if no arrests resulted. Richards' analysis proved true years later: LeBar, who appeared on Rivera's show as the Archdiocese of New York's chief exorcist warning about external demonic threats, was himself later listed on the Archdiocese's official registry of clergy credibly accused of sexually abusing a minor at St. Joseph's Church in Kingston, New York.[18] In 2022, Richards noted this: "BREAKING NEWS: Father James LeBar has been credibly implicated in sexual abuse of children (as I theorized 14 years ago),"[19]—this journalism then faced coordinated suppression the Vatican's platform partnerships.

**Mussolini and Vatican Sovereignty:** The Lateran Treaty was signed by Benito Mussolini for the Italian government and by Cardinal Pietro Gasparri for the papacy on February 11, 1929, establishing Vatican City as a sovereign state and granting the Holy See independence, is still in effect with the Vatican maintaining diplomatic relations with 182 of the 193 countries in the world.[20]

**Vatican's "Expert in Humanity" Claim:** The Church positions itself since at least 1965 as an "expert in all things human," and "bearers of a message for all of humanity" with the Pope's statements interpreted to mean that the entire Catholic Church is represented at the United Nations via the Holy See, making it the only religious community to have such status.[21]

These elements taken together - sovereign immunity established through a fascist treaty that remains

---

[17] Ted L Gunderson on "Trash TV" Geraldo Rivera Show - YouTube, https://www.youtube.com/watch?v=Uw-HOf2r6QI

[18] Archdiocese of New York, Sexual Abuse Crisis, https://archny.org/ministries-and-offices/child-protection/list/ [2] Horowitz Law, Fr. James LeBar – Archdiocese of New York, https://www.adamhorowitzlaw.com/blog/2020/08/fr-james-lebar-archdiocese-of-new-york/

[19] Ted L Gunderson on "Trash TV" Geraldo Rivera Show - YouTube, https://www.youtube.com/watch?v=Uw-HOf2r6QI, see the comment from Richards at the top.

[20] https://www.britannica.com/event/Lateran-Treaty; https://holyseemission.org/contents/mission/5ac79b91753bc.php

[21] https://english.katholisch.de/artikel/52045-the-holy-see-has-been-an-observer-at-the-un-for-60-years

in effect globally, claims of moral expertise on humanity, and a link to the largest tech companies in the world - create the framework that enables institutional protection of child rapists while deflecting scrutiny through coordinated media campaigns warning about external "satanic" threats.

## III. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

This Court has stated that this case presents "novel" constitutional questions. When unprecedented scenarios involve federal officials simultaneously controlling platforms while suppressing constitutional rights, traditional analysis requires factual development, not dismissal.

## IV. ARGUMENT

## A. THRESHOLD ISSUE: CONSTITUTIONAL ANALYSIS OF NOVEL TECHNOLOGY PLATFORMS REQUIRES FACTUAL DEVELOPMENT, NOT DISMISSAL

When constitutional questions involve applying established First Amendment principles to new technology platforms, courts must carefully develop the factual record before resolving such claims. The Supreme Court emphasized this principle in *Moody v. NetChoice*, remanding because "the parties have not briefed the critical issues here, and the record is underdeveloped,"[22] preventing adequate constitutional analysis of how different platforms actually operate. This need for thorough factual development applies with particular force to the unprecedented scenario here involving federal officials simultaneously controlling platforms while suppressing constitutional rights.

---

[22] *Moody v. NetChoice, LLC*, 603 U.S. 707, 726.

## B. X CORP. FAILS TO ADDRESS THEIR EXPLICIT FAQ PROMISES

### 1. The FAQ Promises Create Specific, Binding Contractual Obligations

X Corp.'s Help Center makes unequivocal promises about core platform functionality that create binding contractual obligations. Courts recognize that platform promises about core functionality create enforceable contracts separate from publishing activities. In *Calise v. Meta Platforms, Inc.*, the court held that Meta's promises about platform functionality created a binding contractual obligation separate from its status as a publisher, "such that "§ 230(c)(1) does not apply".[23]

X Corp.'s FAQ promises create precisely this type of specific, binding obligation. X Corp. explicitly promises "When you follow someone, every time they post a new message, it will appear on your X Home timeline."[24]—a concrete commitment that cannot be negated by general disclaimer language.

These FAQ promises[25] are reinforced by X Corp.'s integrated platform design where Follow buttons, interface elements, and executive statements create consistent user expectations. Ex-CEO Yaccarino's[26] promises including: that X provides "Free Speech. Today. Tomorrow. Always"[27] and Musk's categorical statement that X "doesn't censor beyond what is legally required"[28] demonstrate the same corporate commitment to content delivery as the FAQs. X Corp.'s multi-year maintenance

---

[23] *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024).

[24] X Help Ctr., https://help.x.com/en/resources/new-user-faq (last visited Aug. 28, 2025).

[25] Similar language about "following" has appeared on Twitter since at least 2018 – which indicates that when a user chooses to follow someone, they will see that person's posts https://web.archive.org/web/20180103214526/https://help.twitter.com/en/using-twitter/following-faqs And see Exhibit A.

[26] Linda Yaccarino departed X Corp. without explanation or succession planning within 10 hours of the amended complaint filing, conduct alleged to constitute obstruction of this litigation. A separate action addresses her retaliatory conduct during her tenure. Richards v. Yaccarino, No. 3:25-cv-01863 (N.D. Tex. filed July 16, 2025).

[27] X (Oct. 8, 2024, 1:35 PM), https://x.com/lindayaX/status/1843706908353626223 ("Free Speech. Today. Tomorrow. Always. X.").

[28] Elon Musk (@elonmusk), X (Oct. 17, 2024, 12:39 AM), https://x.com/elonmusk/status/1846772929167552549/.

of these identical representations while implementing contrary practices -- including the unchanged "We don't shadow ban! Ever" promise since at least 2018[29] -- proves ongoing platform deception.

Federal Trade Commission enforcement demonstrates that companies face liability for deceptive practices that create gaps between specific promises and actual performance, regardless of general disclaimer language.[30]

## 2. X Corp.'s Systematic Violation Is Mathematically Proven

Despite having approximately 3,400 followers, Mr. Richards' posts typically receive only 9-50 views—a 98% reduction proving deliberate technical intervention, not organic decline.

## C. PLAINTIFF ASSERTS DIRECT CONSTITUTIONAL VIOLATIONS, NOT § 1983

X Corp.'s entire constitutional analysis contains a fundamental error undermining their defense. They acknowledge Plaintiff's amended complaint "no longer expressly reference[s] 42 U.S.C. § 1983" but proceed to analyze claims as if brought under § 1983. This is wrong.

## 1. The First Amendment Is Self-Executing

Constitutional rights create direct causes of action for prospective injunctive relief without requiring statutory authorization. X Corp's analysis overlooks *Murthy v. Missouri*, decided just last year, where the Supreme Court adjudicated direct First Amendment claims against federal officials without any § 1983 analysis. 603 U.S. 43, 49 (2024). The case failed on standing, not on the availability of a direct

---

[29] X Corp., Debunking Twitter Myths, X Help Ctr., https://help.x.com/en/using-x/debunking-twitter-myths (last visited July 6, 2025).; Setting the record straight on shadow banning, https://blog.x.com/en_us/topics/company/2018/Setting-the-record-straight-on-shadow-banning.
[30] *See, e.g.*, FTC v. Vonage Holdings Corp., No. 3:22-cv-06435 (D.N.J. Nov. 3, 2022), https://dockets.justia.com/docket/new-jersey/njdce/3:2022cv06435/503922 ($100 million settlement for deceptive practices); In re Epic Games, Inc., FTC File No. 1923203 (Mar. 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/1923203-epic-games-matter ($245 million settlement for dark patterns).

constitutional cause of action—confirming that federal courts routinely accept constitutional claims based on the Constitution alone. Notably, the federal defendants never challenged the availability of direct constitutional claims in their motion to dismiss, despite raising standing, sovereign immunity, and other procedural defenses. This omission is particularly relevant given that *Murthy* involved a similar question —federal officials coordinating with social media platforms to restrict speech.

Section 1983 is merely one statutory vehicle for constitutional claims—it is not a prerequisite. Federal courts have jurisdiction to grant prospective relief based on the Constitution itself.

**2. Several Constitutional Theories Show Direct Government-Platform Integration Violation**

**Federal Instrumentality Theory**: DOGE, headed by Musk, uses X as its official communication platform while X simultaneously suppresses criticism of government policies. A federal court found that Trump attempted to "unilaterally creat[e] a federal agency pursuant to Executive Order" in violation of constitutional requirements.[31] Another court determined that the entity that became DOGE "is apparently exercising 'substantial authority independent of the President.'"[32] This functional integration creates state action under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), transforming X's content moderation into government censorship.

**Joint Action Theory**: The systematic coordination evidenced by the June 2-5, 2025 timeline provides compelling circumstantial evidence: June 2 private attorney-client Gmail stating intention to add Trump as defendant "after June 5 for a specific reason," followed by coordinated staging of "feud" on the exact specified date. This mathematical improbability, combined with Musk's strategic DOGE "departure" immediately after receiving Plaintiff's 42-page demand letter (despite Trump's

---

[31] *State of New Mexico v. Musk*, Civil Action No. 25-cv-429 (TSC), at *1 (D.D.C. May 27, 2025).
[32] *Citizens for Responsibility and Ethics in Washington v. U.S. DOGE Service*, 2025 U.S. Dist. LEXIS 50506, *4 (D.D.C. Mar. 19, 2025).

contradictory statements that DOGE is "his baby" and "Elon's not really leaving" with Musk confirming the sentiment[33]) and Yaccarino's resignation as CEO within hours of the amended complaint naming her, demonstrates sophisticated operational integration disguised as separation. Musk's documented deployment of AI systems to search federal employee emails[34] suggests systematic monitoring that transforms platform decisions into government constitutional violations. As detailed above, this coordination operates within the documented institutional framework where the Vatican maintains sovereign immunity through the 1929 fascist Lateran Treaty while positioning itself as "expert in all things human" at the United Nations, together operating with coordinated digital suppression campaigns—the same pattern that emerged when the Vatican partnered exclusively with YouTube to "fight back" against Plaintiff's accountability research in 2009.[35]

**Government Coordination Theory**: Under *Norwood v. Harrison*, "a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish."[36] Federal officials cannot directly suppress religious expression, so they coordinate with X Corp. to accomplish the forbidden result through private platform control.

Trump's July 23, 2025 Executive Order "Preventing Woke AI in the Federal Government"[37] specifically aligns with xAI's Grok messaging, stated by Musk to be: "Anti-woke" and "maximally

---

[33] Drugs, marital advice and that black eye: key takeaways from Trump's Oval Office send-off for Elon Musk, The Guardian (May 30, 2025), https://www.theguardian.com/us-news/2025/may/30/key-takeaways-musk-trump-send-off.

[34] *See* Exclusive: Musk's DOGE expanding his Grok AI in US government, raising conflict concerns, REUTERS (May 23, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/musks-doge-expanding-his-grok-ai-us-government-raising-conflict-concerns-2025-05-23/.

[35] The Independent, "Vatican launches YouTube channel," available at https://www.independent.co.uk/news/world/europe/vatican-launches-youtube-channel-1514238.html.

[36] 413 U.S. 455, 465 (1973).

[37] Exec. Order No. 14319, Preventing Woke AI in the Federal Government, 90 Fed. Reg. 35389 (July 23, 2025).

truth-seeking" artificial intelligence.[38] When the same Grok AI that moderates Plaintiff's religious content receives preference in federal procurement while suppressing Mr. Richards' unique biblical viewpoint,[39] this is government direction of private platform decisions through coordinated AI.[40]

## D. THE TERMS OF SERVICE DO NOT BAR PLAINTIFF'S CLAIMS

### 1. Explicit FAQ Promises Override General Disclaimer Language

Under established contract interpretation principles, specific terms control over general provisions.[41] When X Corp. makes explicit promises about content delivery ("When you follow someone, every time they post a new message, it will appear on your X Home timeline.") these specific commitments cannot be negated by general disclaimer language that users never see during the Follow button interaction.

Moreover, the concept of reasonable user expectations prevents platforms from making explicit promises while secretly nullifying them through deceptive practices. In *In re Facebook*, the court rejected a platform's argument that buried contractual language could override users' reasonable expectations, noting that "there are at least three plausible interpretations of the contract language, two of which would lead to a conclusion that users did not consent but were misled."[42] When

---

[38] Dylan Butts, *No 'Woke AI' in Washington, Trump Says as He Launches American AI Action Plan*, CNBC (July 24, 2025, 9:37 AM), https://www.cnbc.com/2025/07/24/no-woke-ai-in-washington-says-trump-as-he-launches-ai-action-plan.html.
[39] This same Grok is proven to censor biblical views. Exhibit B.
[40] Bobby Allyn, *Trump's New AI Policies Keep Culture War Focus on Tech Companies*, **NPR** (July 23, 2025, 5:22 PM ET), https://www.npr.org/2025/07/23/nx-s1-5476771/trump-artificial-intelligence-woke-eo.
[41] *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019) ("a specific contract provision controls over a general one"); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994) ("when a contract provision makes a general statement of coverage, and another provision specifically states the time limit for such coverage, the more specific provision will control").
[42] 402 F. Supp. 3d at 795.

platform terms are susceptible to multiple reasonable interpretations, courts will not permit dismissal based on the platform's preferred reading.

## 2. DTPA Claims Override Contractual Limitation Clauses

Texas law recognizes that certain statutory duties cannot be waived by contractual agreement, particularly under the Deceptive Trade Practices Act. X Corp's systematic shadowbanning while maintaining contrary FAQ promises constitutes false advertising that renders contractual disclaimers unenforceable under DTPA principles.

The DTPA creates statutory duties that "cannot be altered by the agreement of the parties." *Honeywell, Inc. v. Imperial Condominium Asso.*, 716 S.W.2d 75, 78 (Tex. App.—Dallas 1986, no writ). "Traditional contractual notions do not apply when the consumer seeks recovery for the breach of a duty imposed by the DTPA." *Id.* Unlike contractual liability arising from voluntary agreements, "liability for false, misleading and deceptive acts is provided by the legislature for the breach of a duty imposed by it." *Id.*

X Corp's conduct extends beyond mere breach of contract. The company maintained public FAQ representations about content delivery while secretly implementing systematic shadowbanning policies that contradicted those promises. This systematic deception about platform functionality constitutes false advertising under DTPA Section 17.46(b)(5) and (7), creating statutory liability that exists independently of any contractual terms.

Because DTPA liability "springs from the statute" rather than contractual agreements, limitation clauses cannot shield defendants from statutory violations. *Id.* X Corp's deliberate maintenance of contradictory public and private policies demonstrates the type of deceptive conduct the DTPA was designed to remedy, regardless of contractual disclaimers.

### 3. Government Entanglement Under DOGE/Vatican Coordination Voids Contract Defenses

Even if the Terms of Service could override explicit FAQ promises—which they cannot—systematic government entanglement transforms X Corp.'s content moderation from private contractual matters into constitutional violations. Under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), private entities become subject to constitutional constraints when government authority is "entwined in their management or control."

**Direct Government Integration Through DOGE:** The unprecedented nature of this entanglement includes: (1) Musk's appointment as Special Government Employee heading the Department of Government Efficiency, with Musk agreeing as Trump confirmed DOGE is "his baby" and "Elon is really not leaving";[43] (2) $15.4 billion in active government contracts creating financial dependency; (3) Top Secret security clearance providing classified government access; and (4) systematic placement of Tesla engineers in federal agencies implementing coordinated AI policy.

**Institutional Religious Coordination:** This government entanglement operates within a broader framework as explained above. And Musk's July 2, 2022 meeting with Pope Francis, preceded intensified suppression of Plaintiff's biblical content criticizing Catholic institutional practices. The same institutional framework that suppresses Protestant biblical criticism while promoting Catholic perspectives now operates through direct government-platform control via DOGE.

Constitutional violations cannot be waived through contract, making X Corp.'s Terms of Service defense inapplicable as platform decisions become government action promoting Vatican authority.

### E. SECTION 230 DOES NOT IMMUNIZE X CORP.'S DECEPTIVE SERVICE

---

[43] Drugs, marital advice and that black eye: key takeaways from Trump's Oval Office send-off for Elon Musk, The Guardian (May 30, 2025), https://www.theguardian.com/us-news/2025/may/30/key-takeaways-musk-trump-send-off.

**DELIVERY**

## 1. X Corp.'s Conduct Constitutes Service Delivery Fraud, Not Editorial Publishing

X Corp.'s shadowbanning operates invisibly—users believe their content is published normally while X Corp. secretly prevents delivery. This is service delivery manipulation, not editorial publishing. When users click "Follow," they reasonably expect to receive that person's content, just as telephone customers expect their calls to connect. X Corp.'s systematic prevention of this basic connectivity function constitutes service fraud, not editorial discretion.

X Corp. creates approximately 500 million different individualized feeds through algorithmic processing—fundamentally different from traditional publishers creating single editions for all readers. While X Corp.'s suppression operates primarily through automated algorithms, the platform maintains capability for targeted human intervention in specific cases. Regardless of implementation method, the constitutional violation lies in the systematic breach of explicit service promises combined with government coordination. When platforms make categorical commitments that followers will see "every" post, subsequent suppression violates those specific contractual obligations and transforms algorithmic processing into government-coordinated deception.

The invisible nature of shadowbanning—where content appears published but delivery is secretly prevented—constitutes deceptive service delivery that falls outside Section 230's protection for good faith editorial decisions.

## 2. Multiple Legal Theories Defeat Section 230 Immunity

X Corp.'s Match Group citation proves the opposite of their claim—addressing UNDER-moderating third-party content versus this case's OVER-moderating of Plaintiff's content. Match

Group explicitly stated it "need not reach"[44] § 230(c)(2) because (c)(1) immunity applied, making its analysis irrelevant here. Courts recognize clearly applicable Section 230 exceptions:

**Bad Faith Exception**: *e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 2d 1265, 1269 (M.D. Fla. 2002), held Section 230 "only provides immunity for actions voluntarily taken in good faith."[45] Section 230(c)(2)(A) explicitly requires "good faith" conduct. This aligns with FTC Act § 5 enforcement against deceptive business models that promise services while secretly withholding delivery. X Corp.'s pattern demonstrates bad faith through: systematic public denials while implementing shadowbanning; evidence destruction following legal communications (mass deletion of 61,600+ posts and 5,974 media files within days of Plaintiff's demand letter); and documented algorithmic manipulation for personal advantage, including Musk ordering engineers to artificially boost his own tweets by a factor of 1,000 creating precisely the type of deceptive business practice that falls outside Section 230's good faith requirements.

**Contract-Based Claims Exception**: *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024),[46] established Section 230 doesn't protect platforms from contract breach when they make specific promises. X Corp.'s categorical promises—"We do not block, limit, or remove content based on an individual's views" and "Simply put, we don't shadow ban! Ever"—create enforceable duties independent of immunity.

**Anticompetitive Animus Exception**: Enigma Software held immunity "does not extend to anticompetitive conduct."[47] X Corp.'s systematic suppression of religious viewpoints while promoting competing perspectives fits this exception precisely.

---

[44] 2022 WL 877107, at *10.
[45] *e-ventures Worldwide, LLC v. Google*, 188 F. Supp. 3d 1265, 1272-73 (M.D. Fla. 2016).
[46] *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 736.
[47] *Enigma Software Group USA, LLC v. Malwarebytes*, 946 F.3d 1040, 1054 (9th Cir. 2019).

### 3. Shadowbanning Falls Outside Section 230's 1996 Framework

Section 230's "restrict access to or availability of" language contemplates binary conditions—content either accessible or not accessible. 47 U.S.C. § 230(c)(2)(A). The Fifth Circuit cases also only contemplate removal, not visibility limitations.[48] The statutory categories—obscenity, lewdness, violence, harassment—also all contemplate complete removal, not surreptitious suppression while maintaining access.

### 4. Government Coordination Makes Section 230 Inapplicable

Section 230 protects private editorial decisions, not government-directed censorship. When platform decisions operate through the "Preventing Woke AI" Executive Order mandate, systematic personnel placement across agencies, and deep government ties explained in this brief immunity becomes inapplicable.

5. X Corp. continues suppressing Plaintiff's X posts about this lawsuit, preventing public awareness of the litigation and creating a feedback loop where misconduct prevents scrutiny of that misconduct. This violates due process principles by using the same censorship tools challenged in the lawsuit to suppress information about the lawsuit's existence, demonstrating absence of good faith and justifying immediate injunctive relief.

## F. THE FIRST AMENDMENT PROVIDES NO DEFENSE TO GOVERNMENT ACTION

*Moody v. NetChoice* addressed private platform editorial decisions, not systematic government coordination through direct control. Where the same individual (Musk) simultaneously heads a federal agency while controlling platform suppression decisions, the conduct transforms from

---

[48] *E.g. Doe v. MySpace Inc.*, 528 F.3d 413, 417; *Wells v. Youtube*, LLC, 2021 U.S. Dist. LEXIS 120812.

private editorial discretion into government action subject to constitutional constraints. The First Amendment protects private editorial choices - it does not immunize government officials from constitutional liability when they use platform control to suppress protected speech.

**Government Coordination Transforms Constitutional Analysis**

When platform owner and government actor are the same person, there is no "private" editorial decision to protect—only government action subject to constitutional constraints. This case presents the first instance where a federal agency head simultaneously controls the platform suppressing constitutional rights.

**Religious Viewpoint Discrimination Evidence**

The systematic suppression specifically targets Mr. Richards' biblical religious viewpoint while accommodating competing religious perspectives. Content suppression intensified specifically after Mr. Richards posted biblical criticism of Musk's July 2, 2022 meeting with Pope Francis, which Musk described as an "honor." Musk also retweeted Pope Leo XIV's suggestion that he mediate among world leaders, implying support.[49] Musk's pro-Pope perspective demonstrates that the censorship of Mr. Richards constitutes content-specific, viewpoint-discriminatory targeting, rather than neutral platform moderation.

This religious discrimination operates within a coordinated government framework where Trump's Religious Liberty Commission prominently features Catholic Cardinal Timothy Dolan and Bishop Robert Barron as 'Christian' representatives while biblical criticism of Catholic institutions faces platform suppression. This creates governmental endorsement of Catholic over biblical religious

---

[49] Marvie Basilan, *Elon Musk Reposts Pope's Suggestion That Vatican Can Host Global Talks For 'Enemy' Nations*, LATIN TIMES (May 15, 2025, 7:10 AM), https://www.latintimes.com/elon-musk-reposts-popes-suggestion-that-vatican-can-host-global-talks-enemy-nations-583103.

authority, violating the Establishment Clause's prohibition on denominational preferences.

The systematic suppression operates within Trump's coordinated framework where his Religious Liberty Commission features Catholic Cardinal Timothy Dolan and Bishop Robert Barron as "Christian" representatives while biblical criticism of Catholic institutions faces platform suppression, creating governmental endorsement that violates Establishment Clause prohibitions on denominational preferences. This governmental favoritism becomes stark when examining Trump's DOJ intervention to protect Catholic institutional secrecy. Within 72 hours of Washington state passing legislation requiring clergy to report child abuse learned in confession, Trump's Justice Department launched what it called an investigation into this "anti-Catholic law" and formally intervened in federal court to block enforcement.[50] The DOJ argued that requiring Catholic priests to report child abuse "deprives Catholic priests of their fundamental right to freely exercise their religious beliefs" and successfully obtained a federal court injunction protecting confessional secrecy even in child abuse cases. Assistant Attorney General Harmeet Dhillon called laws prohibiting the hiding of priest child abuse "attacks" and stated that "the Justice Department will not sit idly by."[51] Such laws have in fact been enacted successfully without problems in six other very conservative states,[52] showing further the bias and needlessness of this DOJ intervention. This federal intervention to protect institutional secrecy while simultaneously suppressing independent religious voices warning about these very institutional failures demonstrates systematic governmental

---

[50] https://www.bishop-accountability.org/2025/07/trump-and-the-catholic-church-fight/;
https://www.rollingstone.com/politics/politics-features/trump-catholic-church-child-abuse-law-clergy-priests-1235388032/
[51] https://www.justice.gov/opa/pr/justice-department-sues-washington-state-over-its-new-anti-catholic-law-senate-bill-5375
[52] *Trump and the Catholic Church Fight a Law Requiring Clergy to Report Child Abuse*,
BISHOPACCOUNTABILITY.ORG (July 20, 2025), https://www.bishop-accountability.org/2025/07/trump-administration-intervenes-to-help/.

coordination to control religious discourse around accountability.

### 3. DOGE Creation Fulfills State Action Requirements

Trump's creation of DOGE specifically for Musk fulfills the state action analysis and creates direct federal agency liability. The President created a federal agency for which he installed the platform owner, Musk, as its head. Musk, in turn is deeply involved with AI creation -- and upon information and belief -- uses that same AI to censor X posts, in accordance with government requirements from its Woke AI Executive Order.

To further explain, the woke AI Executive Order, clearly favors Grok, which is said to be less "woke" than other prominent LLMs. In addition, when Musk created Grok, he did this after supporting a 6 month ban on AI development. Once that 6 month ban was complete, his AI, Grok, was revealed (suggesting that it was indeed being developed during the 6 month ban). Thus there is a clear tie between Trump's EO, and Musk's AI. Upon information and belief, discovery will show the intricacies of these complex relationships. Taken together, X, which is overseen and censored by Grok, thus becomes a federal instrumentality subject to direct constitutional constraints.

### Upon Information and Belief DOGE and Other US Government Instrumentalities Are Under Vatican Leadership/Coordination

As mentioned throughout this brief, Trump's administration and Musk demonstrate systematic federal coordination with the Vatican to control discourse through, for example: (1) DOJ intervention to protect Catholic confessional privilege in Washington state child abuse reporting laws; (2) Trump's Religious Liberty Commission prominently featuring Catholic Cardinal Timothy Dolan and Bishop Robert Barron as "Christian" representatives while biblical criticism faces platform suppression; (3) Musk's documented meeting with Pope Francis, describing them as an "honor" and reposting papal suggestions for Vatican mediation of global conflicts, and similar from

Trump; (4) federal court injunctions blocking mandatory clergy reporting requirements; and (5) characterizing child protection laws as "anti-Catholic attacks" while simultaneously coordinating platform suppression of institutional criticism. This pattern transforms platform decisions into government-coordinated constitutional violations requiring constitutional remedy.

## G. COMMON CARRIER FRAMEWORK PROVIDES INDEPENDENT CONSTITUTIONAL PATHWAY

In resolving this impermissible interaction between government and X, Plaintiff suggests the Common Carrier framework as a viable solution. Multiple legal scholars across the political spectrum support common carrier treatment for platforms making utility-like promises.

**Conservative scholars** Professor Philip Hamburger and Professor Adam Candeub argue common carrier duties "prevent government censorship through coordination."[53] Professor Candeub's foundational analysis shows platforms receive "liability relief" without corresponding public obligations, violating the historical "regulatory bargain" where communication carriers gained immunity only in exchange for anti-discrimination duties.[54] **Progressive scholars** Ganesh Sitaraman and Morgan Ricks conclude "tech platforms are and should be subject to liability at common law for violating the duties of common carriers."[55] **Justice Thomas** has endorsed this framework across multiple concurrences, most recently in Moody v. NetChoice.[56]

## GOVERNMENT ENTANGLEMENT ELIMINATES TRADITIONAL IMMUNITY

---

[53] Philip Hamburger & Adam Candeub, The Common Carrier Cure for First Amendment Uncertainty, REASON (June 20, 2022).
[54] Adam Candeub, *Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section 230*, 22 YALE J.L. & TECH. 391, 401-02 (2020).
[55] Ganesh Sitaraman & Morgan Ricks, Tech Platforms and the Common Law of Carriers, 73 DUKE L.J. 1037, 1040 (2024).
[56] Thomas stated courts should "continue to consider the common-carrier doctrine." 603 U.S. 707, 752 (2024).

**DEFENSES**

Plaintiff's direct constitutional theory establishes that when government officials simultaneously control platforms while suppressing constitutional rights, traditional private immunity doctrines become inapplicable. Supreme Court precedent supports these frameworks. X Corp.'s voluntary assumption of utility-like delivery promises ("every time they post") creates corresponding constitutional obligations under *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 86 (1980) and *Turner Broadcasting*, 512 U.S. 622, 663 (1997). The transparency framework recognizes that platforms wielding power "to cut off speech" require constitutional constraints comparable to "government power to exclude people from limited public forums." Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*, 1 J. FREE SPEECH L. 377, 385 (2021). Organizations focused on civil liberties, such as the Brennan Center for Justice, similarly advocate for enhanced transparency requirements forcing platforms to disclose content moderation decisions.

**6. X Corp.'s Procedural Challenges to Individual Claims Fail**

**Conspiracy Claims**: X Corp. argues Plaintiff fails to allege "meeting of minds" between Trump and X Corp., but under Texas law, conspiracy can be proven through circumstantial evidence when direct evidence lies within defendants' exclusive control. The systematic coordination evidenced by the June 2-5 timeline, combined with documented financial entanglement ($15.4 billion in contracts) and personnel placement (many Tesla engineers), establishes sufficient circumstantial evidence of agreement.

**DTPA Claims**: X Corp. claims Plaintiff is not a "consumer," ignoring that Plaintiff paid for Premium subscriptions and API access ($200 monthly), clearly establishing commercial transactions under Texas Business and Commerce Code § 17.45(4). X Corp. also argues Rule 9(b) failures, but the systematic maintenance of false FAQ promises while implementing contradictory practices

provides the required "who, what, when, where, and how" specificity, particularly when combined with Senior Legal Director Mehes's explicit denial of shadowbanning despite documented suppression. Plaintiff relied on these material misrepresentations about content delivery and platform transparency when purchasing Premium services and API access, establishing the causal connection between X Corp's false statements and Plaintiff's monetary damages.

**Civil RICO**: X Corp. argues insufficient allegations of intent and enterprise, but the systematic pattern of wire fraud (false electronic promises about content delivery), evidence destruction timed to legal communications, and coordinated responses to private attorney-client communications establish both requisite intent and enterprise activity sufficient to survive motion to dismiss. The enterprise exists through the common purpose of maintaining political power while suppressing criticism through platform control. The enterprise encompasses government agencies/entities, financial relationships, and coordinated personnel placement, creating sufficient distinctness from the corporate defendants under Fifth Circuit precedent.

**Promissory Estoppel**: X Corp. argues claims are duplicative of contract claims, but promissory estoppel provides alternative relief for specific representations (like Musk's "no censorship" promises) that induced reasonable reliance beyond formal contractual terms. Under Texas law, promissory estoppel is not applicable to promises covered by valid contracts, but here the estoppel claims address promises outside the formal TOS.

**Tortious Interference**: X Corp. argues no specific business relationships identified, but Plaintiff adequately alleges interference with Creator Revenue opportunities, speaking engagements, and other professional opportunities that flow directly from platform suppression. The "independently tortious" conduct requirement is satisfied through the constitutional violations, deceptive practices, and contractual breaches established in other counts. Mr. Richards was so popular on the internet

before this X censorship began in 2009, that his YouTube video was the second hit for the term "Vatican". Without this censorship, he would have received millions in income from his organic internet popularity, and X cannot profit from their own censorship by limiting damages X itself caused. Creator Revenue involves relationships between creators, advertisers, and audiences that X Corp. facilitates but doesn't directly control.

**Religious Freedom Restoration Act**: X Corp. argues no "substantial burden," but systematic suppression of digital ministry that constitutes Plaintiff's primary religious expression clearly burdens religious exercise under RFRA's broad protection, particularly when targeting specific biblical viewpoints while accommodating other religious perspectives.

**Common Carrier Liability**: X Corp. argues this claim lacks cognizability, but dismissal would be premature given active development of Texas platform regulation law. Texas filed its response brief in *NetChoice v. Paxton* just three days ago (August 25, 2025), emphasizing that *Moody* left open whether certain platform regulatory approaches face different constitutional analysis. The established common carrier framework has centuries of legal precedent requiring non-discriminatory service from entities making public utility-like promises. In the alternative, should this Court find the common carrier liability claim requires further development of Texas law currently pending in *NetChoice v. Paxton*, Plaintiff requests that ruling on this specific claim be deferred pending resolution of the state law question, while allowing Plaintiff's remaining claims to proceed. This approach preserves judicial resources while ensuring X Corp.'s platform obligations are determined with complete legal development under the evolving Texas regulatory framework.

## V. CONCLUSION

X Corp.'s motion fails because it cannot address the fundamental issues at the heart of this case: their systematic breach of explicit contractual promises and their unprecedented government-

platform entanglement that transforms private decisions into constitutional violations.

X Corp. cannot escape liability for promising one service while secretly delivering another. Their FAQ commitments create binding contractual obligations that they systematically violate through shadowbanning. The unprecedented government-platform coordination through Musk's dual role transforms private business decisions into constitutional violations that cannot be dismissed through contractual disclaimers or immunity claims.

The timing of X Corp.'s motion—filed on the exact day President Trump signed an executive order benefiting Musk's SpaceX[57]—demonstrates the continuing entanglement that makes their constitutional defenses inapplicable.

For these reasons, X Corp.'s Motion to Dismiss should be denied in its entirety.

**In the alternative, should this Court find any claims require additional factual development, Plaintiff respectfully requests leave to amend to: (1)** Add the Department of Government Efficiency (DOGE) as a defendant based on its direct coordination with X Corp. in suppressing Plaintiff's content; **(2)** Clarify X Corp.'s federal agency status under DOGE coordination and add Administrative Procedure Act claims based on X Corp.'s performance of federal functions; **(3)** Add additional factual allegations regarding the systematic coordination between federal officials and X Corp. in targeting religious institutional criticism; **(4)** Include additional constitutional claims under the Establishment Clause for governmental favoritism toward Catholic institutional perspectives; **(5)** Add conspiracy claims against federal officials for coordinated suppression of First Amendment rights; **(6)** Include any other claims that discovery may reveal regarding the government-platform coordination that transforms private content moderation into constitutional violations.

---

[57] *Trump Hands Elon Musk Big Win With New Order*, NEWSWEEK (Aug. 14, 2025), https://www.newsweek.com/donald-trump-elon-musk-spacex-executive-order-2113401.

Respectfully submitted,


/s/ Lisa Weingarten Richards Lisa Weingarten Richards

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

Tel.: (202) 981-2059

lwr@lwrlawoffices.com

VA BAR # 96671

NY BAR #4932570

Counsel for Plaintiff

DATE: August 28, 2025


CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2025, a true and correct copy of the foregoing document was electronically transmitted to the Clerk of Court using the ECF System for filing, and was transmitted to Defendant's counsel via ECF.

 /s/ Lisa Weingarten Richards

Lisa Weingarten Richards

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

Tel.: (202) 981-2059

lwr@lwrlawoffices.com

VA BAR # 96671

NY BAR #4932570

Counsel for plaintiff