# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

## DALLAS DIVISION

THOMAS RICHARDS

          *Plaintiff,*

      *v.*

X Corp., Donald J. Trump

        *Defendants*

_____

Case No. 3:25-cv-916

Lisa Weingarten Richards, Esq.

VSB #96671

NY BAR #4932570

LWR Law Offices

11166 Fairfax Blvd. Suite 500 #1344

Fairfax, VA 22030

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO MOTION FOR ENTRY OF DEFAULT

### Use of Generative Artificial Intelligence
This brief was prepared with the assistance of generative artificial intelligence.

**INTRODUCTION**

Plaintiff respectfully submits this reply to Defendant Trump's Response (ECF No. 94). While DOJ raises various procedural objections, one fundamental fact remains undisputed: Trump personally defaulted on clearly individual capacity claims that no institutional appearance can cure. Even if DOJ representation were somehow proper for hypothetical official capacity claims, Trump unquestionably failed to respond personally to allegations targeting his $300 million quid pro quo arrangement with Musk, his staged obstruction of justice, and his personal religious preferences—conduct serving individual rather than governmental interests that requires personal accountability under *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

This individual capacity default occurred automatically on August 2, 2025, when Trump failed to file any personal answer within the mandatory 21-day deadline. No subsequent DOJ maneuvering can cure this personal default because individual and official capacity claims are legally distinct under controlling Fifth Circuit precedent. The core question is therefore whether this Court will enforce the basic principle that defendants—even presidents—must personally respond to claims seeking individual liability for personal conduct.

Beyond this fundamental individual capacity default, the timeline reveals DOJ's contradictory strategy. Why did DOJ attorney Najib Gazi suddenly make an appearance on the docket on September 15 if DOJ truly believed they were never served? This issue has been raised in multiple filings, (ECF No. 88 at 2, ECF No. 90 at 4) yet Mr. Gazi has never given any explanation, despite responding to these filings multiple times (ECF No. 89, ECF No. 94). This conduct demonstrates both consciousness of proper service and tactical obstruction designed to avoid accountability on the merits.

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………….…………2

TABLE OF AUTHORITIES………………………………………………….……………5

**I. DISPOSITIVE ISSUE: TRUMP'S UNILATERAL SUBSTITUTION OF UNAUTHORIZED COUNSEL WITHOUT COURT PERMISSION PROVES BOTH CONSCIOUSNESS OF SERVICE AND FAILURE TO RESPOND** ................................ 5

**II. ADDITIONAL GROUNDS SUPPORTING DEFAULT**

    a. DOJ'S ACTUAL NOTICE WITHOUT PROPER RESPONSIVE ACTION CONSTITUTES WAIVER ......................................................................... 8

    b. DOJ'S CONTRADICTORY CONDUCT PROVES CONSCIOUSNESS OF PROPER SERVICE ..................................................................................... 14

    c. DOJ'S EXTENSIVE PARTICIPATION CONSTITUTES GENERAL APPEARANCE AND WAIVER ................................................................................... 15

    d. RULE 4(i) DOES NOT APPLY - DOJ LACKS STATUTORY AUTHORITY FOR INDIVIDUAL CONSTITUTIONAL CLAIMS ............................................... 16

    e. TRUMP'S "COURT-ORDERED RESPONSE" ARGUMENT IS SELF-DEFEATING ..................................................................................................... 17

    f. THE SERVICE WAS PROPER AND ACHIEVED ACTUAL NOTICE .................... 19

    g. THE PATTERN OF EVASION REVEALS TACTICAL COORDINATION ............. 19

h. EQUITABLE PRINCIPLES BAR DOJ'S BELATED OBJECTIONS ........................ 20

i. TRUMP'S INDIVIDUAL CAPACITY CLAIMS WERE PROPERLY BROUGHT ... 21

j. TRUMP DEFAULTED IN HIS INDIVIDUAL CAPACITY REGARDLESS OF DOJ'S SERVICE OBJECTIONS ............................................................................................ 21

k. TRUMP'S INDIVIDUAL CAPACITY DEFAULT ENCOMPASSES CLEARLY PERSONAL CONDUCT ......................................................................................... 23

l. ALTERNATIVELY, TRUMP'S CONDUCT CONSTITUTES OFFICIAL CAPACITY VIOLATIONS REQUIRING EX PARTE YOUNG RELIEF ......................................... 27

m. SUMMARY: DEFAULT IS MANDATORY UNDER RULE 55(a)……………….. 28

**TABLE OF AUTHORITIES**

**Cases**

*Kentucky v. Graham*, 473 U.S. 159 (1985)……………………………….……………..2, 22, 26, 29

*Carroll v. Trump*, No. 1:20-cv-07311 (S.D.N.Y. 2020)………………………………………7, 17

*Richards v. Yaccarino*, No. 3:25-cv-01863 (N.D. Tex 2025)........................................8, 12

*Jackson v. United States*, 138 F.R.D. 83 (S.D. Tex. 1991).......................................8, 9, 15

*Panhandle Eastern Pipeline Co. v. Brecheisen*, 323 F.2d 79 (10th 1963)....................................8

*Regions Bank v. Britt*, 642 F. Supp. 2d 584 (S.D. Miss. 2009)..........................................9, 13, 15

*City of New York v. Mickalis Pawn Shop*, 645 F.3d 114 (2d Cir. 2011)……….......................9, 10

*King v. Taylor*, 694 F.3d 650 (6th Cir. 2012)…………………………………….……….10, 15

*Eiden v. McCarthy*, 531 F. Supp. 2d 333 (D. Conn. 2008)……...................................................10

*Datskow v. Teledyne, Inc.*, 899 F.2d 1298 (2d Cir. 1990)……...................................................10

*Buon v. Spindler*, 65 F.4th 64 (2d Cir. 2023)…………….....................................................11

*Giotis v. Apollo of Ozarks, Inc.*, 800 F.2d 660 (7th Cir. 1986)................................................11, 21

*Trustees of Central Laborers' Welfare Fund v. Lowery*, 924 F.2d 731 (7th Cir. 1991)……...........11

*Brunson v. Heavy Lift Cargo Airlines*, 358 B.R. 681 (W.D. La. 2006)..........................................11

*Wells v. Gautreaux*, 771 F. Supp. 3d 842 (M.D. La. 2025)............................................................13

*United States v. 51 Pieces of Real Property*, 17 F.3d 1306 (10th Cir. 1994)................................13

*Democratic Republic of Congo v. FG Hemisphere Associates*, 508 F.3d 1062 (D.C. Cir. 2007)..14

*Chambers v. Mukasey*, 520 F.3d 445, 449 (5th Cir. 2008)…………….......................................15

*Carroll v. Trump*, No. 24-644 (2d Cir. 2025)...........................................................................16

*Clinton v. Jones*, 520 U.S. 681 (1997),………………….…………........................................17

*Carroll v. Trump*, (1:22-cv-10016, 2022)....................................................................................20

*Goodman v. Harris County*, 571 F.3d 388 (5th Cir. 2009)...........................................…...22

*Ex parte Young*, 209 U.S. 123 (1908)………....................................................................27

*Shah v. Univ. of Tex. Southwestern Med. Sch.*, 129 F. Supp. 3d 480...........................................27

**Statutes**

28 U.S.C. § 2671…………………………………………………………………………..16

28 USC 2679(b)(2)(A)…………………………………………………………………..16, 29

**Rules**

Fed. R. Civ. P. 4(i)…………………………………………………………………………16

Fed. R. Civ. P. 12………………………………………………………………………passim

Fed. R. Civ. P. 65…………………………………………………………………………..18

28 C.F.R. § 50.15…………………………………………………………………….…….16

**OTHER AUTHORITIES**

Civil Rights and Civil Liberties Litigation: The Law of Section 1983 § 3.02 (5th ed. 2023)
(Lexis)……………………………………………………………………………....…..27

**I. DISPOSITIVE ISSUE: TRUMP'S UNILATERAL SUBSTITUTION OF UNAUTHORIZED COUNSEL WITHOUT COURT PERMISSION PROVES BOTH CONSCIOUSNESS OF SERVICE AND FAILURE TO RESPOND**

DOJ explicitly acknowledges "First, Plaintiff has sued the President solely in his individual capacity." (ECF No. 73 at 7). Yet rather than responding through proper private counsel as required for individual capacity claims, Trump unilaterally substituted DOJ attorneys. This substitution proves consciousness of service—defendants don't send lawyers to defend lawsuits they were "never served" with.

By acknowledging this was brought as an individual capacity suit, DOJ admitted they were not the proper party to respond. Yet buried in their response, DOJ attempts to wiggle out of their own opening acknowledgment by claiming "Plaintiff has not yet served President Trump with the Amended Complaint in compliance with Federal Rule of Civil Procedure 4." (ECF No. 73 at 10.) This contradiction is telling: DOJ simultaneously acknowledges defending an individual capacity lawsuit while claiming they were never properly served to defend it.

The contrast with proper procedure is stark. In *Carroll v. Trump*, No. 1:20-cv-07311 (S.D.N.Y.), when Trump was served individually at Mar-a-Lago for defamation claims, DOJ used structured procedure: they filed a formal motion to substitute the United States as defendant, arguing Trump acted in his official capacity. See ECF No. 3 (Motion to Substitute Party). Here, DOJ bypassed any procedural protections, appearing directly for individual capacity claims without statutory authorization—a shortcut that violates the individual vs. official capacity distinctions that structured approaches like Carroll's maintain.

When served individually, Trump was required to respond personally through authorized counsel within 21 days. He never filed any answer to the individual capacity claims served on July 11, 2025, and remains in default to this day. DOJ's unauthorized appearance cannot cure this fundamental procedural failure—Trump still has not answered the lawsuit requiring individual accountability.

While this threshold issue alone mandates entry of default, DOJ's conduct violates multiple additional legal principles that independently support the same conclusion.

## II. ADDITIONAL GROUNDS FOR THE SAME CONCLUSION

### a. DOJ'S ACTUAL NOTICE WITHOUT PROPER RESPONSIVE ACTION CONSTITUTES WAIVER

**The Critical Distinction**:

Trump's DOJ counsel correctly notes they filed no Rule 12 motion or responsive pleading to the complaint. However, DOJ had *actual notice* of both the lawsuit and the complaint through their July 29 TRO response yet chose to do nothing for 46 days until default appeared imminent due to a default in the related case in this Court, *Richards v. Yaccarino*, No. 3:25-cv-01863 (N.D. Tex. September 12, 2025).

**DOJ's Buried Service Reservation Cannot Cure Their Procedural Default**:

In *Jackson v. United States*, 138 F.R.D. 83, 86 (S.D. Tex. 1991), the court emphasized that proper service reservations must provide "fair notice to [plaintiff] of the nature of the invalidity" and give plaintiff "ample time to discover, correct, and perfect [his] service," citing *Panhandle Eastern Pipeline Co. v. Brecheisen*, 323 F.2d 79, 83 (10th Cir. 1963). Here, DOJ's tactical

approach violates basic principles of fair notice. While DOJ included purported service reservation language in their July 29 TRO response (ECF No. 73 at 10), this service objection was buried in emergency briefing on a different topic. Seeing as DOJ alleged there were service defects, it was required to prominently communicate its service objection so Plaintiff could cure any defects.

Here, DOJ's buried service language in emergency TRO briefing failed to provide meaningful notice. In *Regions Bank v. Britt*, 642 F. Supp. 2d 584, 588 (S.D. Miss. 2009), the defendant properly preserved service objections by clearly raising them in a prominent "answer and response" that gave fair notice. (See Exhibit A, in which Defendant Brian Britt raised his objections clearly at the beginning of his response – in the unnumbered introduction, throughout the response – ¶ 12, and again at the end of his response – ¶ 88). Critically, Brian Britt made no substantial merits arguments and engaged in no constitutional or immunity analysis—he simply preserved his jurisdictional objection prominently and repeatedly throughout his response.

By contrast, DOJ's cursory service language was buried in 22 pages of merits briefing on an unrelated TRO motion. Had DOJ genuinely believed they were never served, fair notice principles required a clear, prominent language or a separate filing alerting Plaintiff to the claimed defect -- not buried language that gave Plaintiff no meaningful opportunity to be informed of and thus to cure the alleged service problems.[1]

In addition, Federal courts recognize that defendants forfeit service objections through strategic litigation conduct designed to evade adverse rulings. In *City of New York v. Mickalis Pawn Shop*,

---

[1] Plaintiff was indeed unaware of Trump's objection to service and proceeded in good faith when seeking default. This demonstrates exactly why *Jackson v. United States* requires prominent notice—buried reservations in unrelated emergency briefing fail to alert opposing counsel to preserved defenses, preventing meaningful opportunity to address service issues.

645 F.3d 114, 139-40 (2d Cir. 2011), defendants initially challenged personal jurisdiction, participated substantially in litigation, then strategically withdrew when facing adverse rulings. The Second Circuit held this conduct forfeited their jurisdictional defense, explaining that courts "will not allow the defendants to 'escape the consequences' of their strategic decisions simply because they have proven to be disadvantageous to them." Here, DOJ's pattern mirrors *Mickalis Pawn*: they participated through their 22-page TRO response, buried an objection in a response dealing with wholly different issues, then strategically remained silent on service objections until facing default. This constitutes the same type of tactical manipulation that *Mickalis Pawn* held forfeits defensive objections.

**Forfeiture Through Unreasonable Delay and Gamesmanship**: Even properly preserved defenses can be forfeited through unreasonable delay and litigation conduct. In *King v. Taylor*, 694 F.3d 650, 658-59 (6th Cir. 2012), the court held that "even where a defendant properly preserves a Rule 12(b) defense by including it in an answer, he may forfeit the right to seek a ruling on the defense at a later juncture through his conduct during the litigation." The court emphasized that defendants are "required at some point to raise the issue by motion for the court's determination" and that "[w]aiting too long to do so can forfeit the defense." The *King* court found forfeiture where the defendant waited until summary judgment to raise service defenses. Here, DOJ's 46-day delay combined with contradictory attorney appearances demonstrates similar conduct.

**Courts Require Specificity, Not Buried Reservations**: In *Eiden v. McCarthy*, 531 F. Supp. 2d 333, 344-45 (D. Conn. 2008), the court noted that defendants must raise insufficient service defenses with specificity, and that general assertions about preserving defenses are insufficient. DOJ's cursory language buried in emergency TRO briefing fails this specificity requirement and

cannot preserve service objections when combined with their subsequent delay and contradictory conduct.

**DOJ's Legal Position Contradicts Established Precedent**: DOJ's assertion that "a party waives an insufficient service of process defense *only* by failing to assert the defense in a motion under Rule 12 or a responsive pleading" (emphasis added) directly contradicts established federal precedent. In *Datskow v. Teledyne, Inc.*, 899 F.2d 1298, 1303 (2d Cir. 1990), the Second Circuit held that "[d]elay in challenging personal jurisdiction by motion to dismiss has resulted in waiver, even where, as here, the defense was asserted in a timely answer." Similarly, in *Buon v. Spindler*, 65 F.4th 64, 74 (2d Cir. 2023), the court held that "even if insufficiency of process is raised in a motion or response, it can subsequently be waived by 'submission through conduct' that leads plaintiffs to believe service was adequate and no such defense will be continued."

**The "Waiver of Waiver" Doctrine**: Courts recognize that defendants can waive their own waiver defenses through misleading conduct. *Giotis v. Apollo of Ozarks, Inc.*, 800 F.2d 660, 663 (7th Cir. 1986) ("there can be a waiver of a waiver, i.e., a defense of waiver can itself be waived by not being raised"). DOJ's extensive participation followed by strategic silence demonstrates this exact pattern.

Federal courts consistently find waiver when defendants' conduct leads plaintiffs to believe service objections will not be raised. In *Trustees of Central Laborers' Welfare Fund v. Lowery*, 924 F.2d 731, 733 (7th Cir. 1991), the court held that defendants waive service objections when they "lead a plaintiff to believe that service is adequate and that no such defense will be interposed." The court emphasized that "waiver may be found where the conduct relied upon...occurs after entry of default" through defendant's litigation participation. Here, DOJ's 22-page substantive TRO response, followed by 46 days of silence on service, led Plaintiff to

reasonably believe no service objections would be raised - exactly the conduct *Lowery* identifies as constituting waiver.

In the Fifth Circuit, courts recognize that defendants waive service and jurisdictional objections through litigation conduct even after initially preserving them. In *Brunson v. Heavy Lift Cargo Airlines*, 358 B.R. 681, 687 (W.D. La. 2006), the court held that defendants waived personal jurisdiction defenses by "participating in the litigation of the TRO/Preliminary Injunction...after the answer was filed, and by not moving to dismiss under F.R.C.P. 12(b)(2)." The court emphasized that when defendants "submit[] to the authority of the Court to impose injunctive relief, it has per se, waived" jurisdictional objections. Here, DOJ's substantial participation in TRO proceedings constitutes the same waiver pattern identified in *Brunson*. DOJ cannot now claim they were never served when they voluntarily submitted to this Court's authority in the TRO proceedings.

**The Fatal Timeline**:

- **July 11**: Trump served with complaint at Mar-a-Lago

- **July 29**: DOJ files substantive TRO response with buried service reservation

- **August 1**: Individual defendant response deadline passes (21 days)

- **September 9**: Government defendant deadline passes (60 days)

- **September 12**: Default entered by Clerk against Linda Yaccarino in related case - *Richards v. Yaccarino*, No. 3:25-cv-01863 (N.D. Tex., 2025)

- **September 15**: Najib Gazi suddenly makes appearance on docket without explanation

- September 15: Only then does DOJ raise service objections

**DOJ Cannot Remain Silent Then Claim Defective Service**:

Under *Wells v. Gautreaux*, defendants have "no obligation to appear in court or defend an action before it is formally served with process." 771 F. Supp. 3d 842, 848 (M.D. La. 2025). Yet DOJ filed comprehensive merits briefing and remained in the docket for weeks. Having actual notice of the complaint, DOJ should have filed a proper Rule 12(b)(5) motion if they genuinely believed service was defective. Their strategic silence for 46 days, followed by sudden attorney appearance exactly when default appeared imminent, and was obtained against defendant Yaccarino in the related litigation demonstrates tactical gamesmanship rather than legitimate procedural concern.

The Fifth Circuit district courts recognize that defendants waive service objections through substantial participation combined with delay in pursuing the defense. In *Regions Bank v. Britt*, 642 F. Supp. 2d 584, 588 (S.D. Miss. 2009), the court held that "defendants have been found to have waived the jurisdictional defense, despite nominally preserving it in an answer, if the defendant substantially participates in the litigation without actively pursuing the defense." Here, DOJ's substantial participation and extended delay demonstrate the waiver pattern identified in *Regions Bank*.

The Tenth Circuit has applied identical waiver principles where defendants fail to raise service objections in their first defensive moves. In *United States v. 51 Pieces of Real Property*, 17 F.3d 1306, 1314 (10th Cir. 1994), the court held that when a defendant's "response to the government's amended motion for default was a defensive move that triggered the provisions of Rule 12(h)," the defendant "should have included its objection to the court's exercise of personal jurisdiction in its response" The court found that defendant's "failure to object in a timely fashion, however, waived the defense." Here, DOJ's July 29 TRO response was their first

defensive move, triggering Rule 12(h) obligations. Their failure to include a proper service objection constitutes waiver under Tenth Circuit precedent.

The D.C. Circuit has applied identical waiver principles to post-default litigation conduct. In *Democratic Republic of Congo v. FG Hemisphere Associates*, 508 F.3d 1062, 1064 (D.C. Cir. 2007), the court found waiver where defendant "engaged in extensive post-default litigation without suggesting an infirmity in personal jurisdiction" for 13 months. The court held that defendants cannot participate substantially in litigation, then later claim service defects. DOJ's pattern mirrors *FG Hemisphere*.

### b. DOJ'S CONTRADICTORY CONDUCT PROVES CONSCIOUSNESS OF PROPER SERVICE

**The Inexplicable Attorney Appearance**: If Trump was truly "never served," why did Najib Gazi appear on September 15? New counsel doesn't appear in cases where clients were never served - they appear to defend cases. Mr. Gazi's unexplained appearance without any substantive filing created reasonable expectations that were immediately contradicted by procedural objections.

**Kenneth Coffin's Strategic Disappearance**: Despite monitoring the docket and filing the July 29 TRO response, Mr. Coffin remained completely silent when default motions were filed. Instead, new attorney Mr. Gazi suddenly appeared - suggesting internal recognition that their position was untenable and fresh counsel was needed to manufacture procedural objections.

**Pattern of Tactical Obstruction**: This mirrors Trump's documented evasion pattern throughout this litigation. As detailed in Plaintiff's sanctions motion (ECF No. 67), Trump's security director Dan Freeman initially falsely denied authority to accept service, then accepted service normally

16 hours later when confronted. DOJ's conduct follows an identical pattern: evade until cornered, then manufacture procedural objections.

### c.  DOJ'S EXTENSIVE PARTICIPATION CONSTITUTES GENERAL APPEARANCE AND WAIVER

**Substantial Merits Participation**: DOJ's July 29 response wasn't a limited jurisdictional objection - it was comprehensive merits briefing spanning 22 pages addressing constitutional claims, immunity arguments, and factual disputes.

*Regions Bank v. Britt* establishes that substantial litigation participation waives service objections even when defendants claim technical defects. 642 F. Supp. 2d at 588. DOJ's comprehensive merits briefing addressing constitutional claims, immunity arguments, and factual disputes constitutes the "active litigation of the case" that *Regions Bank* held "amounts to implicit consent to the court's jurisdiction."

**Voluntary Submission to Jurisdiction**: In *Chambers v. Mukasey*, 520 F.3d 445, 449 (5th Cir. 2008), the Fifth Circuit held that defendants waive service defects by "voluntarily submit[ting] [themselves] to the court's jurisdiction by appearing before it and allowing it to adjudicate [their] rights." DOJ's substantive TRO response constitutes exactly such voluntary submission.

**Forfeiture Through Delay and Contradictory Conduct**: Even properly preserved defenses can be forfeited through unreasonable delay and litigation conduct. In *King v. Taylor*, 694 F.3d 650, 658-59 (6th Cir. 2012), the court held that defendants forfeit service defenses through excessive delay, noting such delay "for gamesmanship purposes, weighs against" the defendant. 694 F.3d at 661. Here, DOJ demonstrates identical gamesmanship. This principle aligns with *Jackson v.*

*United States*, where the court noted that service objections must be raised with specificity and timeliness to provide fair notice, not buried in unrelated emergency motions. 138 F.R.D. at 86.

### d. RULE 4(i) DOES NOT APPLY - DOJ LACKS STATUTORY AUTHORITY FOR INDIVIDUAL CONSTITUTIONAL CLAIMS

**Constitutional Claims Are Statutorily Excluded**: 28 U.S.C. § 2679(b)(2)(A) explicitly prohibits DOJ representation for constitutional violations: "does not extend or apply to a civil action against an employee of the Government—(A) which is brought for a violation of the Constitution of the United States." Since this entire case alleges constitutional violations, DOJ representation is statutorily barred.

**Presidents Are Not "Employees" Under Federal Law**: Multiple federal statutes confirm presidents aren't "employees" under relevant definitions:

- 28 U.S.C. § 2671 defines employees as "officers or employees of any federal agency" - presidents head the executive branch rather than serving within an agency

- 28 USC 2679(b)(2)(A) explicitly excludes constitutional violations from Westfall Act coverage. Since this entire case alleges constitutional violations, DOJ representation is not authorized by statute

- Trump fails to qualify as an "employee of the government" under 28 USC 2671

- 28 C.F.R. § 50.15 contemplates representation of subordinate federal personnel under supervisory oversight - presidents have no supervisors

**Controlling Federal Court Precedent Rejects DOJ Representation**:

- *Carroll v. Trump*, No. 1:20-cv-07311 (S.D.N.Y. 2020): Judge Lewis Kaplan ruled "The President of the United States is not an employee of the Government within the meaning of the relevant statutes"

- Second Circuit "flatly denied Trump's attempt to substitute the DOJ for himself" in 2025 (*Carroll v. Trump*, No. 24-644 (2d Cir.)

- *Clinton v. Jones*, 520 U.S. 681 (1997), required private counsel for individual capacity presidential claims

**DOJ's Unauthorized Appearance Proves Consciousness of Coordination**: DOJ's representation here violates federal statutes while attempting to convert individual constitutional claims into official capacity. As Plaintiff argued in ECF No. 75 at 11: "Trump's DOJ violating statutory constraints for his individual representation exemplifies his broader pattern of compelling others to ignore legal boundaries protecting his personal interests."

e. **TRUMP'S "COURT-ORDERED RESPONSE" ARGUMENT IS SELF-DEFEATING**

**The Fatal Logical Inconsistency**: DOJ argues Trump's TRO response was "court-ordered" (ECF No. 94 at 3) and therefore doesn't constitute voluntary appearance, while simultaneously using DOJ counsel who lack statutory authority to represent him individually. If DOJ lacks authority to represent Trump individually, they couldn't respond to court orders on his behalf either.

**This Proves DOJ Had Actual Notice**: Trump's argument confirms DOJ received and responded to court communications, establishing actual notice of the litigation. Yet DOJ chose strategic silence on the complaint itself rather than proper responsive pleadings.

**The Absurdity of Trump's "Court-Ordered" Distinction**: Trump's argument creates an impossible logical framework: they claim court orders compel responses while Federal Rules do not. This turns federal procedure upside down.

**Federal Rules Create Mandatory Obligations More Binding Than Discretionary Court Orders**: Rule 12(a) establishes absolute deadlines - 21 days for individuals, 60 days for United States government defendants - that apply to every defendant in every federal case without exception. These aren't suggestions; they're mandatory procedural requirements with automatic consequences (default) for non-compliance.

**By Contrast, TRO Orders Are Discretionary**: Under Fed. R. Civ. P. 65, Judge Starr could have denied the TRO motion without any briefing or granted it based solely on Plaintiff's showing. The decision to allow responsive briefing was discretionary, not mandatory.

**Trump's Logic Would Destroy Federal Procedure**: Under Trump's reasoning, defendants could ignore complaints indefinitely unless courts issue specific orders to respond. This would make Rule 12(a) meaningless and create chaos in federal litigation. If defendants must respond to discretionary court orders but not mandatory Federal Rules, the entire procedural system collapses.

**The Truth Trump Avoids**: DOJ responded to the TRO because they had actual notice of the litigation. That same actual notice obligated them to respond to the complaint within the Rule 12(a) deadlines. Their selective compliance - responding when convenient for tactical reasons but ignoring mandatory deadlines - proves strategic manipulation, not legitimate procedural compliance.

**Choice of Unauthorized Counsel**: Trump chose to use statutorily unauthorized DOJ counsel rather than retain private counsel as required by law. This choice constitutes voluntary submission to jurisdiction regardless of any court order and proves consciousness of the coordination alleged throughout the case.

### f. THE SERVICE WAS PROPER AND ACHIEVED ACTUAL NOTICE

**Identical Service Methods**: Plaintiff served both the TRO motion and complaint using identical methods at Mar-a-Lago to the same person (Dan Freeman, Director of Security) (ECF Nos. 54, 66). DOJ cannot claim TRO service was adequate while complaint service was deficient when both used identical procedures.

**Constitutional Purpose Satisfied**: The constitutional purpose of service—providing notice and opportunity to respond—was fully satisfied. DOJ's July 29 response proves they received actual notice and had full opportunity to respond to all claims.

**This Court's Practical Approach**: Judge Starr twice authorized service "by whatever means necessary" in this case (ECF Nos. 20, 62), demonstrating his practical approach prioritizing actual notice over technical compliance. Here, actual notice was unquestionably achieved.

### g. THE PATTERN OF EVASION REVEALS TACTICAL COORDINATION

**The Dan Freeman Parallel**: DOJ's conduct mirrors the documented Freeman evasion pattern. Freeman initially falsely denied authority to accept service, then accepted service normally 16

hours later when confronted.[2] Similarly, DOJ participated substantively in July, then manufactured service objections only when facing default in September.

**Strategic Timing Reveals True Motivation**: DOJ's sudden action occurred immediately after:

1. Plaintiff obtained default against Yaccarino, demonstrating consequences for non-response

2. Public attention to Trump's non-response through social media

3. These events apparently alerted DOJ that their evasion strategy was failing

**The Coordination Pattern**: As Plaintiff documented in ECF No. 75 at 11, this reflects "Trump's broader pattern of compelling others to ignore legal boundaries protecting his personal interests." DOJ's willingness to appear without statutory authority mirrors the systematic coordination alleged throughout the case.

### h.  EQUITABLE PRINCIPLES BAR DOJ'S BELATED OBJECTIONS

**Reasonable Reliance and Prejudice**: Plaintiff reasonably relied on DOJ's July 29 substantive response, structuring subsequent litigation around their apparent acceptance of the case. DOJ's tactical reversal 46 days later causes concrete prejudice and violates basic principles of fair play.

**Judicial Estoppel**: DOJ cannot simultaneously claim authority to represent Trump (evidenced by their participation) while asserting they were never properly served. This contradiction violates principles of judicial estoppel.

---

[2] This pattern of service evasion is consistent with Trump's behavior in other litigation. In *Carroll v. Trump*, Trump's federal security agent at Mar-a-Lago in 2022 similarly refused to accept service, forcing the process server to leave documents on the ground. See Exhibit B, Affidavit of Service (Case No. 1:22-cv-10016, ECF No. 9).

**"Waiver of Waiver" Doctrine**: As courts recognize in *Giotis v. Apollo of Ozarks, Inc.*, 800 F.2d 660, 663 (7th Cir. 1986), "there can be a waiver of a waiver, i.e., a defense of waiver can itself be waived by not being raised" properly. DOJ's conduct demonstrates waiver of their own service objections through delay and contradictory positions.

### i.   TRUMP'S INDIVIDUAL CAPACITY CLAIMS WERE PROPERLY BROUGHT

**Plaintiff's Consistent Position**: As documented in ECF No. 75 at 3, Plaintiff explicitly argued Trump should be sued individually because his "corrupt coordination with Musk constitutes precisely such personal conduct outside legitimate presidential functions."

**Nature of Constitutional Violations**: The complaint alleges Trump's personal $300 million quid pro quo arrangement with Musk for platform control - conduct outside any conceivable official duties and designed for personal political benefit.

### j.   TRUMP DEFAULTED IN HIS INDIVIDUAL CAPACITY REGARDLESS OF DOJ'S SERVICE OBJECTIONS

**Even Accepting All DOJ Arguments, Trump Remains in Personal Capacity Default**: Even if DOJ were correct - which Plaintiff has demonstrated they are not - Trump unquestionably defaulted in his personal capacity. No one disputes this fundamental fact.

**Personal Capacity Default Is Undisputed**: Trump had 21 days under Rule 12(a)(1)(A)(i) to respond personally to individual capacity allegations. He filed nothing. No personal counsel appeared. No individual capacity answer exists. Under Federal Rule 55(a), this personal capacity default occurred on August 2, 2025, and remains unwaived regardless of any subsequent DOJ maneuvering.

**Personal and Official Capacity Require Separate Defenses**: As *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), makes clear, personal capacity suits seek individual liability while official capacity suits are "another way of pleading an action against an entity." Trump's individual default cannot be cured by DOJ's unauthorized institutional appearance.

The Fifth Circuit has consistently recognized that individual and official capacity claims represent fundamentally different causes of action. In *Goodman v. Harris County*, 571 F.3d 388, 394-95 (5th Cir. 2009), the court explained that "[p]ersonal-capacity suits seek to impose liability upon a government official as an individual while official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." The court emphasized that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." (*quoting Kentucky v Graham*). The Fifth Circuit has emphasized that individual and official capacity claims require separate treatment precisely because they involve fundamentally different legal and procedural considerations. In *Harmon v. Dallas County*, 927 F.3d 884, 891 (5th Cir. 2019), the court explained that "different legal theories may be necessary to prove liability in a personal-capacity, as opposed to an official-capacity, case" and "different defenses are available to a defendant who is sued in his personal capacity." The court concluded that "courts do not generally consider an official sued in his personal capacity as being in privity with the government." This fundamental separation means that Trump's individual capacity default cannot be cured by DOJ's service objections, as DOJ represents institutional interests that are legally distinct from Trump's personal liability. The procedural requirements for individual capacity claims must be satisfied by Trump personally, not through institutional counsel lacking statutory authority to represent him individually.

### k. TRUMP'S INDIVIDUAL CAPACITY DEFAULT ENCOMPASSES CLEARLY PERSONAL CONDUCT OUTSIDE ANY OFFICIAL DUTIES

Even if this Court were to determine that DOJ representation was appropriate for hypothetical official capacity claims—which Plaintiff disputes—Trump unquestionably defaulted in his individual capacity on multiple claims that seek personal liability for conduct undertaken for personal benefit rather than legitimate governmental functions. Federal courts consistently recognize that individual capacity defaults cannot be cured by institutional appearances, as personal and official capacity claims represent fundamentally different legal theories requiring separate defenses.

**A. Personal Financial Corruption Claims**

1. **$300 Million Personal Campaign Benefit**: Trump personally received approximately $300 million from Musk for his presidential campaign, creating a personal debt and financial obligation that motivates his coordination with Musk's platform control. This personal enrichment through campaign contributions constitutes individual conduct for personal political benefit, not official presidential duties.

2. **Quid Pro Quo Exchange for Personal Gain**: Trump created the Department of Government Efficiency specifically for Musk—evidenced by the "DOGE" acronym referencing Musk's personal cryptocurrency interests—in direct exchange for the $300 million contribution. This represents Trump's personal decision to trade governmental positions for private campaign financing, constituting individual corruption outside any legitimate presidential function.

3. **Personal Wealth-for-Access Arrangement**: Trump's relationship with Musk operates through Musk's status as "the largest financial backer of Donald Trump's presidential campaign," creating ongoing personal obligations that transcend any official governmental relationship. Trump's coordination with Musk serves these personal financial interests rather than constitutional duties.

## B. Personal Deception and Obstruction of Justice

4. **Staged "Feud" to Evade Individual Legal Liability**: Following interception of Plaintiff's June 2, 2025 attorney-client communication about adding Trump as defendant, Trump participated in the June 5, 2025 coordinated "feud" performance designed to create false evidence of separation and obstruct justice. This deceptive conduct was undertaken to protect Trump from personal legal liability, not to advance any governmental interest.

5. **Personal Coordination in Email Surveillance**: The mathematical improbability of the "feud" timing—occurring on the exact date specified in Plaintiff's private legal communications—suggests Trump's personal participation in surveillance activities designed to protect his individual interests in this litigation.

6. **Evidence Manipulation for Personal Protection**: Trump's participation in manufacturing false evidence of conflict with Musk serves his personal interest in evading liability for their coordinated suppression of government criticism, not any legitimate executive function.

## C. Personal Religious and Political Preferences

7. **Individual Denominational Preferences**: Trump's personal statements calling papal meetings "the honor of a lifetime" and Pope Leo XIV's election "a Great Honor for our Country" reflect his individual religious preferences rather than official governmental policy. These personal views inform his coordination with platform suppression of biblical criticism.

8. **Personal Religious Commission Appointments**: Trump's choice to prominently feature Catholic Cardinal Timothy Dolan and Bishop Robert Barron as "Christian" representatives while biblical criticism faces systematic suppression represents his personal denominational preferences implemented for individual political benefit.

9. **Private Coordination with Vatican Interests**: Trump's enthusiastic personal support for Vatican officials, combined with platform suppression of Vatican-critical content, demonstrates individual coordination to advance personal religious preferences rather than constitutional obligations.

## D. Personal Coordination to Protect Private Interests

10. **Suppression of Criticism Targeting Personal Arrangement**: The systematic suppression specifically targets Mr. Richards' criticism of the Trump-Musk financial relationship and their coordinated use of governmental power for private benefit. This suppression serves Trump's personal interest in concealing corrupt arrangements rather than any legitimate governmental purpose.

11. **Platform Control for Personal Political Benefit**: Trump's coordination with Musk's platform control serves their mutual personal interests in maintaining power and

suppressing criticism of their financial arrangement, not constitutional duties or official policy implementation.

12. **Individual Participation in Constitutional Violations**: Trump's personal coordination with X Corp. to suppress religious expression and government criticism violates his individual obligations under constitutional law, creating personal liability separate from any official capacity considerations.

## E. Legal Significance of Individual Capacity Default

These individual capacity violations establish personal liability against Trump that cannot be cured by DOJ's institutional appearance because: (1) the conduct serves Trump's personal financial and political interests rather than official duties; (2) the coordination involves private arrangements outside governmental authority; (3) the deceptive conduct was undertaken to evade personal legal liability; and (4) the constitutional violations stem from Trump's individual decisions to abuse governmental power for private benefit.

Under *Kentucky v. Graham*, "[p]ersonal-capacity suits seek to impose personal liability upon a government officer…whereas official-capacity suits against an officer are generally treated as suits against the governmental entity of which the officer is an agent." 473 U.S. 159, 161 (1985). The individual capacity claims detailed above seek personal liability for Trump's corrupt use of governmental power for private benefit—precisely the type of conduct that requires individual rather than institutional accountability.

Trump's failure to respond personally to these individual capacity allegations within the Rule 12(a) deadline constitutes complete default on claims seeking personal damages, injunctive relief, and constitutional accountability that no institutional representation can cure. This

individual capacity default mandates entry of default under Rule 55(a) regardless of any determination about DOJ's authority for hypothetical official capacity claims.

## l. ALTERNATIVELY, TRUMP'S CONDUCT CONSTITUTES OFFICIAL CAPACITY VIOLATIONS REQUIRING EX PARTE YOUNG RELIEF

**Individual Capacity Claims Were Properly Brought**: As Plaintiff established in ECF No. 75, Trump's $300 million quid pro quo coordination with Musk for personal political benefit falls outside legitimate presidential functions and constitutes individual conduct.

**But If the Court Views This as Official Capacity**: Even under an official capacity analysis, Plaintiff's claims succeed. For prospective relief against ongoing constitutional violations, the *Ex parte Young* doctrine permits suits against government officials acting beyond their lawful authority. *Ex parte Young*, 209 U.S. 123 (1908). Qualified immunity does not apply to actions seeking declaratory and injunctive relief against government officials. *Shah v. Univ. of Tex. Southwestern Med. Sch.*, 129 F. Supp. 3d 480. Moreover, qualified immunity does not protect actions taken for personal benefit or in collusion with others, as they fall outside the scope of such immunity. Civil Rights and Civil Liberties Litigation: The Law of Section 1983 § 3.02 (5th ed. 2023) (Lexis). Trump's corrupt coordination with Musk constitutes precisely such personal conduct outside legitimate presidential functions, rendering any immunity defense inapplicable.

**No Immunity Bar for Ongoing Constitutional Violations**: Presidential immunity does not bar prospective relief for ongoing constitutional violations under the *Ex parte Young* doctrine. Courts routinely grant injunctive relief against immune officials when they engage in systematic constitutional violations, regardless of immunity status.

**This Analysis Still Supports Default**: Whether viewed as individual or official capacity, DOJ's unauthorized representation remains statutorily prohibited for constitutional claims, their participation constitutes waiver, and Trump's failure to respond timely mandates default under either framework.

The evidence compels one conclusion: DOJ received actual notice, participated extensively on the merits, then manufactured procedural objections only when facing consequences for their failure to respond timely to the complaint.

**Courts exist to resolve disputes on the merits, not enable endless procedural manipulation by government lawyers who miss deadlines.** DOJ had 46 days, actual notice of all claims, and multiple opportunities for proper relief. They chose tactical obstruction instead.

**The Pattern Is Clear**: Just as Dan Freeman initially denied authority then accepted service when cornered, DOJ participated substantively then claimed service defects when facing default. This demonstrates consciousness of proper service combined with systematic evasion tactics.

**Legal Authority Supports Default**: DOJ's extensive participation constitutes waiver under Fifth Circuit precedent, their statutory authority is non-existent for individual constitutional claims, and their 46-day delay forfeits any preserved objections through tactical gamesmanship.

**Personal Capacity Default Remains**: Regardless of whether claims are characterized as individual or official capacity, Trump's personal capacity default is complete and undisputed and mandates entry of default under Rule 55(a).

## m. SUMMARY: DEFAULT IS MANDATORY UNDER RULE 55(a)

The undisputed facts compel entry of default against Trump in his individual capacity:

- **Proper Service with Actual Notice**: Trump was served at Mar-a-Lago on July 11, 2025, using identical methods that DOJ accepted as adequate for TRO purposes.

- **Individual Capacity Default Is Complete**: Trump failed to file any answer or make any personal appearance within the mandatory 21-day Rule 12(a)(1)(A)(i) deadline, completing his individual capacity default on August 2, 2025.

- **DOJ Lacks Statutory Authority**: 28 U.S.C. § 2679(b)(2)(A) explicitly prohibits DOJ representation for constitutional violations, making their appearance unauthorized and unable to cure Trump's personal default.

- **Waiver Through Substantial Participation**: DOJ's 22-page substantive TRO response followed by 46 days of strategic silence constitutes waiver of service objections under Fifth Circuit precedent.

- **Personal Conduct Outside Official Duties**: The claims target Trump's $300 million quid pro quo arrangement with Musk, staged obstruction of justice, and personal religious preferences—conduct serving individual rather than governmental interests.

- **No Institutional Cure for Personal Default**: Under *Kentucky v. Graham*, individual and official capacity claims are legally distinct, requiring separate defenses that DOJ's institutional appearance cannot provide.

The motion for entry of default should be **GRANTED**.

---

DATED: September 28, 2025

Respectfully submitted,

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards
VSB #96671,
NY BAR #4932570
LWR Law Offices
3060 Williams Dr, Ste 300 #510
Fairfax, VA 22031
Tel.: (202) 981-2059
lwr@lwrlawoffices.com
Counsel for Plaintiff

---

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2025, a true and correct copy of the foregoing document was served upon all parties of record via the Court's ECF system.

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards