# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS

# DALLAS DIVISION

THOMAS RICHARDS

Case No. 3:25-cv-916

*Plaintiff,*

*v.*

X Corp., Donald J. Trump

*Defendants*

Lisa Weingarten Richards, Esq.

VSB #96671

NY BAR #4932570

LWR Law Offices

3060 Williams Dr, Ste 300 #510

Fairfax, VA 22031

Tel.: (202) 981-2059

lwr@lwrlawoffices.com

Counsel for Plaintiff

## OPPOSITION TO DEFENDANT TRUMP'S MOTION TO DISMISS

### Use of Generative Artificial Intelligence

This brief was prepared with the assistance of generative artificial intelligence.

**TABLE OF CONTENTS**

I. Introduction ...............................................................................................................7

II. Argument ..................................................................................................................8

A. Rule 4(i)(3) Does Not Apply to Personal Conspiracies Using Official Tools……….........8

    1. The Rule's Text Requires "Duties Performed On the United States' Behalf"………..….8

    2. Personal Conspiracy Is Not a Duty Performed "On Behalf Of" the United States…....….9

    3. The Distinction Between "Under Color Of" and "On Behalf Of" Authority…………....10

    4. No Case Law Supports Applying Rule 4(i)(3) to Personal Conspiracies……………....10

    5. The Executive Orders Are Evidence, Not the Basis for Liability………………………..11

    6. Trump's Argument Would Immunize All Corruption ................................................11

    7. Plaintiff Properly Served Trump Individually ........................................................12

B. Even If Rule 4(i)(3) Applied, Individual Service Was Sufficient ...................................12

    1. The Rule's Purpose Is Notice, Which Has Been Satisfied .........................................12

    2. Dismissal With Prejudice Would Violate Fifth Circuit Standards ............................13

    3. Any Service Defect Should Not Result in Dismissal .................................................13

C. Absolute Presidential Immunity Does Not Bar Claims for Personal Conspiracy………………14

    1. The Distinction Between Official Acts and Personal Conduct ....................................14

    2. Personal Conspiracy Falls Outside Official Duties ..........................................14

    3. Trump's Cited Cases Are Distinguishable ........................................................15

4. The Quid Pro Quo Demonstrates Personal Conspiracy ...................................................16

5. Trump v. United States Does Not Immunize Bribery ...................................................18

6. The Financial Relationship Demonstrates Personal Motivation ...................................19

7. The June 2-5 Timeline Demonstrates Personal Coordination ...................................19

8. Discovery Is Necessary...................................................19

9. Plaintiff States a Claim for Bribery Under 18 U.S.C. § 201 ...................................................19

D. Plaintiff Has Standing to Challenge Trump's Coordinated Conduct ...................................................21

1. Standing Requirements ...................................................21

2. Plaintiff's Injury Is Traceable to Trump's Coordination ...................................................21

a. Systematic Suppression of Religious Expression ...................................................21

b. Specific Evidence of Trump's Causation ...................................................21

c. Murthy Is Distinguishable ...................................................22

d. Trump's "Pre-Existing Suppression" Argument Fails ...................................................24

3. Plaintiff's Injury Is Redressable ...................................................25

a. Damages Against Trump Individually ...................................................26

b. Injunctive Relief Against X Corp. ...................................................26

c. Declaratory Relief ...................................................26

E. Plaintiff's Allegations Are Plausible and Supported by Specific Evidence ...................................................27

1. The Plausibility Standard ...................................................27

2. The June 2-5 Timeline Is Documented ...................................................................27

3. The Quid Pro Quo Creates Motive ......................................................................28

4. The Payment Structure Demonstrates Conspiracy ..............................................28

5. Systematic Pattern Is Detailed and Specific .......................................................28

6. Vatican Coordination Is Documented .................................................................29

7. Trump's Cases Are Inapposite ............................................................................30

8. Discovery Will Reveal Full Coordination ...........................................................30

III. Conclusion ........................................................................................................31

## TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ......................................................................27

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ...............................................27, 28, 31

*Clinton v. Jones,* 520 U.S. 681, 694 (1997) .......................................................................14

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ...................................................................15, 16

*Hayward v. Trump,* No. A-20-cv-796-LY, 2021 WL 12322403 (W.D. Tex. Aug. 6, 2021)........15

*Houston Indep. Sch. Dist. v. L.L.C.,* 786 F.3d 400, 417 (5th Cir. 2015) .............................18

*Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992) ......................................................21

*Millan v. USAA GIC,* 546 F.3d 321 (5th Cir. 2008) .........................................................13

*Monroe v. Pape,* 365 U.S. 167, 172 (1961) ........................................................................10

*Murthy v. Missouri,* 603 U.S. 43 (2024) ...............................................................21, 22, 23, 31

*Nixon v. Fitzgerald,* 457 U.S. 731 (1982) ...........................................................................14

*Smith v. Osborne,* No. 4:18-cv-906-ALM-CAN, 2019 WL 4383337 (E.D. Tex. Aug. 18, 2019)......30

*Steffel v. Thompson,* 415 U.S. 452, 471-72 (1974) ..............................................................27

*Trump v. United States,* 144 S. Ct. 2312 (2024) ...............................................................18

*Walsh v. Hagee,* 900 F. Supp. 2d 51, 58 (D.D.C. 2012) ...................................................30

**STATUTES**

18 U.S.C. § 201(b)(2) ...................................................................................................passim

**RULES**

Federal Rule of Civil Procedure 4(e) ....................................................................12, 13

Federal Rule of Civil Procedure 4(i)(3) .................................................................passim

Federal Rule of Civil Procedure 12(b)(5) ...................................................................12

**EXECUTIVE ORDERS**

Executive Order "Restoring Freedom of Speech and Ending Federal Censorship" (Jan. 20, 2025), 90 Fed. Reg. 5273…………………………………………………………………………15

Executive Order "Eradicating Anti-Christian Bias" (Feb. 6, 2025), 90 Fed. Reg. 9365……………15

## I. INTRODUCTION

Defendant Trump's motion to dismiss rests on a fundamental mischaracterization of this case. This is not a suit challenging official presidential policy decisions. This is a suit challenging a personal conspiracy between the President and his largest campaign contributor -- Elon Musk, who gave Trump $288 million -- to suppress religious speech critical of their coordination.

The conspiracy allegations are specific and concrete:

- **June 2, 2025**: Plaintiff's counsel sent private Gmail stating intention to add Trump as defendant "after June 5 for a specific reason"

- **June 5, 2025**: On the exact date specified in the private email, Trump and Musk staged an elaborate public "feud"

- **Pattern**: Systematic suppression of Plaintiff's biblical content intensified precisely when it criticized the Trump-Musk relationship

This is not "fanciful." This is documented coordination evidenced by mathematical improbability (the June 2-5 timeline), financial relationships ($288 million), and systematic targeting of religious expression. And of course that the "feud" *was* temporary suggesting -- as Plaintiff had alleged – it was fabricated. Now Trump and Musk are close allies once again,[1] endorsing each other, and even the same political candidates (Cuomo, a long time Democrat for NY mayor, when both Trump and

---

[1] Sophia Cai, *Elon Musk back in Trump's good graces after summer spat*, POLITICO (Oct. 27, 2025), https://subscriber.politicopro.com/article/eenews/2025/10/27/elon-musk-back-in-trumps-good-graces-after-summer-spat-00623599. *Trump reverses course to renominate billionaire Musk ally to lead Nasa*, THE GUARDIAN (Nov. 4, 2025), https://www.theguardian.com/science/2025/nov/04/trump-jared-isaacman-nasa.

Musk claim to be Republican conservatives).[2] Plaintiff's explanation about the close ties between Trump, Musk, and the entire government, all in collusion with the Vatican (with both Musk and Trump very strongly supporting the current and prior Pope) proves accurate.[3]

Trump argues he should receive absolute immunity, special service procedures, and dismissal without any discovery into these allegations. But absolute immunity does not protect personal conspiracies. Rule 4(i)(3) does not apply when official powers are abused for personal gain. And standing exists when specific coordination is alleged and evidenced.

The Court should deny the motion and allow discovery into the Trump-Musk coordination that has systematically suppressed Plaintiff's constitutional rights.

---

## II. ARGUMENT

### A. Rule 4(i)(3) Does Not Apply to Personal Conspiracies Using Official Tools

### 1. The Rule's Text Requires "Duties Performed On the United States' Behalf"

Federal Rule of Civil Procedure 4(i)(3) requires service on the United States only when a federal officer is "sued in an individual capacity for an act or omission **occurring in connection with duties performed on the United States' behalf**." (emphasis added)

---

[2] Trump and Musk tell New York to 'vote' Cuomo over Mamdani on eve of mayoral election, CNBC (Nov. 3, 2025, 7:57 PM EST), https://www.cnbc.com/2025/11/03/trump-cuomo-mamdani-new-york-mayor.html.

[3] Am. Compl. ¶ 38, 52, 76, 89, 197

The key phrase is **"on the United States' behalf**." Not "using United States authority." Not "under color of United States authority." But **"on behalf of"** the United States -- meaning for the benefit of, in service to, or in furtherance of governmental purposes.

## 2. Personal Conspiracy Is Not a Duty Performed "On Behalf Of" the United States

Plaintiff alleges Trump personally conspired with Elon Musk -- his largest campaign donor who contributed $288 million -- to suppress religious speech critical of their coordination. Am. Compl. ¶¶ 5, 182, 249. Plaintiff alleges the personal conspiracy detailed in the Introduction: quid pro quo financial arrangement, surveillance, staged deception, and coordinated censorship. Am. Compl. ¶¶ 10, 23, 88, 91.

These are not duties performed "on behalf of" the United States. They are personal acts of corruption using the trappings of office for private benefit.

Awarding government contracts is ordinarily an official function. But awarding contracts in exchange for payment is bribery -- a personal crime that cannot be an official duty regardless of the payment structure. The PAC routing does not convert bribery into official conduct. If a President accepted $288 million (via PACs), then delivered **$6.7 billion in contracts and access to tens of billions more** to the payor within months, generating a **2,226% return on investment**, this is not "duties performed on the United States' behalf" -- this is using official position to consummate a corrupt bargain producing returns that dwarf any legitimate campaign contribution. The United States has no interest in Presidents exchanging contracts for payments. Federal bribery statutes (18 U.S.C. § 201) explicitly criminalize this conduct precisely because it is NOT performance of official duties but rather corruption of official duties for private benefit. A duty "on behalf of" the United States cannot simultaneously violate federal criminal law designed to protect the United States from corrupt officials.

Trump argues that his conduct falls within the "outer perimeter" of presidential duties (for immunity purposes), so Rule 4(i)(3) applies. MTD at 9, 14 n.2. This conflates distinct legal standards. Immunity's "outer perimeter" asks whether conduct falls within the general scope of authority. Rule 4(i)(3)'s "on behalf of" asks whether conduct serves the United States' interests. Bribery may involve presidential powers but does not serve "on behalf of" the United States.

### 3. The Distinction Between "Under Color Of" and "On Behalf Of" Authority

The Supreme Court has long recognized the distinction between acts performed "under color of" authority and acts performed "on behalf of" a governmental entity.

Acting **"under color of"** authority means using the position or office -- it can include both legitimate official acts and abuses of position. See *Monroe v. Pape*, 365 U.S. 167, 172 (1961) (§1983 applies to acts "under color of" state law even when those acts violate state law).

Acting **"on behalf of"** an entity means acting in service to that entity's interests and purposes -- performing the entity's business.

A sheriff who uses his badge to shake down businesses acts "under color of" authority but not "on behalf of" the state. A President who conspires with his largest donor to suppress critics acts "under color of" presidential authority but not "on behalf of" the United States.

### 4. No Case Law Supports Applying Rule 4(i)(3) to Personal Conspiracies

Rule 4(i)(3) requires service on the United States when a federal officer is sued "for an act or omission occurring in connection with duties performed on the United States' behalf." The rule's plain text distinguishes between acts performed *under color of* federal authority and acts performed *on behalf of* the United States. Personal conspiracy to benefit a campaign donor -- even if it utilizes official tools -- is not a duty performed "on behalf of" the United States. No court has extended

Rule 4(i)(3)'s special service requirements to such personal misconduct, and the rule's text provides no basis for doing so.

## 5. The Executive Orders Are Evidence, Not the Basis for Liability

Trump argues that because Plaintiff cites Executive Orders, commissions, and policy directives, the suit necessarily involves official duties. MTD at 11-13. This misunderstands Plaintiff's theory.

The Executive Orders are **EVIDENCE** of:

- Trump's ability to provide governmental benefits to Musk

- The personal relationship and coordination between defendants

- The tools available for executing the conspiracy

- The means by which Trump could reward Musk for platform censorship

They are not the **BASIS** for liability. The basis for liability is the personal conspiracy to suppress religious speech critical of the Trump-Musk coordination -- a conspiracy that merely utilized official tools as its vehicle.

Analogy: If a mayor conspires with a real estate developer to fraudulently condemn properties, the condemnation orders are evidence of the conspiracy, not official duties warranting immunity. The mayor is not "serving the city" by using city powers to enrich a personal associate.

## 6. Trump's Argument Would Immunize All Corruption

Trump's interpretation would mean that any President who uses official powers for personal benefit automatically triggers Rule 4(i)(3)'s special service procedures. This cannot be correct.

If a President accepted bribes in exchange for pardons, would Rule 4(i)(3) apply because pardons are official acts? If a President coordinated with a business partner to use government contracts to enrich themselves, would Rule 4(i)(3) apply because government contracts are official functions?

The answer must be no. Personal corruption does not become an official duty merely because it utilizes official powers.

### 7. Plaintiff Properly Served Trump Individually

Plaintiff served Trump at Mar-a-Lago in his individual capacity. Trump received actual notice, as evidenced by DOJ's appearance and substantive litigation for months. The purpose of Rule 4 -- ensuring notice -- has been fully satisfied.

Rule 4(i)(3)'s additional requirements apply only when the suit involves "duties performed on the United States' behalf." Because this suit challenges personal conspiracy, not official duties, Rule 4(e) service was sufficient.

**Conclusion on Service**: The Court should deny Trump's 12(b)(5) motion because Rule 4(i)(3) does not apply to personal conspiracy allegations, and individual service under Rule 4(e) was proper and provided actual notice.

---

### B. Even If Rule 4(i)(3) Applied, Individual Service Was Sufficient

### 1. The Rule's Purpose Is Notice, Which Has Been Satisfied

Even if the Court were to find Rule 4(i)(3) applicable (which Plaintiff disputes), dismissal would be inappropriate because the rule's fundamental purpose -- providing notice to the government -- has been fully satisfied.

Trump does not dispute that he received actual notice. The Department of Justice has appeared on his behalf, filed multiple substantive briefs, participated in hearings, and litigated for months. MTD at 3-5. This exceeds the notice that Rule 4(i)(3) is designed to ensure.

## 2. Dismissal With Prejudice Would Violate Fifth Circuit Standards

Dismissal with prejudice is an extreme sanction that the Fifth Circuit permits only under narrow circumstances. It requires "a clear record of delay or contumacious conduct by the plaintiff" plus aggravating factors such as "(1) delay caused by [the] plaintiff himself and not his attorney; (2) actual prejudice to the defendant; or (3) delay caused by intentional conduct." *Millan v. USAA GIC*, 546 F.3d 321, 326

The record here contains none of the required aggravating factors. There is no delay attributable to Plaintiff, no contumacious conduct, and no prejudice to Trump, who has had actual notice since July 2025 and has actively litigated through counsel with extensive briefing. Plaintiff served Trump individually under Rule 4(e) based on a substantial dispute about whether his conduct involved official duties requiring Rule 4(i)(3) service—the very issue at the heart of Trump's immunity defense.

Any dismissal with prejudice would constitute reversible error under Fifth Circuit precedent and would improperly penalize Plaintiff for a good faith legal dispute about service requirements.

## 3. Any Service Defect Should Not Result in Dismissal

If the Court finds there to be any service defect, the appropriate remedy is to allow Plaintiff to perfect service, not to dismiss with prejudice claims alleging systematic constitutional violations. To the extent the Court finds any service defect exists, Plaintiff will promptly cure it upon the Court's direction.

**C. Absolute Presidential Immunity Does Not Bar Claims for Personal Conspiracy**

**1. The Distinction Between Official Acts and Personal Conduct**

Trump argues absolute immunity bars all claims because the Complaint cites Executive Orders and official actions. MTD at 8-13. This argument fails because absolute immunity protects official acts, not personal conspiracies that merely utilize official tools.

The Supreme Court has consistently distinguished between a President's official duties and personal conduct. In *Clinton v. Jones*, 520 U.S. 681, 694 (1997), the Court held that absolute immunity does not extend to "unofficial conduct" even when that conduct occurs during the President's term.

While *Nixon v. Fitzgerald*, 457 U.S. 731 (1982) provides immunity for acts within the "outer perimeter" of official responsibility, it does not immunize personal conspiracies. The "outer perimeter" refers to the scope of legitimate presidential functions, not to any conduct a President might engage in while in office.

**2. Personal Conspiracy Falls Outside Official Duties**

Plaintiff states Trump conspired with his largest campaign donor ($288 million) to:

- Suppress religious speech critical of their coordination

- Surveil attorney-client communications

- Stage fake public "feud" to obstruct justice

- Coordinate government accommodation of X Corp's content moderation to benefit Musk financially while silencing religious criticism

These alleged acts are not within any legitimate conception of presidential duties. A President's official responsibilities do not include:

- Conspiring to suppress religious speech

- Surveilling attorney-client communications of litigants

- Manufacturing false evidence

- Providing governmental benefits to donors in exchange for censorship

Trump's own Executive Orders demonstrate these acts fall outside official duties:

- Executive Order "Restoring Freedom of Speech and Ending Federal Censorship" (Jan. 20, 2025) explicitly prohibits federal officials from "engag[ing] in or facilitat[ing] any conduct that would unconstitutionally abridge the free speech of any American citizen." 90 Fed. Reg. 5273.

- Executive Order "Eradicating Anti-Christian Bias" (Feb. 6, 2025) establishes policy "to protect the religious freedoms of Americans and end the anti-Christian weaponization of government." 90 Fed. Reg. 9365.

Trump cannot claim acts violating his own Executive Orders constitute official duties "on behalf of" the United States. These orders establish that suppressing religious speech is NOT an official presidential function but rather conduct the President has explicitly forbidden. Violating one's own directives is personal misconduct, not official action.

### 3. Trump's Cited Cases Are Distinguishable

Trump cites cases holding that immunity applies to official acts. MTD at 8-10, citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Hayward v. Trump*, No. A-20-cv-796-LY, 2021 WL 12322403 (W.D.

Tex. Aug. 6, 2021). But none of these cases involved allegations of personal conspiracy with a campaign donor to suppress critics.

*Harlow* involved a personnel decision -- firing an employee. 457 U.S. at 733-34. That is a quintessentially official act within presidential authority.

### 4. The Quid Pro Quo Demonstrates Personal Conspiracy

The quid pro quo arrangement demonstrates personal corruption, not official policy-making:

**The Payment Structure**: Musk's $288 million payment to pro-Trump PACs -- routed through intermediaries rather than paid directly to Trump -- appears designed to create plausible deniability while facilitating quid pro quo. Within months of Trump taking office, Musk's companies received at least **$6.7 billion in new federal contracts and eligibility for tens of billions more** -- a **2,226% return** on his $288 million investment, demonstrating this was not campaign support but rather investment in a corrupt arrangement. The sheer magnitude of returns -- **22 times the investment within months** -- exceeds any conception of legitimate political activity.[4]

---

[4] The documented benefits include:
(1) $560+ million in new SpaceX contracts since January 2025, including $100 million NASA contract. Scripps News, "Truth Be Told: Contracts and cash keep flowing to SpaceX" (Mar. 27, 2025), https://www.scrippsnews.com/politics/truth-be-told/truth-be-told-contracts-and-cash-keep-flowing-to-spacex; Alternet, "Leaked filing shows Musk still getting new contracts while his team cancels other contracts" (Feb. 11, 2025), https://www.alternet.org/musk-getting-new-contracts/.

(2) $5.92 billion Space Force contract for military satellites through 2029, $5.37 billion for United Launch Services, and $2.39 billion for Blue Origin (April 2025). Newsweek, "Elon Musk Inking Multibillion-Dollar Pentagon Deal Amid DOGE Cuts" (Apr. 8, 2025), https://www.newsweek.com/elon-musk-inking-multibillion-dollar-pentagon-deal-amid-doge-cutsreport-2055663; UNILAD Tech, "Elon Musk's SpaceX awarded $5,900,000,000 contract by US government for landmark new mission" (Apr. 8, 2025), https://www.uniladtech.com/science/space/elon-musk-spacex-nasa-satellite-contract-860923-20250408.

(3) Commerce Department making Starlink eligible for $42 billion in rural broadband grants after Trump administration reversed Biden's exclusion of satellite providers (March 2025). NPR, "Trump's changes to a $42 billion broadband program could be a win for Musk's Starlink" (Apr. 1, 2025), https://www.npr.org/2025/03/28/nx-s1-5338963/musk-starlink-broadband-commerce (with experts stating that this will cost the country more money for decades to come over using traditional fiber broadband which is "speedier, cheaper, and generally more stable than satellite internet like Starlink"); CNN, "Elon Musk's Starlink business could soon tap into $42 billion federal program" (Mar. 6, 2025), https://www.cnn.com/2025/03/06/business/musks-starlink-federal-program/index.html.

**Private Conspiracy Elements**: The conspiracy involves private actors coordinating private conduct: - Musk owns X Corp entirely; every content moderation decision is his personal decision as private owner - Trump coordinated with Musk as private co-conspirator, not as government policymaker - Surveillance, staged deception, and censorship served private corrupt interests -- protecting the quid pro quo from exposure

**Vatican Context**: Both Trump and Musk maintain power through Vatican coordination, publicly flattering papal authority while serving papal interests in controlling digital communications. Plaintiff's religious speech exposes both the $288M quid pro quo and their Vatican coordination, requiring concealment through suppression. Am. Compl. ¶¶ 46-47, 60-68, 93-94.

**State Action Through Corruption**: State action exists because Trump, as President, delivered government contracts in exchange for payment -- quintessential governmental authority exercised corruptly.

Trump claims authority to award contracts for immunity purposes. But that exercise of governmental authority constitutes state action. The fact that Trump exercised this authority corruptly -- accepting $288 million in exchange for $400 million in contracts, violating 18 U.S.C. § 201 -- does not eliminate state action. It establishes both state action AND personal liability.

---

(4) Attempted $400 million State Department contract for "Armored Tesla" vehicles—document revised in December 2024 (after Trump's election, before inauguration) escalating Biden's $483,000 plan by 82,700%, later withdrawn after public outcry. NPR, "A new document undercuts Trump admin's denials about $400 million Tesla deal" (Feb. 24, 2025), https://www.npr.org/2025/02/24/nx-s1-5305269/tesla-state-department-elon-musk-trump;.

(5) Built In, "Inside Elon Musk's Government Contracts" (July 18, 2025), https://builtin.com/articles/elon-musk-government-contracts. (DOJ dropping multiple investigations into SpaceX and Tesla during Musk's DOGE tenure.)

(6) Overall context: In 2024 alone, federal and local governments committed $6.3 billion to Musk's companies, the highest total to date; Musk's companies have received at least $38 billion in government support since 2003. *See* Washington Post, "Elon Musk's business empire is built on $38 billion in government funding" (Feb. 26, 2025), https://www.washingtonpost.com/technology/interactive/2025/elon-musk-business-government-contracts-funding/.

Trump cannot claim governmental authority for immunity while denying the state action implications of exercising that authority. Using governmental authority to commit federal bribery falls outside official duties and gives rise to personal liability. *Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 417 (5th Cir. 2015)

**PAC Structure as Consciousness of Guilt**: The PAC routing does not insulate Trump from liability -- it demonstrates consciousness of guilt. Legitimate campaign support does not generate 2,226% ROI in government contracts within months. Legitimate political activity does not require surveillance of critics' privileged communications and staged deceptions to conceal the relationship. These are personal crimes Trump committed while serving as president: bribery (accepting payment for contracts), conspiracy (surveilling privileged communications), obstruction (staging fake feud), and conspiracy against rights (coordinating censorship). Delivering contracts in exchange for payment is federal crime, not "official policy-making" entitled to immunity.

### 5. Trump v. United States Does Not Immunize Bribery

Trump will likely cite *Trump v. United States*, 144 S. Ct. 2312 (2024), arguing that immunity applies to "official acts" regardless of motive. But that case does not immunize bribery. *Trump v. United States* addressed whether corrupt motive transforms official acts into unofficial conduct. The Court held it does not -- immunity turns on the nature of the act, not the motive. *Id.* at 2333. But bribery is not an "official act with corrupt motive." Bribery is a distinct crime consisting of the exchange itself. The crime is not "awarding a contract with bad motive." The crime is "accepting payment in exchange for awarding a contract." The elements of bribery under 18 U.S.C. § 201 are: 1. Public official 2. Corruptly demands, seeks, receives, accepts, or agrees to receive or accept 3. Anything of value 4. In return for being influenced in the performance of any official act The crime is the quid pro quo -- the exchange. Plaintiff does not allege Trump "awarded contracts with corrupt motive." Plaintiff

alleges Trump "accepted $288 million in exchange for awarding contracts" -- the exchange itself is the crime. *Trump v. United States* does not hold that the exchange of payment for official acts is immune. If it did, federal bribery law would be unenforceable against sitting presidents.[5] The Court's holding that "motive doesn't matter" cannot mean "bribery is immune if it involves official acts" -- that would nullify 18 U.S.C. § 201 as applied to presidents. The distinction: - Official act + corrupt motive = still official (*Trump v. United States*) - Payment + official act in exchange = bribery (not official at all) Plaintiff alleges the latter.

### 6. The Financial Relationship Demonstrates Personal Motivation

The quid pro quo arrangement detailed above demonstrates personal motivation, not official policy. A President who delivers $400 million in contracts to his largest donor in exchange for platform censorship of critics serves corrupt personal interests, not the United States. Am. Compl. ¶ 5.

### 7. The June 2-5 Timeline Demonstrates Personal Coordination

The temporal correlation detailed in the Introduction -- private email specifying June 5, followed by staged "feud" on that exact date -- demonstrates personal coordination to obstruct justice, not official policy. Am. Compl. ¶¶ 151-154.

### 8. Discovery Is Necessary

Even accepting Trump's characterization arguendo, dismissal would be premature. Trump's motion relies entirely on labeling corrupt conduct as "official." At the pleading stage, the Court must accept Plaintiff's allegations that the conduct was personal conspiracy -- the quid pro quo, surveillance,

---

[5] Section 201 applies to all federal officials—from Cabinet secretaries to members of Congress to federal judges. Presidential immunity cannot exempt the President from criminal bribery law that applies universally to every other federal official. Otherwise, the President would be above the law that governs all other federal actors.

staged deception, and coordinated censorship detailed above. Trump cannot defeat a complaint by recharacterizing alleged bribery and obstruction as presidential decision-making. Discovery is necessary to establish the full extent of the conspiracy.

**Conclusion on Immunity**: Absolute immunity does not bar claims for personal conspiracy to suppress religious speech. Discovery is necessary to determine the true nature of Trump's conduct.

**9. Plaintiff States a Claim for Bribery Under 18 U.S.C. § 201** 18 U.S.C. § 201(b)(2) makes it a crime for a public official to "corruptly demand[], seek[], receive[], accept[], or agree[] to receive or accept anything of value personally or for any other person or entity, in return for... being influenced in the performance of any official act." Plaintiff alleges:

- Trump accepted $288 million (via PACs) = 'anything of value'

- From Musk = during campaign and presidency

- In return for awarding government contracts and restructuring federal programs = 'official act'

- Creating **2,226% ROI** (**$6.7+ billion**) within months = demonstrates the exchange

- The magnitude of return ($6.4 billion profit on $288 million investment) makes corrupt intent evident

These allegations state a claim for bribery. The PAC structure is irrelevant -- § 201(b)(2) covers value received "personally or for any other person or entity." Campaign contributions that benefit a candidate's election constitute "value" under the statute. While Plaintiff cannot criminally prosecute Trump, Plaintiff can pursue civil remedies for constitutional violations that occurred as part of the bribery scheme -- specifically, suppression of religious speech exposing the corrupt arrangement.

The underlying bribery demonstrates the conduct was personal crime, not official act entitled to immunity.

---

### D. Plaintiff Has Standing to Challenge Trump's Coordinated Conduct

#### 1. Standing Requirements

To establish standing, Plaintiff must show: (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Trump argues Plaintiff lacks standing because his injury is not traceable to Trump's conduct and cannot be redressed by judicial relief. MTD at 15-22. Both arguments fail.

#### 2. Plaintiff's Injury Is Traceable to Trump's Coordination

##### a. Systematic Suppression of Religious Expression

Plaintiff has suffered concrete injury: 98% reduction in content visibility, deletion of 61,600+ posts, removal of 5,974 media files, and systematic throttling of his biblical ministry despite 3,400+ followers. Am. Compl. ¶¶ 82-86, 184.

##### b. Specific Evidence of Trump's Causation

Unlike *Murthy v. Missouri*, 603 U.S. 43 (2024), Plaintiff provides specific evidence of coordination: - Quid pro quo: $288 million payment generating 2,226% return in government contracts - Temporal correlation: June 2-5 timeline demonstrating surveillance or coordination - Systematic targeting: Suppression intensifying when Plaintiff's speech exposed the arrangement - Governmental endorsement: Trump's Religious Liberty Commission featuring Catholic leaders while Plaintiff's biblical critique faces suppression Am. Compl. ¶¶ 5, 39, 82-86, 93-94, 151-154, 196. This is not

*Murthy*'s "attenuated chain of possibilities." This is documented financial quid pro quo creating motive, temporal correlation demonstrating coordination, and systematic suppression of speech exposing the arrangement.

The PAC Structure Does Not Break Causation: Trump may argue the PAC structure breaks the causal chain -- that he didn't "receive" the money so there's no direct benefit to him. This argument fails. Campaign contributions to PACs supporting a candidate financially benefit that candidate by funding their election. The $288 million to pro-Trump PACs directly benefited Trump's campaign. Within montha of Trump taking office, Trump delivered massive amounts in contracts to the contributor. The causal chain is direct: Musk pays → Trump benefits → Trump wins → Trump delivers contracts. The PAC intermediary is legally irrelevant to causation. The quid pro quo is: - Musk's payment helped elect Trump (cause) - Trump's contract awards benefited Musk (effect).[6] That the payment was routed through PACs rather than paid directly to Trump does not eliminate the causal relationship between the payment and the governmental benefit. If it did, all bribery could be laundered through PACs.

c. *Murthy* Is Distinguishable

Trump extensively cites *Murthy v. Missouri*, arguing Plaintiff's causation theory fails. MTD at 18-19. But Murthy is readily distinguishable:

---

[6] The Trump Administration's selective enforcement further shows coordination with X Corp. FCC Chairman Brendan Carr sent letters to Apple, Google, Meta, and Microsoft CEOs warning their content moderation would be "reviewed" for restricting "First Amendment rights"—while notably excluding Musk's X from these warnings. Am. Compl. ¶ 13. This proves government pressure applied to platforms that don't coordinate with administration preferences while X receives preferential treatment.

**Murthy**: Plaintiffs alleged generalized government "pressure" on platforms to moderate certain content, without evidence of specific coordination regarding plaintiffs' specific content. 603 U.S. at 59-60.

**Here**: Plaintiff alleges -- and provides evidence of -- specific coordination:

- Mathematical improbability (June 2-5 timeline)

- Direct financial relationship ($288 million)

- Systematic pattern targeting Plaintiff specifically

- Government endorsement of the exact religious viewpoint X amplifies while suppressing Plaintiff

Murthy held that to establish causation, the plaintiff must show a predictable chain of events leading from the government action to the asserted injury. 603 U.S. at 59

The causal chain is direct: Musk pays $288 million → Trump delivers **$6.7+ billion in contracts and program restructuring** generating 2,226% return → Plaintiff's speech exposes the arrangement → suppression intensifies → legal action threatened → surveillance and staged obstruction follow. Am. Compl. ¶¶ 5, 151-157, 191.

This is not speculation. This is a documented pattern supported by specific evidence.

The distinction is fundamental: *Murthy* involved government persuasion ("jawboning") without consideration. Here, Plaintiff alleges bribery with documented quid pro quo -- $288 million payment generating **2,226% return ($6.7+ billion)** within months. The financial exchange transforms causation from speculative (did persuasion work?) to direct (payment created mutual interest in suppressing exposure of a **$6.4 billion corrupt profit**). That financial exchange transforms

causation from speculative (did persuasion work?) to direct (payment created mutual interest in suppressing exposure of the arrangement).

### d. Trump's "Pre-Existing Suppression" Argument Fails

Trump argues suppression began before he took office (July 2022), so he cannot be the cause. MTD at 16-17. This argument fails for several reasons: First, the Complaint alleges Trump and Musk coordinated before Trump took office. Suppression began when Plaintiff exposed Musk's Vatican coordination -- the July 2, 2022 Musk-Pope meeting. Am. Compl. ¶ 38. Trump's $288 million payment during the 2024 campaign and subsequent $400 million quid pro quo transformed private censorship into state action conspiracy. What began as Musk's private Vatican coordination became government action when Trump:

(1) accepted $288 million from Musk,

(2) delivered $400 million in contracts within weeks of taking office,

(3) gave Musk governmental authority (DOGE), which according to Trump, continued even after the official title expired,[7] and

(4) coordinated suppression of speech that exposed the arrangement.

Pre-existing private conduct became conspiracy when Trump used governmental power to consummate the quid pro quo. Second, suppression intensified after Trump took office and gave Musk governmental authority.

---

[7] See Drugs, marital advice and that black eye: key takeaways from Trump's Oval Office send-off for Elon Musk, The Guardian (May 30, 2025), https://www.theguardian.com/us-news/2025/may/30/key-takeaways-musk-trump send-off. (Trump stating "Elon's not really leaving" and DOGE is "his baby"); Am. Compl. *Eg* ¶117.

The pattern of escalation following legal demands (March 2025, April 2025, June 2025) occurred entirely during Trump's presidency. Am. Compl. ¶¶ 155-157, 191.

Third, causation does not require that Trump be the sole cause -- only that he be a substantial contributing cause. Trump argues Musk had independent motives (personal animosity, petty feuds) to suppress Plaintiff. MTD at 17-18. But Musk's independent motives do not negate Trump's conspiracy participation. If two people rob a bank, one cannot escape liability by arguing "He would have robbed it even if I didn't help him."

The June 2-5 timeline shows Trump's active coordination, not passive acquiescence to Musk's independent decisions. Trump's participation in the conspiracy is established regardless of Musk's other motives.

Fourth, Trump argues multiple platforms suppressed Plaintiff independent of Trump's involvement. MTD at 16-17. This supports Plaintiff's theory. This coordination operates through permanent infrastructure: over three dozen former Tesla engineers embedded in federal agencies under Thomas Shedd's leadership continue implementing Musk's AI-First strategy across government operations. Am. Compl. ¶¶ 12, 125, 128 (and ECF Doc. 58).

Major platforms formally submitted to Vatican guidance through agreements like the Rome Call for AI Ethics. Am. Compl. ¶¶ 63-64. Both Trump and Musk participate in this Vatican-tech structure.

The $288 million quid pro quo exists within this framework -- Trump's governmental authority combined with Musk's platform control to suppress religious speech exposing both the financial arrangement and Vatican coordination. That other platforms also suppress Vatican criticism demonstrates the conspiracy's breadth, not Trump's lack of involvement.

**3. Plaintiff's Injury Is Redressable**

**a. Damages Against Trump Individually**

Plaintiff seeks damages in Trump's individual capacity. Am. Compl., Prayer for Relief ¶ D. Individual capacity damages are clearly redressable through monetary judgment.

Trump argues injunctive relief is unavailable in individual capacity suits. MTD at 20-22. Plaintiff does not dispute this as to Trump specifically. However, injunctive relief against X Corp. remains available and would redress Plaintiff's injury.

**b. Injunctive Relief Against X Corp.**

The primary injunctive relief sought targets X Corp., not Trump. Am. Compl., Prayer for Relief ¶ A. Relief requiring X Corp. to:

- Remove algorithmic suppression

- Restore deleted content

- Provide transparent moderation

...would directly redress Plaintiff's injury regardless of Trump's involvement.

**c. Declaratory Relief**

Declaratory judgment that Trump-Musk coordination violates constitutional rights would provide concrete relief by:

- Establishing legal framework for future claims

- Creating precedent preventing similar coordination

- Vindicating constitutional rights through judicial declaration

See *Steffel v. Thompson*, 415 U.S. 452, 471-72 (1974) (declaratory relief redresses injury even without injunction).

**Conclusion on Standing**: Plaintiff has standing based on specific evidence of coordination, documented financial relationships, and concrete patterns of systematic suppression. Discovery will reveal the full extent of Trump's role.

---

### E. Plaintiff's Allegations Are Plausible and Supported by Specific Evidence

### 1. The Plausibility Standard

Trump dismisses Plaintiff's allegations as "implausible," "fanciful," and "bizarre conspiracy theories." MTD at 22-25. This rhetoric cannot substitute for legal analysis.

Under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." "Plausible" does not mean "probable" or "likely" -- it means "more than merely possible." Iqbal, 556 U.S. at 678.

At the motion to dismiss stage, courts must accept all well-pled facts as true and draw all reasonable inferences in favor of the plaintiff. Plaintiff has provided specific factual allegations supported by documentary evidence: a $288 million payment generating 2,226% return in government contracts within one month, temporal correlation between privileged communications and staged public conduct, and systematic suppression patterns documented with numerical precision. These are not conspiracy theories -- these are documented facts requiring discovery.

### 2. The June 2-5 Timeline Is Documented

Trump dismisses the timeline as "far-fetched." MTD at 23. But the evidence is specific: private email (Exhibit A) specifying June 5, followed by staged "feud" on that exact date. Combined with documented government access to Gmail and Plaintiff's 25-year opposition to government-Vatican coordination, the inference of surveillance or coordination is plausible. Am. Compl. ¶¶ 151-154, Exhibit A.

### 3. The Quid Pro Quo Creates Motive

The $288 million payment generating **2,226% return ($6.7+ billion in contracts and program access) within months** is documented fact creating overwhelming motive. A **$6.4 billion profit** on a $288 million investment, consummated through presidential authority to award contracts and restructure federal programs, exceeds any legitimate political relationship. Courts routinely find conspiracy plausible when financial relationships create motive. Twombly, 550 U.S. at 565-66.

### 4. The Payment Structure Demonstrates Conspiracy

Trump will argue the $288 million was a legal campaign contribution. But as detailed in Section C.4 above, the 2,226% ROI in government contracts within months, combined with the PAC routing, surveillance of privileged communications, and staged deception on the exact date specified in surveilled email, exceeds Iqbal/Twombly's plausibility threshold for quid pro quo conspiracy. No legitimate campaign contribution generates a **$6.4 billion return** within months of inauguration.

### 5. Systematic Pattern Is Detailed and Specific

Plaintiff alleges systematic suppression with specific facts:

- 98% reduction in engagement (¶ 82)

- 61,600+ posts deleted (¶ 83)

- 5,974 media files removed (¶ 16, 191, 205)

- Zero impressions on 14-year-old posts despite 3,400 followers (¶ 82)

- Escalation following legal demands with specific dates (¶¶ 155-157, 191)

- The prior background of significant Vatican influence in big tech when Plaintiff's bible work has always had a main emphasis on teaching about the unbibilical and corrupt practices of that same entity

These are not "conclusory allegations" -- they are specific factual assertions that, taken as true, state plausible claims.

## 6. Vatican Coordination Is Documented

Trump mocks "Vatican coordination" allegations as implausible. MTD at 23. But Plaintiff documents:

- **Rome Call for AI Ethics**: Formal agreement where Microsoft, IBM, Cisco submitted to Vatican guidance (¶¶ 63-64)

- **Google-Vatican Partnership**: Exclusive YouTube partnership, only religion in Google's history (¶¶ 46-47)

- **Eric Schmidt Promise**: "We will make it happen" regarding suppression of Vatican-critical content[8] (¶ 47)

- **Government Commission**: Trump's commission features Catholic leaders while Plaintiff's biblical critique of the Vatican faces suppression (¶¶ 93-94, 196)

_____

Am. Compl. ¶¶ 46-47, 60-68, 93-94, 196. These are documented facts, not fantasy.

## 7. Trump's Cases Are Inapposite

Trump cites cases dismissing complaints alleging "bizarre conspiracy theories" and "government surveillance." MTD at 23, citing *Walsh v. Hagee*, 900 F. Supp. 2d 51, 58 (D.D.C. 2012); *Smith v. Osborne*, No. 4:18-cv-906-ALM-CAN, 2019 WL 4383337, at *3 (E.D. Tex. Aug. 18, 2019).

These cases are distinguishable. Walsh involved unspecified allegations of "government surveillance and harassment" without any supporting facts. 900 F. Supp. 2d at 58. Smith involved allegations of "government manipulations of their will or mind" -- vague claims of mental control without evidentiary support. 2019 WL 4383337, at *2.

Here, Plaintiff alleges concrete financial relationships, documented coordination, and systematic suppression with specific evidence: **$288 million payment generating $6.7+ billion in government contracts within months** (2,226% return), June 2-5 temporal correlation between privileged email and staged conduct, and numerical documentation of suppression (98% reduction, 61,600+ posts deleted, 5,974 media files removed). Plaintiff's 25+ years of biblical and historical scholarship provides the analytical framework for identifying institutional coordination patterns documented in publicly available records and formal agreements.

## 8. Discovery Will Reveal Full Coordination

Even if the Court finds some allegations require additional support, dismissal would be premature. Discovery is necessary to:

- Obtain internal communications between Trump and Musk

- Establish mechanism of June 2 email surveillance

- Document financial arrangements beyond the $288 million

- Reveal full extent of coordination

Plaintiff has provided sufficient allegations to warrant discovery. The Court should deny the motion and allow the case to proceed.

**Conclusion on Plausibility**: Plaintiff's allegations are specific, documented, and plausible. They exceed the Iqbal/Twombly standard and warrant discovery.

---

## III. CONCLUSION

This case presents straightforward applications of well-established constitutional principles to documented facts:

1. **Service**: Rule 4(i)(3) does not apply to personal conspiracies. Personal corruption is not a "duty performed on the United States' behalf." Individual service was proper.

2. **Immunity**: Absolute immunity does not protect personal conspiracies to suppress religious speech. Discovery is necessary to determine whether alleged acts were official or personal.

3. **Standing**: Plaintiff has standing based on specific evidence: June 2-5 timeline, $288 million contribution, systematic suppression patterns. Murthy is distinguishable.

4. **Plausibility**: Allegations are specific and documented, exceeding Iqbal/Twombly requirements. Discovery will reveal full coordination.

The Court should DENY Trump's motion to dismiss and allow this case to proceed to discovery.

Dated: November 5, 2025

Respectfully submitted,

Lisa Weingarten Richards, Esq.

VSB #96671,

NY BAR #4932570

LWR Law Offices

3060 Williams Dr, Ste 300 #510

Fairfax, VA 22031

Tel.: (202) 981-2059

lwr@lwrlawoffices.com

Counsel for Plaintiff

---

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2025, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Lisa Weingarten Richards

Lisa Weingarten Richards